**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **BISON BUILDING** | § | **CASE NO. 09-34452** |
| **HOLDINGS, INC.,** *et al.*, | § | |
| | § | |
| Debtors. | § | **(Chapter 11 – Jointly Administered)** |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE USE OF CASH COLLATERAL AND**
**APPROVING POST-PETITION SECURED FINANCING,**
**(II) GRANTING ADEQUATE PROTECTION,**
**(III) GRANTING LIENS, AND (IV) SCHEDULING  A FINAL HEARING**

Bison Building Holdings, Inc., Bison Building Materials, LLC, Bison Building GP, Inc.,

HLBM Company, Milltech, Inc., Bison Building Materials Nevada, LLC, Bison Multi-Family

Sales, LLC and Bison Construction Services, LLC (collectively, the "Debtors") seek interim and

final orders (i) authorizing the Debtors to use cash collateral and approving post-petition secured

financing; (ii) granting adequate protection; (iii) granting liens; and (iv) scheduling final hearings

with respect to the relief requested herein.

## Summary of the Motion

1.      The Debtors seek immediate authority to use cash collateral and to borrow funds

pursuant to a proposed DIP credit facility on an interim basis.  The Debtors also request a

hearing for final approval of the proposed DIP credit facility and use of cash collateral.

## Emergency Consideration

2.      The Debtors request emergency consideration of this motion.  The relief requested

is necessary to continue the operation of the Debtors businesses and maintain their value as a

going concern.  Without immediate funding, the Debtors will not be able to purchase inventory

and pay wages, salaries, rent and other operating expenses incurred in the ordinary course of

their businesses.  As such, the Debtors believe that emergency consideration is necessary.

**Jurisdiction and Venue**

3.      This Court has jurisdiction over these cases pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).  The requested relief is authorized under §§ 105, 361, 362, 363, 364, 506, 507, 1107(a) and 1108 of the Bankruptcy Code. Venue of the Debtors' chapter 11 cases is proper in this district pursuant to 28 U.S.C. §§ 1408(1) and (2).

**Background**

4.      On June 28, 2009, the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").[1]

5.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

6.      Prior to the Petition Date, Bison Building Materials, LLC was a party to an Amended and Restated Credit Agreement dated November 17, 2005 (the "Pre-Petition Credit Agreement") with Wachovia Bank, National Association ("Wachovia" or "Pre-Petition Agent), in its capacity as agent for itself and other lenders (the "Pre-Petition Lenders").

7.      The Pre-Petition Credit Agreement initially provided for a $70 million revolving credit facility (the "Revolver"), and a $4.44 million Term Loan ("Wachovia Term Loan"). Through a series of amendments, the maximum amount of the Revolver was reduced to $30 million in order to reduce ongoing unused commitment fees.  The Wachovia Term Loan was paid prior to the petition date.

8.      Bison Building Materials LLC is the borrower under the Pre-Petition Credit Agreement.  Each of the other Debtors is a guarantor.  The Pre-Petition Credit Agreement is secured by substantially all of the Debtors' assets other than certain tracts of real property.

---

[1]   For a detailed description of the Debtors' businesses and the events leading up to these cases, see the Declaration of Pat W. Bierschwale filed on June 28, 2009.

Funds are advanced under the Revolver based upon availability under a borrowing base that is comprised of (i) 85% of eligible accounts less certain potential adjustments, *plus* (ii) the lesser of (a) $30 million and (b) the lesser of (1) the lesser of (x) 60% of eligible lumber inventory plus (y) 50% of Borrower's eligible other inventories or (2) 85% of the NOLV (as defined in the Pre-Petition Credit Agreement) of eligible inventory.   All obligations under the Revolver bear interest at either LIBOR or the base rate plus a margin.   The LIBOR margin fluctuates between 2.50% and 3.25% based upon the amount of the Debtors' excess availability at the time of determination and the base rate margin is 1.25%.   As of June 25, 2009, the principal amount outstanding under the Revolver was approximately $14,567,947.

### **Relief Requested**

9.      The Debtors seek immediate authority to use cash collateral and borrow pursuant to the proposed DIP Credit Facility in accordance with the Interim Budget[2], a copy of which is attached as **Exhibit 1**.   The Debtors also request a hearing for final approval of the DIP Credit Facility and use of cash collateral.

**Cash Collateral**

10.      To the extent applicable, the Debtors will use cash collateral on an interim basis in accordance with the Interim Budget.[3]   The Debtors propose to adequately protect the Pre-Petition Lenders' interest in cash collateral in several manners.

11.      First, the Debtors believe that the value of all Pre-Petition Collateral exceeds the amount of the indebtedness owed to the Pre-Petition Lenders.   The existing equity cushion will protect the Pre-Petition Lenders against any degradation in their security position during the

---

[2] The Debtors are continuing to finalize their proposed final Budget and Final Order.   In accordance with the Complex Case Procedures, the Debtors will file and serve their proposed final Budget and the Final Order no later then three (3) business days prior to the final hearing scheduled by this Court.

[3] Under the DIP Credit Facility, collections of pre-petition collateral proceeds are applied against the Revolver and re-advanced under the DIP Credit Facility.

interim period.  Second, the Debtors will make interest payments to the Pre-Petition Lenders in the amounts and at the times set forth in the Interim Budget. Third, the Debtors will grant the Pre-Petition Lenders replacement liens upon: (a) all assets in which the Pre-Petition Lenders held a validly perfected lien as of the Petition Date; (b) all property acquired by the Debtors after the Petition Date that is of the exact nature, kind or character of the Pre-Petition Collateral; (c) all of the Debtors' assets on which the Pre-Petition Lenders did not hold a validly perfected lien as of the Petition Date; and (d) all cash and receivables that are the proceeds, product, offspring or profits of the Pre-Petition Collateral.  The replacement liens will adequately protect the Pre-Petition Lenders for the use of cash collateral.

12.     Finally, and solely to the extent the adequate protection provided by the adequate protection liens and the periodic cash payments are insufficient to protect against any diminution in value, the Debtors propose to grant the Pre-Petition Lenders superpriority administrative expense claims, subject to the Carve-Out, in the amount of such insufficiency as provided in by Sections 503(b) and 507(b) of the Bankruptcy Code (the "Superpriority Claims"); provided, however, the Superiority Claims will not attach to proceeds or recoveries from chapter 5 causes of action.

**The DIP Credit Facility**

13.     The Debtors have been unable to obtain post-petition financing on an unsecured basis or on a junior priority basis to the Pre-Petition Lenders.  The Debtors have also evaluated the possibility of replacing the Revolver.  After much negotiation, the Debtors have reached an agreement with the Pre-Petition Lenders to provide post-petition financing (the "DIP Credit Agreement").  A copy of the proposed agreement is attached as **Exhibit 2**.  The Debtors negotiated the DIP Credit Agreement at arm's-length and have determined that it is the best

proposal under the circumstances.  The principal terms of the DIP Credit Agreement are as follows:[4]

| | |
|---|---|
| **Administrative Agent:** | Wachovia, as agent for the lenders under the DIP Credit Agreement. |
| **DIP Lenders:** | Wachovia and any other lenders parties to the DIP Credit Agreement. |
| **Borrower:** | Bison Materials LLC |
| **Guarantors:** | Each of the Debtors other than Borrower. |
| **DIP Facility:** | The DIP Facility will consist of a senior revolving credit facility with a maximum commitment of $25 million (the "***Maximum Credit***"). |
| **Maturity Date:** | All obligations under the DIP Facility accrue or otherwise come due and payable in full on the earliest to occur of (i) 180 days after the Petition Date, (ii) confirmation of a plan of reorganization in the Chapter 11 Cases, (iii) conversion or dismissal of the Chapter 11 Cases; (iv) appointment of a trustee (or examiner with expanded powers equivalent to those of a trustee) in the Chapter 11 Cases; or (v) an event of default or as otherwise set forth in the DIP Financing Agreements. |
| **Use of Proceeds:** | The DIP Facility shall be used in accordance with the Approved Budget solely (a) to finance the purchase of inventory, in the ordinary course of business, (b) to pay salaries, rents and other expenses, in the ordinary course of business, (c) to pay interest, fees and expenses under the DIP Financing Agreements, (d) for general corporate purposes, in each case to the extent expressly permitted under Applicable Law, the DIP Financing Agreements and the DIP Orders and (e) to pay fees and expenses incurred by the DIP Agent and the DIP Lenders incurred in connection with the Debtors' bankruptcy cases. |
| | No part of the proceeds of the DIP Facility can be used to challenge the validity, perfection, priority, extent or enforceability of the DIP Credit Facility, the DIP Financing Agreements, the Pre-Petition Credit Agreement, any indebtedness, security interest or other loan document in favor of Wachovia in connection with the Pre-Petition Credit Agreement (any such indebtedness or other obligations of Debtors to Wachovia incurred or arising prior to the Petition Date, the "***Pre-Petition Debt***"), the liens securing the DIP Credit Facility or any claim against the DIP Agent or the DIP Lenders under the DIP Credit Facility or any Pre-Petition Debt. |

---

[4] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement or the Interim Order, as the case may be.  The description of the material terms of the DIP Credit Agreement set forth herein are for summary purposes only and the terms of the DIP Credit Agreement shall control in all circumstances.

| | |
|---|---|
| **Budget:** | The Debtors' expenditures shall not exceed amounts set forth in the Approved Budget by more than 15% (tested on a weekly basis for the immediately preceding rolling four-week period) for any of the line items "sales," "expenses," "collections," "inventory purchases," "loan balance" and "availability."  By way of example, this 15% per line item variance shall function as follows: revenue and collections line items may not fall below 85% of projections and costs or expenses line items may not exceed 115% of projections. |
| **Interest Rates:** | Loans under the DIP Credit Facility will bear interest at a rate per annum equal to the Adjusted Eurodollar Rate, determined on a monthly basis, plus 5.0% per annum.  After an Event of Default under the DIP Financing Agreements, the applicable rate of interest shall be increased by 2.0% per annum.  "***Adjusted Eurodollar Rate***" means the rate of interest (rounded upwards, if necessary, to the nearest $1/100^{th}$ of 1%) for one month U.S. Dollar deposits as reported on Reuters Screen LIBOR01(or any successor page) as of 11:00 a.m., London time, on such day, or if such day is not a London business day, then the immediately preceding London business day as determined by Agent (or if not so reported, then as determined by Agent from another recognized source of interbank quotation).  All interest will be computed on basis of actual days elapsed over a 360 day year, payable monthly. |
| **Fees:** | The Debtors shall pay the DIP Agent, for the account of DIP Lenders, a closing fee for the DIP Credit Facility in an amount equal to $250,000, which fee is fully earned as of the closing date of the DIP Credit Facility and payable as follows:  (i) the first $125,000 shall be paid at closing of the DIP Credit Facility; (ii) the next $63,000 shall be paid on the thirtieth $(30^{th})$ day following the closing date of the DIP Credit Facility; and (iii) the remaining $62,000 shall be paid on the sixtieth $(60^{th})$ day following the closing date of the DIP Credit Facility.  Such Closing Fee is fully prepaid and non-refundable in the event that the DIP Agent chooses not to approve an exit credit facility.  In the event the DIP Agent chooses to offer an exit credit facility to the Debtors or to any successor, no additional closing fee shall be charged with respect to such exit facility, it being understood that the closing fee described above is intended to compensate the DIP Agent and the DIP Lenders for the DIP Credit Facility and any such exit facility that the DIP Agent chooses to offer.

Debtors shall pay to DIP Agent, for the account of DIP Lenders, monthly an unused line fee at a rate equal to 0.75% (on a per annum basis) calculated upon the amount by which the Maximum Credit exceeds the average daily principal balance of the outstanding Revolving Loans and LC's during the immediately preceding month (or part thereof) while the DIP Financing Agreements are in effect and for so long thereafter as any Obligations are outstanding. Such fee shall be |

payable on the first day of each month in arrears and shall be calculated based on a three hundred sixty (360) day year and actual days elapsed

Debtors shall pay to Agent, for the benefit of the LC Issuer, a letter of credit fee at a rate, on any date of determination, equal to one and one-half percent (1.5%) per annum times the amount of the applicable Letter of Credit. Debtors shall additionally pay to the LC Issuer all additional bank charges and fees for letters of credit charged by the LC Issuer.

**Security:** The DIP Agent, on behalf of the DIP Lenders, shall be granted the following liens and claims (the "***Post-Petition Collateral***"): a perfected first priority lien, subject only to the Carve-Out, in all unencumbered Post-Petition Collateral pursuant to 11 U.S.C. §364(c)(2); a perfected junior lien in all Post-Petition Collateral subject to a valid and unavoidable encumbrance in existence as of the Petition Date that are subsequently perfected pursuant to 11 U.S.C. §546(b). The obligations secured will include hedging and other bank product obligations. Debtors shall further grant Agent, on behalf of the DIP Lenders, a super-priority administrative expense claim pursuant to 11 U.S.C. §364(c)(1), subject only to the Carve-Out.

**Expenses:** Debtors will, from and after closing, and upon DIP Agent's demand, pay all of the reasonable out-of-pocket expenses and customary administrative charges incurred by DIP Agent, including, without limitation, appraisal fees, legal costs and expenses, filing and search charges, recording taxes and field examination charges and expenses (including a charge at the then standard rate of DIP Agent per person per day for the examiners of DIP Agent in the field and in the office, which is currently $1,000/day, plus travel, hotel and all other out-of-pocket expenses), and consultant fees incurred in the structuring, negotiation, arrangement, syndication, restructuring, administration or amending of the DIP Credit Facility. Such amounts may, at DIP Agent's option, be charged to the loan account of Debtors maintained by DIP Agent.

**Excess Availability:** On the date of the initial borrowing of DIP Revolving Loans, the excess availability, after giving effect to such borrowing and any outstanding LC's, shall equal or exceed $1,500,000. For purposes of this Term Sheet, the term "excess availability" means the lesser of the Borrowing Base or the Maximum Credit (after taking into account applicable reserves), <u>minus</u> fees and expenses that, at the time of determination, are payable pursuant to the DIP Financing Agreements.

**Events of Default:** Customary for facilities of this nature and other events of default as may be deemed appropriate by DIP Agent. Defaults, will include, but not be limited to: breaches of affirmative and negative covenants (subject to customary grace periods); the falsity or material inaccuracy of any representations or warranties in the DIP Financing Agreements; the appointment of a trustee or examiner with expanded powers equivalent

to those of a trustee; dismissal or conversion to Chapter 7 of the Chapter 11 Case; confirmation of any plan of reorganization in the Chapter 11 Case which does not provide for the payment in full, in cash, of the DIP Credit Facility and all obligations thereunder immediately upon the effective date of any such plan, together with all pre-petition debt owed to the DIP Agent and the DIP Lenders, which shall not exceed eleven days after entry of a confirmation order; amendment or stay of any financing order or reversal, modification, or vacation of any financing order, whether on appeal or otherwise; the filing of any motion or other request with the Bankruptcy Court seeking authority to use any cash proceeds of any of the collateral or to use Cash Collateral as defined in the Bankruptcy Code without DIP Agent's consent or Debtors' obtaining any other financing under any section of the Bankruptcy Code with respect to any of the collateral secured by a lien which is, equal or senior to any lien held by or granted to DIP Agent, unless the proceeds of any such financing are to be immediately applied upon closing to pay the DIP Credit Facility and the obligations thereunder in full in cash; the challenge by Debtors, any committee or any other party in interest or creditor of the validity, extent, perfection, enforceability or priority of any liens of DIP Agent or as to the obligations under the DIP Credit Facility or any Pre-Petition Debt or to assert any claims or causes of action against DIP Agent; the grant of a lien on or other interest in Debtors' property (other than those specifically allowed under the loan agreement) or an administrative expense claim (other than any such administrative expense claim permitted by a financing order or by the loan agreement) that is superior to or ranks in parity with DIP Agent's security interest in or lien upon the Collateral or administrative expense priority; Debtors' cessation of all or any material part of its remaining business operations (with certain exceptions); or any event of non-compliance with the terms of the Interim or Final DIP Order.

Upon any Event of Default, the DIP Lenders shall have the right to seek an emergency hearing upon a motion for relief from the automatic stay to allow the DIP Lenders to exercise their state law remedies under the DIP Credit Facility documents and against their respective collateral. The DIP Lenders shall give 5 business days' written notice to the Debtors, any duly appointed unsecured creditors' committee and the U.S. Trustee of such motion for relief from stay and the Bankruptcy Court will agree to hear such motion immediately after the expiration of such notice period.  The Debtors shall not object to or otherwise resist the hearing of any motion for relief from stay filed according to this provision and upon the DIP Lenders compliance with such notice requirements.

**Covenants:**                    Usual and customary affirmative and negative covenants for asset based facilities of this type.

**Representations/**        Usual and customary for a facility of this type.
**Warranties:**

14.    The Debtors believe that the terms and conditions of the DIP Credit Agreement are fair and reasonable under the circumstances.  The Debtors request that the DIP Lenders be afforded the benefits of § 364(e) of the Bankruptcy Code with respect to the DIP Credit Agreement

15.    The Debtors require the financing to continue the operation of their businesses and maintain their value as a going concern.  Without funding, the Debtors will not be able to purchase inventory and pay wages, salaries, rent and other operating expenses incurred in the ordinary course of their businesses.  The Debtors' request for interim authorization seeks to use only that amount of cash collateral and loans under the DIP Credit  Facility as is necessary to avoid immediate and irreparable harm to the value of their assets in accordance with Rules 4001(b)(2) and 6003 of the Bankruptcy Rules and the provisions of the Complex Case Procedures.

16.    The Interim Budget itemizes the sources and uses of cash and provides a projection of cash receipts and expenditures. The Interim Budget includes a list of business expenses that are reasonable and necessary and that must be paid in order to continue the Debtors' business operations until such time as a final hearing on this motion can be held.  The Debtors request that any amounts listed in the Interim Budget that are unused in any week be carried over on a line-item basis and used by the Debtors in any subsequent week and that the Debtors be permitted to vary their results by line item by not more than 15% during any week.  By way of example, the 15% per line item variance shall function as follows:  "revenue and collections" line items may not fall below 85% of projections and "costs or expenses" line items

may not exceed 115% of projections.  The line items referred to above shall be:  sales, expenses, collections, inventory purchases, loan balance and excess availability.

### Notice Procedures and Scheduling Final Hearing

17.   The Debtors request that the Court schedule a final hearing on the use of cash collateral and the post-petition financing.  The Interim Order will be mailed to (a) all parties that were mailed a copy of this motion; (b) any party which files a request for notices prior to the mailing date; (c) counsel for any committee that is formed prior to the mailing date, (d) the Office of the U.S. Trustee; (e) the Internal Revenue Service; (f) counsel to Wachovia; and (g) all creditors with secured claims exceeding $1,000,000.  The notice will reflect that the Debtors will seek approval at the Final Hearing of a waiver of rights under section 506(c) of the Bankruptcy Code.

Accordingly, the Debtors request that the Court grant both interim and final relief as set forth above as well as such other just relief.

**Dated: June 28, 2009.**

/s/ Joshua W. Wolfshohl
David R. Jones
State Bar No. 00786001/S.D.Tex. No. 16082
Joshua W. Wolfshohl
State Bar No. 24038592
1000 Main, 36th Floor
Houston, Texas 77002
(713) 226-6000
(713) 226-6248 (Facsimile)
**Counsel for the Debtors**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument will be duly served by United States first class mail to all creditors and parties-in-interest on June 29, 2009.

/s/ Joshua W. Wolfshohl
Joshua W. Wolfshohl

**<u>EXHIBIT 1</u>**

**Bison Building Materials, LLC**
D I P Budget
($000s)

| | Week | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| For week ending on Friday | 7/3/09 | 7/10/09 | 7/17/09 | 7/24/09 | 7/31/09 |
| **Sales** | $ 2,000 | $ 2,510 | $ 2,510 | $ 2,510 | $ 3,011 |
| **Cash Receipts:** | | | | | |
| Trade Receipts | 1,800 | 1,800 | 2,000 | 2,000 | 2,100 |
| Sales Tax | 141 | 144 | 149 | 150 | 179 |
| Cash Sales | 283 | 355 | 355 | 355 | 425 |
| Rebates | | | | | |
| Misc | | | | | |
| Sale of Assets | - | - | - | - | - |
| **Total operating receipts** | 2,223 | 2,298 | 2,504 | 2,505 | 2,704 |
| **Cash Disbursements:** | | | | | |
| *Operating* | | | | | |
| Inventory and Material Purchases | 1,500 | 1,600 | 1,800 | 1,800 | 1,850 |
| Labor Costs | 464 | 353 | 697 | 353 | 633 |
| Real Estate Leases | 107 | - | - | - | - |
| Equipment Leases | 57 | 13 | 17 | 18 | - |
| Sales & Use Tax | - | - | - | 655 | - |
| Insurance | - | - | 53 | - | 42 |
| Operating Expenses | 166 | 166 | 166 | 166 | 166 |
| Property and Other Taxes | - | - | - | - | - |
| Professional Fees | - | - | - | - | - |
| Capital Expenditures | - | - | - | - | - |
| Other | 10 | 10 | 10 | 10 | 10 |
| Total Other Operating Expenses | 804 | 542 | 942 | 1,202 | 851 |
| Total operating disbursements | 2,304 | 2,142 | 2,742 | 3,002 | 2,701 |
| Operating Cash Flow | (81) | 156 | (239) | (497) | 3 |
| Cumulative Operating Cash Flow | (81) | 75 | (164) | (661) | (658) |
| *Debt costs* | | | | | |
| Wachovia interest rate swap | 35 | - | - | - | - |
| Interest - Wachovia Revolver | 49 | - | - | - | - |
| Interest-Trade Creditor Term Loans | | | | | 15 |
| Interest-Restructured Equip Lease Term Loan | | | | | |
| Legal - Bank Related | - | - | - | - | - |
| Non-Wachovia Debt & Captial lease payments | 225 | 35 | 31 | - | 26 |
| Other Bank Charges | - | 25 | 9 | - | - |
| Total debt costs | 309 | 60 | 39 | - | 41 |
| *Restructuring costs* | | | | | |
| Severance/wind-down costs | - | - | - | - | - |
| Bank fees | 139 | - | - | - | 62 |
| Legal/advisor fees/retainers | - | - | - | - | 132 |
| US Trustee Fee | - | - | 1 | - | - |
| Other-Utility Deposits | 49 | - | - | - | - |
| Total restructuring costs | 188 | - | 1 | - | 194 |
| Total Other Operating Disbs, Debt Costs & Rest Costs | 1,301 | 602 | 982 | 1,202 | 1,086 |
| **Total disbursements** | 2,801 | 2,202 | 2,782 | 3,002 | 2,936 |
| **Net cash flow** | (578) | 96 | (279) | (497) | (232) |
| Cumulative net cash flow | (578) | (482) | (760) | (1,258) | (1,490) |
| Revolver Balance - book | 15,578 | 15,982 | 16,260 | 16,758 | 16,990 |
| Letter of Credit | 500 | - | - | - | - |
| Revolver Balance - bank | 16,078 | 15,982 | 16,260 | 16,758 | 16,990 |
| A/R availability | 10,925 | 11,070 | 11,228 | 11,390 | 11,835 |
| Inventory availability | 6,394 | 6,550 | 6,664 | 6,778 | 6,871 |
| Total availability adjustments | (633) | (611) | (611) | (611) | (611) |
| Total availability | 16,686 | 17,009 | 17,281 | 17,557 | 18,095 |
| Temporary increase in availability | - | - | - | - | - |
| Long-term increase in availability | - | - | - | - | - |
| Availability / (Over-advance) - book | $ 608 | $ 1,027 | $ 1,021 | $ 800 | $ 1,105 |

**Working Capital Rollforwards:**

| *Accounts Receivable* | | | | | |
|---|---|---|---|---|---|
| Beginning A/R | $ 16,600 | $ 16,546 | $ 16,937 | $ 17,128 | $ 17,320 |
| Sales on account | 1,746 | 2,191 | 2,191 | 2,191 | 2,628 |
| Paydown on A/R | 1,800 | 1,800 | 2,000 | 2,000 | 2,100 |
| Applied A/R adjustment | | | | | |
| Ending A/R | 16,546 | 16,937 | 17,128 | 17,320 | 17,848 |
| Ineligible A/R | 3,693 | 3,914 | 3,919 | 3,919 | 3,924 |
| Net A/R | 12,853 | 13,023 | 13,210 | 13,401 | 13,924 |
| Advance rate | 85.00% | 85.00% | 85.00% | 85.00% | 85.00% |
| Borrowing base A/R | 10,925 | 11,070 | 11,228 | 11,390 | 11,835 |
| Ineligible A/R % | 22.32% | 23.11% | 22.88% | 22.63% | 21.99% |

| *Inventory* | | | | | |
|---|---|---|---|---|---|
| Beginning inventory | 16,054 | 16,534 | 16,914 | 17,191 | 17,467 |
| Inventory receipts | 1,980 | 1,980 | 2,076 | 2,076 | 2,076 |
| Cost of sales | 1,500 | 1,600 | 1,800 | 1,800 | 1,850 |
| Ending inventory | 16,534 | 16,914 | 17,191 | 17,467 | 17,693 |
| Ineligible inventory | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Net inventory | 15,534 | 15,914 | 16,191 | 16,467 | 16,693 |
| Advance rate | 41.2% | 41.2% | 41.2% | 41.2% | 41.2% |
| Borrowing base inventory | 6,394 | 6,550 | 6,664 | 6,778 | 6,871 |
| Ineligible inventory % | 6.0% | 5.9% | 5.8% | 5.7% | 5.7% |

*Availability Reserves*

| | | | | | |
|---|---|---|---|---|---|
| Carve Out | 132 | 132 | 132 | 132 | 132 |
| Swap settlement | 501 | 479 | 479 | 479 | 479 |
| Total availability adjustments | 633 | 611 | 611 | 611 | 611 |

**EXHIBIT 2**

## RATIFICATION AND AMENDMENT AGREEMENT

THIS RATIFICATION AND AMENDMENT AGREEMENT (this "<u>Ratification Agreement</u>" or "<u>Agreement</u>"), dated as of [_____], 2009, is by and among WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association, individually ("<u>Wachovia</u>"), as letter of credit issuer (in such capacity, the "<u>LC Issuer</u>") and as agent (in such capacity, "<u>Agent</u>"), the lenders party to the Credit Agreement defined below (collectively, the "<u>Lenders</u>" and each a "<u>Lender</u>"; the Agent, the LC Issuer and the Lenders are collectively referred to herein as the "<u>Lender Parties</u>" and each a "<u>Lender Party</u>"), BISON BUILDING MATERIALS LLC, a Texas limited liability company, as debtor and debtor-in-possession ("<u>Debtor</u>" or "<u>Borrower</u>") and the persons party hereto as "<u>Guarantors</u>", as debtors and debtors-in-possession (collectively, the "<u>Guarantors</u>" and each a "<u>Guarantor</u>").

### W I T N E S S E T H:

WHEREAS, Debtor and Guarantors have commenced a joint case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division and Debtor and Guarantors have retained possession of their assets and are authorized under the Bankruptcy Code to continue the management and operation of their business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, before the commencement of the Chapter 11 Case (as hereinafter defined), Lenders made loans and advances to Debtor secured by the assets and properties of Debtor and Guarantors and guaranteed by the Guarantors as set forth in the Existing Financing Agreements (as hereinafter defined); and

WHEREAS, Debtor has applied to Agent and Lenders for a post-petition revolving credit facility; and

WHEREAS, the Bankruptcy Court (as hereinafter defined) has entered a Financing Order (as hereinafter defined) pursuant to which Lenders may make post-petition loans and advances to Debtor on the terms therein set forth; and

WHEREAS, the Financing Order provides that as a condition to the making of such post-petition loans and advances and extending such other financial accommodations Debtor and Guarantors shall execute and deliver this Ratification Agreement; and

WHEREAS, each of Debtor and each Guarantor desires to reaffirm its obligations pursuant to the Existing Financing Agreements, ratify the Existing Financing Agreements and acknowledge its continuing liabilities to Agent and Lenders thereunder as set forth herein in order to induce Lenders to make such post-petition loans and advances to Debtor; and

WHEREAS, Debtor has also requested that Agent and Lenders agree to amend the Credit Agreement (as hereinafter defined) as provided in this Ratification Agreement and Agent and Lenders are willing to do so, subject to the terms and conditions contained herein;

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, LC Issuer, Lenders, Debtor and Guarantors mutually covenant, warrant and agree as follows:

1.    DEFINITIONS

        1.1    Additional Definitions. As used herein, the following terms shall have the respective meanings given to them below and the Credit Agreement shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

        (a)    "Bank Product Provider" shall mean any Lender or any Affiliate of a Lender or other financial institution approved by Agent that provides any Bank Products to the Credit Parties.

        (b)    "Bank Products" shall mean any one or more of the following types of services or facilities provided to a Credit Party or any Subsidiary thereof by a Bank Product Provider: (a) credit cards or stored value cards (including credit cards or stored value cards issued to employees of a Credit Party or Subsidiary thereof), (b) cash management or related services, including, without limitation (i) the automated clearinghouse transfer of funds for the account of a Credit Party or Subsidiary thereof pursuant to agreement or overdraft for any accounts of a Credit Party or Subsidiary thereof maintained at Agent or any other Bank Product Provider that are subject to the control of Agent (whether by operation of law or pursuant to a control agreement to which Agent is a party), as applicable and (ii) controlled disbursement services and (c) Hedge Agreements, if and to the extent permitted under the Financing Agreements.

        (c)    "Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

        (d)    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of Texas, Houston Division or the United States District Court for the Southern District of Texas or any other court having jurisdiction over the Chapter 11 Case from time to time.

        (e)    "Budget" shall mean any set of projections approved by the Agent showing all projected cash receipts and all projected cash disbursements (with detail as to sources of cash receipts and identification of cash disbursements) for the Debtor and Guarantors delivered to Agent pursuant to Section 5.4 of this Agreement or Section 6.2(i) of the Credit Agreement. The initial Budget shall be substantially in the form of Exhibit "A" hereto and made a part hereof and all Budgets thereafter shall be in form and detail acceptable to Agent showing all facets of the Debtors and Guarantors' operations (with inclusion of the following line items: sales, expenses, collections, inventory purchases, loan balance and excess availability).

        (f)    "Budget Variance" shall mean, for any rolling four week period, (i) with respect to any expense or disbursement line item set forth in the Budget or with respect to the aggregate amounts set forth for expenses or disbursements, a variance of more than or equal to one hundred

and fifteen percent (115%) of any such amount during such period and (ii) with respect to any revenue or collection line item set forth in the Budget or with respect to the aggregate amounts set forth for revenue or collection, a variance of less than or equal to eighty-five percent (85%) of any such amount during such period.

(g)     "Carve-Out" shall have the meaning assigned to it in the Financing Order.

(h)     "Carve-Out Amount" shall mean a carve-out for: (a) the payment of allowed professional fees and disbursements incurred by bankruptcy counsel retained, pursuant to 11 U.S.C. §§ 327 or 1103(a), by the Debtors in an amount not to exceed $50,000 (the "Post-Default Carve-Out Amount") on account of such professional fees and disbursements incurred following the "Default Point" (as defined below), and the aggregate amount (the "Pre-Default Carve-Out Amount") of all accrued, invoiced or paid professional fees and disbursements for the time period from the Petition Date until the Default Point up to the amount set forth in the Budget during the time period from the Petition Date until the Default Point (provided nothing herein shall be construed to (i) provide for double payment of any fees or disbursements; (ii) alter the procedures for the approval of professional compensation as set forth under the Bankruptcy Code and Rules and the rules of the Bankruptcy Court; or (ii) alter the ability of any party to object to such fees and disbursements); and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; provided, however, the Carve-Out Amount shall not include professional fees and disbursements above $25,000 incurred in connection with investigating and/or any professional fees and disbursements litigating any claims or causes of action against Lender and/or any defense to the Pre-Petition Debt or any lien of Lender.  Until the Default Point, the Debtors shall be permitted to pay compensation and reimbursement of expenses in accordance with the Budget, allowed and payable under 11 U.S.C. §§ 330 and 331 and/or all other orders of the Bankruptcy Court, as the same may be payable, and the amounts so paid shall be free and clear of the DIP Liens and the Super-Priority Claims.  As used herein, "Default Point" means that date when both (x) an Event of Default shall have occurred and (y) Lender has ceased making advances to the Debtors under the DIP Loan Documents.  The Lender shall be entitled to reserve for such amounts.

(i)     "Chapter 11 Case" shall mean the Chapter 11 Cases of Debtor and Guarantors, Chapter 11 Case No's. [_____] through [_____], which are being administered under the Bankruptcy Code, and are pending in the Bankruptcy Court.

(j)     "Collateral" shall mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.  Collateral shall not in any event include claims and causes of action of any Credit Party arising under §§ 544, 545, 547, 548 or 549 of the Bankruptcy Code.

(k)     "Collection Account" shall mean account #2000018530395 of Debtor maintained with and controlled by Agent.

(l)     "Credit Agreement" shall mean the Amended and Restated Credit Agreement, dated November 17, 2005, between Agent, Lender and Bison Building Materials LLC (as successor by Merger with Bison Building Materials, Ltd.), as Borrower, as amended by First Amendment to Amended and Restated Credit Agreement dated as of January 18, 2006, Second Amendment to Amended and Restated Credit Agreement dated as of March 10, 2006, Third

Amendment to Amended and Restated Credit Agreement dated as of September 8, 2006, Fourth Amendment to Amended and Restated Credit Agreement dated as of July 30, 2007, Fifth Amendment to Amended and Restated Credit Agreement dated as of February 26, 2008, Sixth Amendment to Amended and Restated Credit Agreement and Limited Waiver dated as of July 29, 2008, Seventh Amendment to Amended and Restated Credit Agreement dated as of January 6, 2009, and Eighth Amendment to Amended and Restated Credit Agreement dated as of March 31, 2009, as the same now exists (including after amendment hereby) or may hereafter be amended, modified, supplemented , extended, renewed, restated or replaced.

(m)     "Credit Parties" shall mean, collectively, Debtor and each Guarantor.

(n)     "Debtor" shall mean Bison Building Materials LLC, a Texas limited liability company, as a debtor and debtor-in-possession, and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(o)     "Default Point" means that date when both (x) an Event of Default shall have occurred and shall be continuing and (y) Lenders shall have notified Borrower that, as a result of such Event of Default, Lenders will no longer make advances to the Borrower under the Credit Agreement, as amended hereby.

(p)     "Existing Events of Default" shall mean the Events of Default existing as of the Petition Date under the Existing Financing Agreements, as amended hereby, as specifically set forth in Schedule I attached hereto.

(q)     "Existing Financing Agreements" shall mean the Financing Agreements as in effect immediately before the Petition Date.

(r)     "Final Financing Order" shall mean the order entered by the Bankruptcy Court in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2), pursuant to Section 364(c) and (d) of the Bankruptcy Code, as to which no stay pending appeal has been entered, and no motion to reconsider filed, and which has not been vacated, modified or reversed, (i) authorizing the Borrower to incur post-petition secured indebtedness and authorizing the Credit Parties to grant Liens in accordance with this Agreement and the other Financing Agreements, (ii) providing for the super-priority of the Obligations, including without limitation, a specific grant of a security interest to Agent, for the benefit of Lender Parties, in all Collateral, as well as the right to the proceeds from all Collateral in accordance with this Agreement and the other Financing Agreements, (iii) providing "adequate protection" pursuant to Section 364(d) of the Bankruptcy Code to such creditors whose Liens have been primed, if any, and (iv) authorizing the payment by the Borrower of all fees and expenses contemplated by this Agreement and the other Financing Agreements, including, but not limited to, those certain fees set forth in Section 10 herein, each as set forth in such order, and in all respects to be satisfactory to Agent.

(s)     "Financing Agreements" shall mean, collectively, the Credit Agreement, the Security Documents, the Guarantees and the other Existing Financing Agreements and this

RATIFICATION AND AMENDMENT AGREEMENT - Page 4
DAL 77,552,678 .6

Agreement, together with all supplements, agreements, notes, documents, security agreements, pledge agreements, instruments and guarantees at any time executed and/or delivered in connection therewith or related thereto, as all of the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(t)     "Financing Order" shall mean, collectively, the Interim Financing Order, the Final Financing Order and such other orders relating thereto or authorizing the granting of credit by Lender Parties to Debtor on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

(u)     "Guarantees" shall mean the guarantees listed on Exhibit "B" attached hereto and made a part hereof, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(v)     "Guarantors" shall mean, collectively, Bison Building GP, Inc., Bison Building Holdings Inc., Milltech Inc., HLBM Company, Bison Building Materials Nevada, LLC, Bison Multi-Family Sales, LLC, and Bison Construction Services, LLC, each as a debtor and debtor-in-possession, and their successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as such Person's legal representative or with respect to the property of the estate of such Person whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and their successors upon conclusion of the Chapter 11 Case).

(w)     "Hedge Agreements" shall mean (a) any agreement providing for options, swaps, floors, caps, collars, forward sales or forward purchases involving interest rates, commodities or commodity prices, equities, currencies, bonds, or indexes based on any of the foregoing, including, without limitation, Swap Agreements, (b) any option, futures or forward contract traded on an exchange, and (c) any other derivative agreement or other similar agreement or arrangement.

(x)     "Interim Financing Order" shall mean the order entered by the Bankruptcy Court in the Chapter 11 Case pursuant to Section 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), as to which no stay pending appeal, has been entered, and which Interim Order has not been vacated, modified or reversed, (i) authorizing the Borrower to incur post-petition secured indebtedness and authorizing the Credit Parties to grant Liens in accordance with this Agreement and the other Financing Agreements, (ii) providing for the super-priority of the Obligations, including without limitation, a specific grant of a security interest to Agent, for the benefit of Lender Parties, in all Collateral, as well as the right to the proceeds from all Collateral in accordance with this Agreement and the other Financing Agreements, (iii) providing "adequate protection" pursuant to Section 364(d) of the Bankruptcy Code to such creditors whose Liens have been primed, and (iv) authorizing the payment by the Borrower of all fees and expenses contemplated by this Agreement and the other Financing Agreements, including, but not limited to, those certain fees set forth in Section 11 hereof, each on an interim basis and as set forth in such order, and in all respects to be satisfactory to Agent.

(y)     "Lockbox" shall mean Debtor's lockbox #951315 maintained with Agent.

(z)     "Petition Date" shall mean the date of the commencement of the Chapter 11 Case.

(aa)    "Post-Petition Borrowing Base" means an amount equal to (1) 85% of the Credit Parties Eligible Receivables, less adjustments to the extent required by Agent for the effect of non-cash credits against Accounts of the Credit Parties in excess of 5% of the aggregate amount of all Accounts, plus (2) the lesser of (a) 50% of the Credit Parties' Eligible Inventory and (b) up to 85% of the NOLV of the Credit Parties' Eligible Inventory, minus (3) Reserves established by Agent.

(bb)    "Post-Petition Closing Date" shall mean the date upon which all conditions precedent set forth in Section 9 of this Agreement have been satisfied.

(cc)    "Post-Petition Collateral" shall mean, collectively, all now existing or hereafter acquired personal property of Credit Parties' estates, wheresoever located, of any kind or nature, including fixtures, upon which Agent, for the benefit of Lender Parties, is granted a security interest or lien pursuant to the Financing Agreements or the Financing Order or any other order entered or issued by the Bankruptcy Court.   Post-Petition Collateral shall not in any event include claims and causes of action of any Credit Party arising under §§ 544, 545, 547, 548 or 549 of the Bankruptcy Code.

(dd)    "Post-Petition LC Obligations" shall mean, at any time of determination, the sum of all Post-Petition Matured LC Obligations plus the maximum amounts which LC Issuer might then or thereafter be called upon to advance under all Post-Petition Letters of Credit then outstanding.

(ee)    "Post-Petition Letter of Credit" means any post-petition letter of credit issued by LC Issuer pursuant to Section 7.5 of this Agreement at the application of Borrower.

(ff)    "Post-Petition Loan Limit" shall mean $25,000,000.

(gg)    "Post-Petition Matured LC Obligations" shall mean all amounts paid by LC issuer on drafts or demands for payment drawn or made under or purported to be under any Post-Petition Letter of Credit and all other amounts due and owing to LC Issuer under any LC Application for any Post-Petition Letter of Credit, to the extent the same have not been repaid to LC Issuer (with the proceeds of Post-Petition Revolving Loans or otherwise).

(hh)    "Post-Petition Obligations" shall mean (a) all Post-Petition Revolving Loans, Post-Petition LC Obligations and all other advances, debts, obligations, liabilities, indebtedness, covenants and duties of Credit Parties to Lender Parties of every kind and description, however evidenced, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not due, primary or secondary, liquidated or unliquidated, and (b) all obligations, liabilities and indebtedness of every kind, nature and description arising under or pursuant to any Bank Products, and, with respect to each of (a) and (b) of this definition, arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Case, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Case, and arising under or related to this Agreement, the other Financing Agreements, a Financing Order or by operation of law or otherwise and whether incurred by Credit Parties as principal, surety, endorser, guarantor or otherwise and including, without

limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, early termination fees, prepayment penalties, late payment fees, other fees, commissions, costs, expenses and attorneys, accountants and consultants fees and expenses incurred by Lender Parties in connection with any of the foregoing.

(ii)     "Post-Petition Revolving Loan Commitment" shall mean the lesser of (a) the Post-Petition Loan Limit and (b) the Post-Petition Borrowing Base.

(jj)     "Post-Petition Revolving Loan Default Interest Rate" shall mean the Post-Petition Revolving Loan Interest Rate plus two percent (2.0%) per annum.

(kk)     "Post-Petition Revolving Loan Interest Rate" shall mean the LIBOR Market Index Rate plus five percent (5.0%) per annum.

(ll)     "Post-Petition Revolving Loans" shall mean the loans made by Lenders to or for the benefit of Borrower on a revolving basis as set forth in Section 7 hereof.

(mm)     "Pre-Petition Collateral" shall mean all "Collateral" as such term is defined in the Credit Agreement and all other security for the Pre-Petition Obligations as provided in the Existing Financing Agreements immediately prior to the Petition Date.

(nn)     "Pre-Petition Obligations" shall mean all Loans, LC Obligations, and all other advances, debts, obligations, liabilities, indebtedness, covenants and duties of Credit Parties to Lender Parties of every kind and description, however evidenced, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not due, primary or secondary, liquidated or unliquidated, and all obligations, liabilities and indebtedness of every kind, nature and description owing by any or all of the Credit Parties to Agent or any Lender or any Affiliate of Agent or any Lender arising under or pursuant to any Swap Agreement, each arising before the Petition Date and arising under or related to the Existing Financing Agreements or by operation of law and whether incurred by Credit Parties as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, early termination fees, prepayment penalties, late payment fees, other fees, commissions, costs, expenses and attorneys, accountants and consultants fees and expenses incurred in connection with any of the foregoing.

(oo)     "Reserves" shall mean, on any date of determination, the sum of (a) a reserve or reserves in the full amount of the Carve-Out Amount on such date and (b) such other reserves against availability that Agent, in its reasonable credit judgment, establishes from time to time.

(pp)     "Security Documents" shall mean the documents and instruments listed on Exhibit "C" attached hereto and made a part hereof, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(qq)     "Termination Date" shall mean the earlier to occur of: (i) 180 days after the Petition Date; (ii) the date of termination of Lenders' obligation to make Post-Petition Revolving Loans and LC Issuer to issue Post-Petition Letters of Credit pursuant to Section 8.1 of the Credit Agreement; (iii) July 6, 2009, if the Interim Financing Order, in form and substance acceptable

to Agent, has not been entered by the Bankruptcy Court by such date; (iv) August 15, 2009, if the Final Financing Order, in form and substance acceptable to Agent, has not been entered by the Bankruptcy Court by such date; (v) the date on which the Interim Financing Order expires, unless the Final Financing Order shall have been entered and become effective by such date; (vi) the date of entry of an order of the Bankruptcy Court confirming a plan of reorganization in any Chapter 11 Case that has not been consented to by Agent and that fails to provide for the payment in full in cash of all Obligations (and termination of all related lending commitments) on the effective date of such plan; (vii) if a plan of reorganization that has been consented to by the Agent or that provides for payment in full in cash of all Obligations (and termination of all related lending commitments) has been confirmed by order of the Bankruptcy Court, the earlier of (1) the effective date of such plan of reorganization or (2) the thirtieth (30th) day after the date of entry of such confirmation order; (viii) conversion or dismissal of the Chapter 11 Case; or (ix) appointment of a trustee (or examiner with expanded powers equivalent to those of a trustee) in the Chapter 11 Case.

      1.2    <u>Amendments to Definitions in Financing Agreements.</u>

      (a)    All references to the term "Collateral" in the Credit Agreement or any other term referring to the security for the Pre-Petition Obligations therein shall be deemed and each such reference is hereby amended to include, without limitation, the Pre-Petition Collateral and the Post-Petition Collateral.  All references to the term "Collateral" of any Person in any Security Document or any other term referring to the security for the Pre-Petition Obligations therein shall be deemed and each such reference is hereby amended to include, without limitation, the Pre-Petition Collateral of such Person and the Post-Petition Collateral of such Person.

      (b)    All references to the term "Borrower" in any of the Existing Financing Agreements, shall be deemed and each such reference is hereby amended to mean and include Bison Building Materials LLC, a Texas limited liability company, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

      (c)    All references to the term "Guarantor" in the Bison GP Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the Bison GP Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include Bison Building GP, Inc., a Texas corporation, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

      (d)    All references to the term "Guarantor" in the Bison Holdings Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the Bison Holdings Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include Bison Building Holdings Inc., a Texas corporation, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any

trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(e)     All references to the term "Guarantor" in the Milltech Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the Milltech Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include Milltech Inc., a Colorado corporation, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(f)     All references to the term "Guarantor" in the HLBM Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the HLBM Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include HLBM Company, a Texas corporation, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(g)     All references to the term "Guarantor" in the Bison Nevada Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the Bison Nevada Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include Bison Building Materials Nevada, LLC, a Nevada limited liability company, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(h)     All references to the term "Guarantor" in the Bison Multi-Family Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the Bison Multi-Family Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include Bison Multi-Family Sales, LLC, a Texas limited liability company, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(i)     All references to the term "Guarantor" in the Bison Construction Services Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the Bison Construction Services Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include Bison Construction

Services, LLC, a Texas limited liability company, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(j)     All references to the term "Loan Document" in any of the Existing Financing Agreements, shall be deemed and each such reference is hereby amended to include, in addition and not in limitation, this Agreement, all of the Existing Financing Agreements as ratified, assumed and adopted by Credit Parties pursuant to the terms hereof, as amended and supplemented hereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(k)     All references to the term "Agreement" in the Credit Agreement and to the term "Credit Agreement" in any of the other Existing Financing Agreements and the Financing Agreements shall be deemed and each such reference is hereby amended to mean this Agreement, all of the Existing Financing Agreements as ratified, assumed and adopted by Debtor pursuant to the terms hereof, as amended and supplemented hereby and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(l)     All references to a "Guaranty" in the Existing Financing Agreements shall be deemed and each such reference is hereby amended to mean such Guaranty, as ratified, assumed and adopted by the applicable Guarantor pursuant to the terms hereof, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(m)     All references to a "Security Agreement" in the Existing Financing Agreements shall be deemed and each such reference is hereby amended to mean the Security Agreements, this Agreement, all of the Existing Financing Agreements as ratified, assumed and adopted by Credit Parties pursuant to the terms hereof, as amended and supplemented hereby and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(n)     All references to "Agreement" in any Security Document shall be deemed and each such reference is hereby amended to mean such Security Document and this Agreement, each as ratified, assumed and adopted by Credit Parties pursuant to the terms hereof, as amended and supplemented hereby and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(o)     All references to the term "Material Adverse Change", "material adverse effect" and "material adverse change" in this Agreement and in any of the Existing Financing Agreements shall be deemed and each reference in the Existing Financing Agreements is amended to add at the end of such term "; provided, that, the commencement of the Chapter 11 Case, and the events which lead to such filing, shall not constitute a material adverse effect or material adverse change."

(p)     All references to the term "LC Obligations" in this Agreement and in any of the Existing Financing Agreements shall be deemed and each such reference in the Existing Financing Agreements is hereby amended to include, without limitation, the Post-Petition LC Obligations.

(q)     All references to the term "Obligations" and "Secured Obligations" in this Agreement and in any of the Existing Financing Agreements shall be deemed and each such reference in the Existing Financing Agreements is hereby amended to include, without limitation, the Pre-Petition Obligations and the Post-Petition Obligations.

1.3     Interpretation.

(a)     For purposes of this Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used and/or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Credit Agreement.

(b)     All references to the terms "Agent", "LC Issuer", "Lender" or any other person pursuant to the definitions in the recitals hereto or otherwise shall include its or their respective successors and assigns.

(c)     All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular.

(d)     All terms not specifically defined herein which are defined in the UCC shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

2.     ACKNOWLEDGMENT

2.1     Pre-Petition Obligations. Debtor hereby acknowledges, confirms and agrees that Debtor is indebted to Lender Parties for the Pre-Petition Obligations, as of the close of business on the Petition Date, in an amount of not less than $15,368,504.64 in the aggregate, all of which Pre-Petition Obligations are unconditionally owing by Debtor, jointly and severally, individually and collectively, to Lender Parties, together with interest accrued and accruing thereon, in each case together with costs, expenses, fees (including attorneys' fees and legal expenses) and all other charges now or hereafter owed by Debtor to Lender Parties, all of which are unconditionally owing by Debtor to Lender Parties, without offset, recoupment, defense or counterclaim of any kind, nature and description whatsoever.

2.2     Acknowledgment of Security Interests and Liens.  Each Credit Party hereby acknowledges, confirms and agrees that Agent, for the benefit of Lender Parties, has and shall continue to have valid, enforceable and perfected first priority, subject only to the Carve-Out Amount and validly perfected Permitted Liens, and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted by such Credit Party to Agent, for the benefit of Lender Parties, pursuant to the Existing Financing Agreements as in effect immediately prior to the Petition Date to secure all of the Obligations, as well as valid and enforceable first priority and senior security interests in and liens upon (subject and subordinate only to the Carve-Out Amount and validly perfected Permitted Liens) all Post-Petition Collateral granted to Agent, for

the benefit of Lender Parties, under the Financing Order or hereunder or under any of the other Financing Agreements or otherwise granted to or held by Agent, for the benefit of Lender Parties.

2.3    Binding Effect of Documents.  Each Credit Party hereby acknowledges, confirms and agrees that: (a) each of the Existing Financing Agreements to which it is a party has been duly executed and delivered to Agent by such Credit Party and is in full force and effect as of the date hereof, (b) the agreements and obligations of such Credit Party contained in the Existing Financing Agreements constitute the legal, valid and binding obligations of such Credit Party enforceable against such Credit Party in accordance with their respective terms and no Credit Party has a valid defense, offset, recoupment claim or counterclaim to the enforcement of such obligations, and (c) Lender Parties are and shall be entitled to all of the rights, remedies and benefits provided for in the Financing Agreements and the Financing Order.

3.    ADOPTION AND RATIFICATION.  Each Credit Party hereby (a) ratifies, assumes, adopts and agrees to be bound by the Existing Financing Agreements, as modified by this Agreement, and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of the Existing Financing Agreements, as modified by this Agreement and the Financing Order. All of the Existing Financing Agreements are hereby incorporated herein by reference as amended herein, and hereby are and shall be deemed adopted and assumed in full by each Credit Party, as a debtor and debtor-in-possession, and considered as agreements between Credit Parties and Lender Parties.  Each Credit Party hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Existing Financing Agreements, as amended and supplemented pursuant hereto and the Financing Order, and each Credit Party agrees to be fully bound, as a debtor and debtor-in-possession, by the terms of the Financing Agreements as amended hereby to which such Credit Party is a party.

4.    GRANT OF SECURITY INTEREST

4.1    Grant of Security Interest.  As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), each Credit Party, as debtor and debtor-in-possession, hereby grants, pledges and assigns to Agent, for the benefit of Lender Parties, and also confirms, reaffirms and restates the prior grant to Agent, for the benefit of Lender Parties, of, continuing security interests in and liens upon, and rights of setoff and recoupment against, all of such Credit Party's Collateral.  Each Credit Party hereby confirms, reaffirms and restates the prior grant to Agent, for the benefit of Lender Parties, of, continuing security interests in and liens upon, and rights of setoff and recoupment against, all of such Credit Party's Collateral.

4.2    Liens Under Financing Orders.  The Liens and security interests granted to the Agent, for the benefit of Lender Parties, pursuant to the provisions of this Agreement and pursuant to any of the other Financing Agreements shall be all those Liens conferred upon Agent, for the benefit of Lender Parties, by the Bankruptcy Court pursuant to the terms of the Financing Orders.  Anything contained in this Agreement or any other Financing Agreements to the contrary notwithstanding, except for the sale of Inventory to buyers in the ordinary course of business and except as specifically permitted herein, no Credit Party has any authority, express or implied, to dispose of any item or portion of the Collateral without the consent of the Agent.

4.3    Priority of Liens; Further Assistance.

(a)    The Liens granted pursuant to the terms of this Agreement and the other Financing Agreements, and the Liens conferred upon Agent, for the benefit of Lender Parties, pursuant of the Financing Orders, shall constitute (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, a "super-priority" administrative expense claim, subject and subordinate only to the Carve-Out Amount, (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, a first-priority Lien, subject and subordinate only to the Carve-Out Amount, upon or security interest in all of the Post-Petition Collateral that is not otherwise encumbered by a validly perfected security interest or Lien in existence on the Petition Date that has not been primed, if any; and (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, a second priority Lien upon or security interest in all of the Post-Petition Collateral subject to a validly perfected and unavoidable security interest or Lien that has not been primed and which has not been subordinated to the Liens in favor of Agent, for the benefit of Lender Parties in their capacity as pre-petition lenders.

(b)    Agent's Liens on and in the Collateral of the Credit Parties and Agent's and Lenders' respective administrative claims under Section 364(c)(1) and 364(d) of the Bankruptcy Code afforded the Obligations shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code, subject and subordinate only to the Carve-Out Amount. Except for the Carve-Out Amount, no expenses, costs or charges in connection with the Bankruptcy Case shall be charged against the Collateral or any Lender Party under Section 506(c) of the Bankruptcy Code and each Credit Party hereby waives any rights it has to seek such charges under Section 506(c) of the Bankruptcy Code.

5.    REPRESENTATIONS, WARRANTIES AND COVENANTS.    The Credit Parties hereby ratify and confirm the representations and warranties contained in Sections 5.2, 5.3 (subject to entry of the Financing Orders), and 5.5 (subject to entry of the Financing Orders) of the Credit Agreement (but not any other representation therein or in any other Existing Financing Agreements). In addition, the Credit Parties, jointly and severally, hereby represent, warrant and covenant with, to and in favor of Lender Parties the following:

5.1    Use of Proceeds. The Debtor shall use the proceeds of all Post-Petition Revolving Loans for the purpose of funding post-petition cash expenditures expressly set forth in the Budget. No portion of any administrative expense claim or other claim relating to the Chapter 11 Case shall be paid with the proceeds of such Post-Petition Revolving Loans provided by Lenders to Debtor, other than those administrative expense claims and other claims relating to the Chapter 11 Case (i) directly attributable to the operation of the business of Debtor and as specifically identified in the Budget, or (ii) as otherwise authorized by the Bankruptcy Court and expressly authorized by Agent in writing. No proceeds of any Post-Petition Revolving Loans or Post-Petition Letter of Credit may be utilized by the Debtor or any other Credit Party to finance in any way any professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against any Lender Party or its counsel or advisors (including advisors to their counsel) under this Agreement, the Credit Agreement, the Financing Agreements or the Existing Financing Agreements and/or challenging or raising any defenses to the obligations or Liens under this Agreement, the Credit Agreement, the Financing Agreements or the Existing Financing Agreements; provided, however, that proceeds of Post-

RATIFICATION AND AMENDMENT AGREEMENT - Page 13
DAL 77,552,678 .6

Petition Revolving Loans in an amount up to $25,000 may be used by counsel to the Official Creditors' Committee, if any, to investigate (but not prosecute) any such claims, causes of action or defenses.

     5.2   <u>Cash Management System; Collection of Receivables and other Collateral</u>.

     (a)   Each Credit Party shall, and shall cause its Subsidiaries to, maintain cash management arrangements consistent with those in effect immediately prior to the Petition Date. Without limiting the foregoing, all proceeds of Collateral shall be deposited into the Lockbox and/or Collection Account and immediately applied against the Obligations in accordance with this <u>Section 5.3</u>. Credit Parties hereby agree to enter into one or more lockbox and/or blocked account or deposit account control agreements with Agent in order to further evidence the Agent's control of amounts held in the Lockbox and the Collection Account, as may be required by Agent in its discretion. Additionally, Credit Parties shall not and shall not cause or permit their Subsidiaries to (i) deposit any Collateral or proceeds of Collateral into any bank account other than the Lockbox or the Collection Account or (ii) establish any new bank accounts without prior written notice to Agent and unless the bank at which the applicable account is to be held enters into a tri-party control agreement, in form and substance reasonably satisfactory to Agent, regarding such bank account pursuant to which such bank (1) acknowledges the security interest of Agent in such bank account, (2) agrees to comply with instructions originated by Agent directing disposition of the funds in the bank account without further consent from such Credit Party or Subsidiary and (3) agrees to subordinate and limit any security interest the bank may have in the bank account.

     (b)   All payments made to the Lockbox, funds received in the Collection Account or other funds received and collected by Agent, whether in respect of Eligible Receivables, as proceeds of Collateral or otherwise, shall be treated, unless otherwise specified by or prohibited by the Financing Orders, (i) to the extent such property is Pre-Petition Collateral or the proceeds of Pre-Petition Collateral, first as payments on the Pre-Petition Obligations, and then as payments to Agent, for the benefit of Lender Parties, in respect of the Obligations and therefore shall constitute the property of Lender Parties to the extent of the then outstanding Obligations, and (ii) to the extent such property is Post-Petition Collateral, first as payments to Agent, for the benefit of Lender Parties, in respect of the Post-Petition Obligations and therefore shall constitute the property of Lender Parties to the extent of the then outstanding Post-Petition Obligations.

     5.3   <u>Budget.</u>

     (a)   The Budget has been thoroughly reviewed by Credit Parties and their management and sets forth projected cash disbursements for the period covered thereby, of Credit Parties.

     (b)   Each Credit Party acknowledges that it shall constitute a material deviation from the Budget and an additional Event of Default under the Credit Agreement if a Budget Variance occurs, as calculated on the second business day of each week based on the rolling four week period ending on the Friday of the immediately preceding week.

(c)     By no later than 11:00 a.m., Prevailing Central Time, on the second business day of each week, the Borrower shall deliver to Agent a schedule of receipts and disbursements received and paid, respectively, during the previous week and other information with respect to compliance with the Budget as requested by the Agent and/or Majority Lenders.

5.4     Sales or other Disposition of Assets. Notwithstanding anything to the contrary contained in Section 7.4 of the Credit Agreement or any other provision in the Credit Agreement or any of the other Financing Agreements, no Credit Party shall sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of Agent and an order of the Bankruptcy Court (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent, or any other Lender Party), except for sales of Credit Parties' Inventory in the ordinary course of its business.

5.5     ERISA.  Credit Parties hereby represent and warrant with, to and in favor of Lender Parties that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of Credit Parties arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "PBGC") or the controlling sponsor of, or a member of the controlled group of, any pension benefit plan of a Credit Party and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of Debtor or any other Credit Party.

5.6     Environmental.  Each Credit Party hereby represents and warrants with, to and in favor of Lender Parties that, to the best of its knowledge, (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of such Credit Party arising under any Environmental Law, whether held by the Texas Department of Environmental Protection or any other Person, and (b) no notice of lien has been filed by the Texas Department of Environmental Protection (or any other Person) pursuant to any Environmental Law against any assets or properties of any Credit Party.

5.7     Inventory.  Each Credit Party hereby represents and warrants with, to and in favor of Lender Parties as to the accuracy, in all material respects, of post-petition written information, furnished to the Agent in connection with Inventory counts, if any.

5.8     Administrative Claims.  Credit Parties shall pay all Professional Fees and Administrative Claims (as such terms are defined in the Financing Order) and other Administrative Claims as provided in the Budget or as otherwise approved by Agent and the Bankruptcy Court within the respective due dates, to the extent it has funds available to do so.

5.9     Compliance with Laws.  Each Credit Party hereby represents and warrants with, to and in favor of Lender Parties that it is in compliance with all applicable Laws except where failure to do so would not reasonably be expected to have a Material Adverse Effect.

5.10    Existing Events of Default.  Credit Parties hereby represent and warrant with, to and in favor of Lender Parties that Schedule I sets forth a complete and accurate description of the Existing Events of Default and further provides that it is not in default in the payment of any amounts at any time due on any material indebtedness owed by Credit Parties or in the performance of any other material terms or covenants of any evidence of such indebtedness or of

any mortgage, security agreement, indenture, pledge or other agreement relating thereto or securing such indebtedness except as set forth on Schedule I hereto.

6.    REAFFIRMATION OF GUARANTEES.  Each Guarantor hereby (i) consents to this Agreement, (ii) reaffirms all of its payment and performance obligations under, and all other terms and conditions of, its Guaranty and (iii) acknowledges and agrees that its Guaranty remains in full force and effect and is hereby reaffirmed, ratified and confirmed.  Each Guarantor hereby agrees that all references to the "Credit Agreement" and the "Loan Documents" in its Guaranty shall be a reference to the Credit Agreement and Loan Documents, as applicable, as modified by this Agreement, and as the same may from time to time hereafter be amended, modified or restated.  The terms of this Section 6 shall constitute part of each Guaranty and each Guaranty shall be deemed to be hereby amended and modified to include the terms hereof.  Each Guarantor hereby further agrees and acknowledges that (i) neither the execution and delivery of this Agreement by the undersigned, nor Lender Parties' request therefore, shall constitute a course of dealing between Lender Parties and such Guarantor requiring a reaffirmation of guaranty with respect to any other modifications to any Financing Agreement or this Agreement as a condition to the enforceability of its Guaranty, (ii) nothing herein or in this Agreement shall constitute a waiver by any Lender Party of any violation by such Guarantor (whether or not known to the Lender Parties) of such Guarantor's obligations under its Guaranty or any previous reaffirmation agreement with respect thereto, or any right or remedy of Lender Parties with respect thereto, all of which rights and remedies are hereby expressly reserved and (iii) no delay or inaction on the part of any Lender Party to enforce any of its rights or remedies under its Guaranty shall constitute a waiver of, or otherwise diminish or modify, such rights or remedies.

7.    WAIVER OF EXISTING EVENTS OF DEFAULT.  Agent and each other Lender Party each hereby waives the Existing Events of Default during the term of this Agreement, it being understood that upon the occurrence and continuation of any additional or other Event of Default or the expiration or termination of this Agreement, Agent and the other Lender Parties shall have the right to exercise any and all of their rights and remedies with respect to the Existing Events of Default.  No existing defaults or Events of Default and no rights or remedies of Agent or the other Lender Parties have been or are being waived hereby and no changes or modifications to the Financing Agreements have been or are being made or are intended hereby, except for the waivers and amendments expressly set forth herein.  In addition, without limiting the foregoing, the waivers by Agent and the other Lender Parties set forth herein do not constitute an agreement to grant, and Credit Parties acknowledge that Agent and the other Lender Parties may decline to grant, any other or further waivers with respect to the subject matter hereof or any other matters regardless of whether or not there occurs any change in facts or circumstances relating to any Credit Party.

8.    AMENDMENTS

8.1    Post-Petition Revolving Loans

(a)    Upon the request of Borrower to the Agent, made at any time and from time to time prior to the Termination Date, subject to the terms and conditions contained herein, in the Credit Agreement and in the other Financing Agreements, each Lender shall make Post-Petition Revolving Loans to Borrower in amounts in excess of the amounts otherwise available to

Borrower under Section 2.1 of the Credit Agreement (as calculated by Agent, and subject to the sublimits and Reserves provided for in this Agreement) so long as (i) such Post-Petition Revolving Loans are in accordance with the Budget, and (ii) the aggregate amount of outstanding Post-Petition Revolving Loans and existing Post-Petition LC Obligations (after giving effect to any such borrowing request) does not exceed the Post-Petition Revolving Loan Commitment. Borrower may borrow, repay and re-borrow Post-Petition Revolving Loans under this Section 8.1 subject to the conditions set forth herein. All Post-Petition Revolving Loans shall be considered "Revolving Loans" under the Credit Agreement and shall be made in accordance with the terms of Section 2.1 of the Credit Agreement.

(b)     Except in Agent's and Lenders' discretion, Borrower shall not have any right to request, and Lenders shall not make, any Post-Petition Revolving Loans in excess of the amounts contained in the Budget up to the Post-Petition Revolving Loan Commitment or at any time after the occurrence and during the continuation of an Event of Default or after the Termination Date. The Post-Petition Revolving Loans shall be secured by all Collateral.

(c)     The Credit Agreement or the other Financing Agreements, all outstanding and unpaid Obligations arising pursuant to the Post-Petition Revolving Loans (including, but not limited to, principal, interest, fees, costs, expenses and other charges in respect thereof payable by Borrower to Lender Parties) shall automatically, without notice or demand, be absolutely and unconditionally due and payable and Borrower shall pay to Agent, for the benefit of Lender Parties, in cash or other immediately available funds all such Obligations on the Termination Date. All amounts received by Agent and Lenders in respect of the Obligations shall be applied as set forth in Section 3.1 of the Credit Agreement, as amended hereby.

8.2     Interest Rate. Interest shall accrue on the outstanding principal balance of all Post-Petition Revolving Loans made pursuant to this Section 8 at a variable rate, adjusted on the first day of each month, equal to the Post-Petition Revolving Loan Interest Rate and shall be due and payable monthly on the first business day of each calendar month beginning with the calendar month immediately succeeding the Post-Petition Closing Date.

8.3     Priority of All Advances and Loans. All Post-Petition Revolving Loans made hereunder by Lenders to Borrower shall constitute and be deemed a cost and expense of administration in the Bankruptcy Case and shall be entitled to priority under Section 364(c)(1), Section 364(c)(2), Section 364(c)(3), and Section 364(d) of the Bankruptcy Code ahead of all other costs and expenses of administration of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code, except as subject and subordinate to the Carve-Out Amount and as may be otherwise provided in the Financing Orders.

8.4     Definitions. The following definitions in Section 1.1 of the Credit Agreement are hereby amended in their entirety to read as follows:

"'Material Adverse Change' means a material and adverse change, other than the filing of the Chapter 11 Case, on (a) the business, assets, operations or financial or other condition of any Restricted Person, (b) Borrower's ability to timely pay the Obligations; or (c) the enforceability of the material terms of any Loan Documents."

"'Eligible Inventory' means, as of any date, collectively, Eligible Lumber Inventory and Eligible Other Inventory as of such date, the aggregate value of all inventory (excluding work in progress and packaging materials, supplies and any advertising costs capitalized into inventory) then owned by and in the possession or under the control of the Borrower or any Guarantor and held for sale or disposition in the ordinary course of its business, in which Agent for the benefit of Lenders has a perfected, first priority lien (subject only to the Carve-Out Amount), valued at the lower of cost or market value and which Agent has determined to be eligible for credit extensions hereunder. Eligible Inventory shall not include (a) inventory that has been shipped or delivered to a customer on consignment, on a sale or return basis or the basis of any similar understanding, (b) inventory with respect to which a claim exists disputing Borrower's or any Guarantor's title to or right to possession of such inventory, (c) inventory that is not in good and saleable condition or does not comply with any applicable laws, rules or regulations or the standards imposed by any governmental authority with respect to its transportation, storage, labeling, use or sale, (d) inventory that constitutes inventory-in-transit; provided that the aggregate value of inventory excluded from Eligible Inventory as a result of this subparagraph (d) shall not exceed $500,000, and (e) inventory that Agent, in its sole discretion, has determined to be unmarketable. 'Eligible Lumber Inventory' means all inventory described above which is comprised of materials that are of a type that historically have been characterized by the Borrower and Guarantors as "lumber inventory", and 'Eligible Other Inventory' means all other inventory of Borrower and the Guarantors."

"'Eligible Receivables' means, at any time, an amount equal to the aggregate net invoice or ledger amount owing on all trade accounts receivable of Borrower and each Guarantor for goods sold or leased or (as approved by Agent) services rendered in the ordinary course of business, in which Agent for the benefit of Lenders has a perfected, first priority lien (subject only to the Carve-Out Amount), after deducting (without duplication): (i) each such Account that is unpaid ninety (90) days or more after the past due date thereof, (ii) the amount of all discounts, allowances, rebates, credits and adjustments to such Accounts, (iii) the amount of all contra accounts, setoffs, defenses or counterclaims asserted by or available to the account debtors, (iv) all Accounts with respect to which goods are placed on consignment or subject to a guaranteed sale, bill and hold sale, sale-or-return, sale-on-approval or other similar terms by reason of which payment by the account debtor may be conditional or which is subject to repurchase, return, rejection, repossession, loss or damage, (v) the amount billed for or representing retainage, if any, until all prerequisites to the immediate payment of retainage have been satisfied, (vi) all Accounts owing by account debtors that are not solvent or for which there has been instituted a proceeding in bankruptcy or reorganization under the United States Bankruptcy Code or other law, whether state or federal, now or hereafter existing for relief of debtors, (vii) all Accounts owing by any affiliates or employees of Borrower or any Guarantor, (viii) all Accounts in which the account debtor is the United States or any department, agency or instrumentality of the United States, except to the extent an acknowledgement of assignment to Agent of such Account in compliance with the Federal Assignment of Claims Act and other applicable laws has been executed by Borrower or such Guarantor, as the case may be, in favor of Agent for the benefit of Lenders, (ix) all Accounts due Borrower or any Guarantor by any account debtor whose principal place of business is located outside the United States of America and its territories or any account debtor that is a Sanctioned Person (as defined in the current Loan Agreement), (x) all Accounts subject to any provision prohibiting assignment or requiring notice of or consent to such assignment, (xi) if more than twenty percent (20%) of the then

balance owing by any single account debtor does not qualify as an Eligible Receivable under any other provisions of this definition, pursuant to clause (i) above, then the aggregate amount of all Accounts owing by such account debtor shall be excluded from Eligible Receivables, (xii) Accounts as to which the goods giving rise to the Account have not been delivered to and accepted by the account debtor or the service giving rise to the Account has not been completely performed or which do not represent a final sale, (xiii) Accounts evidenced by a note or other instrument or chattel paper or reduced to judgment, (xiv) Accounts for which the total of all Accounts from an account debtor (together with the affiliates of the account debtor) exceed fifteen percent (15%) of the total Accounts of Borrower and the Guarantors (to the extent of such excess), (xv) Accounts which, by contract, subrogation, mechanics' lien laws or otherwise, are subject to claims by Borrower's or any Guarantor's creditors or other third parties or which are owed by account debtors as to whom any creditor of Borrower or any Guarantor (including any bonding company) has filed an affidavit of lien or has exercised retainage rights or has otherwise exercised its collateral rights, (xvi) any and all other Accounts the validity, collectability, or amount of which is determined in good faith by Borrower, any Guarantor or Agent to be doubtful, (xvii) Accounts owed by an account debtor to Borrower or any Guarantor which is located in a jurisdiction where Borrower or such Guarantor, as the case may be, is required to qualify to transact business or to file reports, unless Borrower or such Guarantor, as the case may be, has so qualified or filed, (xviii) Accounts owed by an account debtor who disputes the liability therefore (to the extent of such dispute), and (xix) any other Account which Agent otherwise in its sole and absolute discretion deems to be ineligible."

"'LIBOR Market Index Rate' means the rate of interest (rounded upwards, if necessary, to the nearest 1/100th of 1%) for one month U.S. Dollar deposits as reported on Reuters Screen LIBOR01 (or any successor page) as of 11:00 a.m., London time, on such day, or if such day is not a London business day, then the immediately preceding London business day as determined by Agent (or if not so reported, then as determined by Agent from another recognized source of interbank quotation)."

"'Eligible Transferee' means a Person which either (a) is a Lender or an Affiliate of a Lender, or (b) is consented to as an Eligible Transferee by Agent and, so long as no Default or Event of Default is continuing, by Borrower, which consents in each case will not be unreasonably withheld; provided, however, that in no event will a Person that is a "vulture fund" or is regularly a purchaser of "distressed debt" be deemed an Eligible Transferee under clause (b) hereof.

8.5     Letter of Credit Accommodations.  Subject to the terms and conditions hereof, Borrower may from time to time prior to the Termination Date request LC Issuer to issue one or more Post-Petition Letters of Credit, provided that, after taking such Post-Petition Letter of Credit into account:

(a)     The aggregate amount of outstanding Post-Petition Revolving Loans and existing Post-Petition LC Obligations at such time does not exceed the Post-Petition Revolving Loan Commitment at such time;

(b)     the aggregate amount of Post-Petition LC Obligations at such time does not exceed $2,000,000.00;

RATIFICATION AND AMENDMENT AGREEMENT - Page 19
DAL 77,552,678 .6

(c)     the expiration date of such Post-Petition Letter of Credit is prior to the Termination Date;

(d)     such Post-Petition Letter of Credit is to be used for general corporate purposes of Borrower;

(e)     such Post-Petition Letter of Credit is not directly or indirectly used to assure payment of or otherwise support any Indebtedness of any Person other than Indebtedness of any Restricted Person;

(f)     the issuance of such Post-Petition Letter of Credit will be in compliance with all applicable governmental restrictions, policies, and guidelines and will not subject LC Issuer to any cost which is not reimbursable under Article III of the Credit Agreement;

(g)     the form and terms of such Post-Petition Letter of Credit are acceptable to LC Issuer in its sole and absolute discretion; and

(h)     all other conditions in the Credit Agreement to the issuance of Letters of Credit have been satisfied.

LC Issuer will honor any such request if the foregoing conditions (a) through (h) (for all purposes herein and in the Credit Agreement called the "LC Conditions") have been met as of the date of issuance of such Post-Petition Letter of Credit.  LC Issuer may choose to honor any such request for any other Post-Petition Letter of Credit if the LC Conditions are not met but has no obligation to do so and may refuse to issue any other requested Post-Petition Letter of Credit for which the LC Conditions are not met.  Borrower shall request Post-Petition Letters of Credit in accordance with the provisions of Section 2.11 of the Credit Agreement.  All Post-Petition Letters of Credit shall be considered "Letters of Credit" under the Credit Agreement and shall be governed by the terms of Sections 2.11 through 2.15 of the Credit Agreement, as such sections are amended hereby.

8.6     <u>Post-Petition Fees</u>.  Section 2.6 of the Credit Agreement shall be amended by adding the following new subsection (e) at the end thereof:

> "(f) Post-Petition Revolving Loans Facility Fee.     The Borrower agrees to pay to Agent, for the account of each Lender, a facility fee equal to three-quarters of one percent (0.75%) per annum times the daily unused portion of such Lender's Post-Petition Revolving Loan Commitment from the Post-Petition Closing Date to and including the date on which all Post-Petition Revolving Loans and other Obligations are paid in full, payable on the first day of each calendar month, in arrears, and on the Termination Date."

8.7     <u>Payments</u>.  Section 3.1 of the Credit Agreement is hereby amended as follows:

(a)     by deleting subsections (a) through (d) and replacing them with new subsections (a) through (e), to read as follows:

"(a)      first, to pay any fees, indemnities or expense reimbursements then due to Agent, LC Issuer or Lenders from any Restricted Person;

(b)      second, to pay interest due in respect of any Loans or LC Obligations;

(c)      third, to pay principal due in respect of the Loans and to pay Obligations then due arising under or pursuant to any Hedge Agreements of any Restricted Person with a Bank Product Provider, on a pro rata basis;

(d)      fourth, to pay or prepay any other Obligations whether or not then due, in such order and manner as Agent determines and at any time an Event of Default exists or has occurred and is continuing, to provide cash collateral for any LC Obligations or other contingent Obligations (but not including for this purpose any Obligations arising under or pursuant to any Bank Products); and

(e)      fifth, to pay or prepay any Obligations arising under or pursuant to any Bank Products (other than to the extent provided for above) on a pro rata basis."

; and

(b)      by adding the following sentence at the end of Section 3.1:

"Without limiting the generality of the foregoing, Lenders shall apply any such payments and proceeds received from Pre-Petition Collateral first to the Pre-Petition Obligations until such Pre-Petition Obligations are paid and satisfied in full."

8.8      <u>Representations and Warranties</u>.   Sections 5.1, 5.4 and 5.6 through 5.18 are hereby deleted in their entirety and replaced with the following:

"[Reserved]."

8.9      <u>Reporting Requirements</u>.

Section 6.2 of the Credit Agreement is hereby amended by:

(a)      inserting the following language at the end of Section 6.2(a):

"provided, however, that Borrower shall not be required to obtain an audit opinion for the Fiscal Year ending April 30, 2009"

(b)      amending Section 6.2(c) to read as follows:

"(c)  upon each request for an advance and, in addition thereto, daily delivery, on or before 11:00 a.m., Prevailing Central Time, on each business day, of the Borrowing Base report and

Compliance Certificate, together with a daily summary of aging of Eligible Receivables as of the end of the immediately preceding business day and a daily report of inventory of Borrower and Guarantors, by category and location, each in form and substance reasonably acceptable to Agent."

and

(c)     deleting the "." at the end of Section 6.2(f) and replacing it with ";" and adding the following subsections 6.2(g) through (n) immediately following Section 6.2(f) as follows:

"(g)  No later than 11:00 a.m., Prevailing Central Time, on the second business day of each week, (1) a detailed aging of Eligible Accounts as of the last day of the preceding calendar week and (2) a reconciliation to the previous calendar week's aging of Eligible Accounts and to Borrower's general ledger;

(h)  No later than 11:00 a.m., Prevailing Central Time on the second business day of each week, a certified comparison of the corresponding figures for the corresponding periods in the most recent Budget and a report as to the actual performance of the prior week ending Friday and of the cumulative rolling four (4) week period ending on the Friday of the prior week, in form and substance reasonably satisfactory to Agent;

(i)  No later than 11:00 a.m., Prevailing Central Time, on the second business day of each week, an updated, "rolling" 13-week Budget (or, for the first four weeks following the Petition Date, an updated "rolling" 5-week Budget) which sets forth by line item updated projected receipts and disbursements for the Borrower and the other Restricted Persons during the period commencing from the end of the previous week through and including thirteen weeks (or 5 weeks, if applicable) thereafter; provided that the Borrower and Restricted Persons shall still be subject to and governed by the terms of the immediately preceding Budget approved by Agent and then in effect and the Agent, LC Issuer and Lenders shall have no obligation to fund to such updated budget or permit the use of cash with respect thereto until such time as Agent notifies Borrower that such updated budget has been approved;

(j)  Promptly (and in any event within two business (2) days) after filing thereof, copies of any pleadings, motions, applications, financial information and other papers and documents filed by the Borrower and/or any other Restricted Person in the Chapter 11 Case, which papers and documents would not otherwise be served on the Agent or Lenders (including counsel to Agent and Lenders) pursuant to the Bankruptcy Court's appropriate procedures;

(k)   Promptly after sending thereof, copies of all written reports given by the Borrower or any other Restricted Person to any official or unofficial creditors' committee in the Chapter 11 Case; and

(l)   From time to time, with reasonable promptness, any and all receivables schedules, inventory reports, collection reports, deposit records, copies of invoices to account debtors, shipment documents and delivery receipts for goods sold, and such other material, reports, records or information as the Agent may request."

8.10   <u>Field Examinations</u>. Section 6.3 of the Credit Agreement is hereby amended in its entirety to read as follows:

"Section 6.3   <u>Other   Information   and   Inspections</u>. Borrower will furnish to each Lender Party any information which such Lender Party may from time to time request in writing concerning any covenant, provision or condition of the Loan Documents, any collateral or any matter in connection with the businesses and operations of each Restricted Person.   Each Restricted Person will permit representatives appointed by Agent (including independent accountants, auditors, agents, attorneys, appraisers, examiners and any other Persons) to, inspect and examine, at such times and in such manner as may be required by Agent during normal business hours, any of its property, including its books of account, other books and records, and any facilities or other business assets, and to make extra copies therefrom and photocopies and photographs thereof, and to write down and record any information such representatives obtain, and will permit Agent or its representatives to investigate and verify the accuracy of the information furnished to Agent and Lenders in connection with the Loan Documents and to discuss all such matters with its officers, employees and representatives.   In addition, twice per Fiscal Year, upon Agent's request, Borrower shall provide Agent with an inventory appraisal, performed by an appraisal firm satisfactory to Agent and in form and containing assumptions and appraisal methods satisfactory to Agent.   So long as no Event of Default has occurred and is continuing, the Borrower shall not be required to pay for more than a total of three (3) field audits and/or inventory appraisals prior to the Termination Date; <u>provided, however</u>, the Borrower shall be required to pay for all such field audits and inventory appraisals conducted during the continuance of an Event of Default.   The cost of field examinations shall not exceed $1,000 per examination per day plus out-of-pocket expenses."

8.11   <u>Payment of Taxes</u>. Section 6.7 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

> "Section 6.7.   <u>Payment of Taxes</u>.   Each Restricted Person will timely pay all taxes, assessments, and other governmental charges or levies imposed upon it or upon its income, profits or property and maintain appropriate accruals for any of the foregoing in accordance with GAAP; provided, however, no Restricted Person shall be required to pay any taxes, assessments or other charges or levies the nonpayment of which is permitted by, or stayed by, the Bankruptcy Code.   Borrower and any other Restricted Person may, however, delay paying or discharging any of the foregoing so long as it is in good faith contesting the validity thereof by appropriate proceedings and has set aside on its books adequate reserves therefor."

8.12   <u>Financial Covenants</u>.   Section 7.10 of the Credit Agreement is hereby deleted in its entirety and replaced with:

> "Section 7.10 [Reserved]".

8.13   <u>Events of Default</u>. Section 8.1 of the Credit Agreement is hereby amended as follows:

(a)   Section 8.1(a) of the Loan Agreement is deleted in its entirety and replaced with the following:

> "(a) Any Restricted Person fails to pay when due any of the Obligations or fails to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Financing Agreements;"

(b)   Sections 8.1(b), 8.1(k)(ii) and 8.1(o) of the Credit Agreement are deleted in their entirety and replaced with the following:

> " [Reserved]."

(c)   the following language shall be added to the beginning of each of Sections 8.1(c), 8.1(g) and 8.1(h):

> "Except for defaults and Events of Default occasioned by the filing of the Chapter 11 Case and defaults and Events of Default resulting from obligations with respect to which the Bankruptcy Code prohibits any Restricted Person from complying or permits any Restricted Person not to comply,"

(d)     Sections 8.1(k)(i) and 8.1(k)(iii) of the Credit Agreement are hereby amended to add at the end of each of such Section the following: "provided, that, the foregoing shall not apply to Borrower and Guarantors in the Chapter 11 Case."

(e)     Section 8.1 of the Credit Agreement is hereby amended by adding new Sections 8.1(p) through 8.1(bb) immediately after 8.1(o) as follows:

"8.1(p) the occurrence of any condition or event that permits Agent or any other Lender Party to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default", as such term is defined in the Financing Order; or

(q) the termination or non-renewal of the Loan Documents or other Financing Agreements as provided for in the Financing Order as the result of the objection of any third party being sustained; or

(r) any Restricted Person suspends or discontinues or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business (other than cessation of the AllPan truss operations) or if a trustee, receiver or custodian is appointed for any Restricted Person or any of its properties; or

(s) any act, condition or event occurring after the date of the commencement of the Chapter 11 Case that has a material adverse effect upon the assets of any Restricted Person or the Collateral or the rights and remedies of Agent or any other Lender Party under this Agreement, any other Loan Documents or any other Financing Agreements; or

(t) entry by the Bankruptcy Court of an order converting the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code; or

(u) entry by the Bankruptcy Court of an order dismissing the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily; or

(v) except as specifically authorized by Agent and Majority Lenders in writing, the grant of a lien on or other interest in any Restricted Person's property (other than a lien or encumbrance permitted by Section 4 hereof or by the Financing Order or the proceeds of which are to be immediately applied upon closing to pay the Obligations in full in cash) or an administrative expense claim (other than any such administrative expense claim permitted by the Financing Order) that is superior to or ranks in

parity with Agent's security interest in or lien upon the Collateral or Lender Parties' administrative expense priority; or

(w) the Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent or any other Lender Party); or

(x) the appointment of a trustee in the Chapter 11 Case pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code; or

(y) the appointment of an examiner in the Chapter 11 Case with expanded powers equivalent to those of a trustee pursuant to Section 1104(a) of the Bankruptcy Code; or

(z) the filing of a plan of reorganization by Debtor or the confirmation of any Plan of reorganization in the Chapter 11 Case that does not provide for the payment in full, in cash, of all Obligations (including all Pre-Petition Obligations and all Post-Petition Obligations) immediately upon the effective date of such plan and that is otherwise not in form and substance acceptable to the Agent; or

(aa) the filing by any Restricted Person of any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of (i) the authority to use any cash collateral or (ii) any claim, Lien, or security interest ranking equal or senior in priority to the claims, Liens and security interests granted to the Agent under the Financing Order or the Loan Documents or any such equal or prior claim, Lien or security interest shall be established in any manner, except, in any case, as expressly permitted under the Financing Order;

(bb) any Restricted Person shall file a pleading in the Bankruptcy Court or any court of competent jurisdiction (i) challenging the validity, perfection, enforceability or priority of any Liens of the Agent securing the Obligations (including, without limitation, the Pre-Petition Obligations and the Post-Petition Obligations), (ii) challenging the validity or enforceability of any Loan document or other Financing Agreement, or (iii) asserting any claims against the Agent or any other Lender Party.

(f)     The following shall be added to the end of Section 8.2 of the Credit Agreement:

"In addition, upon any Event of Default, the Agent and the other Lender Parties shall have the right to seek an emergency hearing upon a motion for relief from the automatic stay to allow the Lender Parties to exercise their state law remedies under the Loan Documents and against the Collateral. The Agent shall give five (5) business days' written notice to the Borrower, any duly appointed unsecured creditors' committee and the U.S. trustee of such motion for relief from stay, subject to the Bankruptcy Court's calendar. The Borrower shall not object to or otherwise resist the hearing of any motion for relief from stay filed according to this Section 8.2 and upon the Agent's compliance with such notice requirements.

9.    RELEASE

    9.1    Release.

    (a)    In consideration of the agreements of Agent and the other Lender Parties contained herein and the making of any Post-Petition Revolving Loans by Lenders to Debtor pursuant to the Credit Agreement, as amended hereby, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Credit Party, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges each Lender Party, their successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (each Lender Party and all such other parties being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off and recoupment, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which such Credit Party, or any of its successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Credit Agreement, as amended and supplemented through the date hereof and the other Financing Agreements.

    (b)    Each Credit Party understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

    (c)    Each Credit Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the release set forth above.

9.2     Covenant Not to Sue.  Each Credit Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by Credit Parties pursuant to Section 9.1 hereof.  If any Credit Party violates the foregoing covenant, Credit Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

10.     CONDITIONS PRECEDENT.  The obligation of the Lenders to make the Post-Petition Revolving Loans, the Post-Petition Letters of Credit and other financial accommodations available to Debtor shall be subject to the following conditions precedent:

(a)     Debtor shall furnish to Agent the initial Budget, in form and substance acceptable to Agent and all other financial information, projections, budgets, business plans, cash flows and such other information as Agent shall reasonably request from time to time, each in form and substance satisfactory to Agent;

(b)     as of the Petition Date, the Existing Financing Agreements shall not have been terminated;

(c)     no trustee or examiner with expanded powers or the like shall have been appointed or designated with respect to any Credit Party, as a debtor or debtor-in-possession, or its business, properties and assets;

(d)     the execution and delivery of this Ratification Agreement and all other Financing Agreements that Agent may request to be delivered in connection herewith by each Credit Party, in form and substance satisfactory to Agent;

(e)     certificates of the insurance required under the Credit Agreement, with all hazard insurance containing a lender's loss payable endorsement in the Agent's favor and with all liability insurance naming the Agent as an additional insured, as required under the Credit Agreement;

(f)     such other documents as the Agent in its reasonable discretion may require in connection herewith;

(g)     Debtor shall comply in full with the notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to any relevant Financing Order in a manner acceptable to Agent and its counsel, and the Financing Orders (acceptable in form and substance to Agent) shall have been entered by the Bankruptcy Court authorizing the secured financing under the Financing Agreements, as ratified and amended hereunder, on the terms and conditions set forth in this Ratification Agreement and, among other things, authorizing and granting the senior security interest in liens in favor of Agent, for the benefit of Lender Parties, described in this Ratification Agreement and in the Financing Order, and granting super-priority expense claims, subject only to the Carve-Out Amount, to Lender Parties with respect to all obligations due such Lender Parties and such orders shall be in full force and

effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated, absent the consent of Agent;

(h)     other than the voluntary commencement of the Chapter 11 Cases, no material impairment of the priority of Agent's security interests in the Collateral shall have occurred from the date of the latest field examination of Agent to the Petition Date;

(i)     no Event of Default shall have occurred and be continuing or be existing under any of the Existing Financing Agreements, as modified pursuant hereto and there shall not be pending any motion which, if granted by the Bankruptcy Court, would result in an Event of Default;

(j)     the Bankruptcy Court shall have entered such other orders (e.g., a cash management order) as the Agent may require, each of which shall be in form and substance acceptable to the Agent in its discretion;

(k)     Agent shall be satisfied with respect to the Credit Parties' cash management arrangements in effect on the Post-Petition Closing Date and all of Credit Parties' deposit and other bank accounts shall be subject to deposit account control agreements acceptable to Agent or otherwise under the control of Agent;

(l)     the "first day" orders described on Schedule II attached hereto in form and substance satisfactory to Agent shall have been entered in the Chapter 11 Case;

(m)     Agent shall have received Bankruptcy Court-ordered access to all locations in support of any orderly liquidation of Credit Parties in the event of an Event of Default; and

(n)     on the date of initial borrowing of Post-Petition Revolving Loans, after giving effect to such initial borrowing, the Post-Petition Revolving Loan Commitment less all fees and expenses that are payable pursuant to this Agreement and the other Financing Agreements on and as of such date, shall equal or exceed $1,500,000.

11.     FEES.  In order to induce Agent and Lenders to enter into this Agreement and to make the Post-Petition Revolving Loans, Borrower agrees to pay to Agent, for the benefit of Lenders in accordance with their Percentage Shares, a Commitment Fee in an amount equal to $250,000.00, which Commitment Fee shall be fully earned and non-refundable upon entry of the Interim Financing Order and due and payable as follows:

(a)     the first $125,000.00 shall be paid on the date of the first advance hereunder

(b)     the next $63,000.00 shall be paid on the thirtieth (30th) day following the date of the first advance hereunder; and

(c)     the remainder $62,000.00 shall be paid on the sixtieth (60th) day following the date of the first advance hereunder.

In the event that the Agent chooses to offer an exit credit facility to the Debtor and its Subsidiaries or to any successor, no additional closing fee shall be charged with respect to such

exit facility, it being understood that the Commitment Fee provided for herein is intended to compensate the Agent and the Lenders for the Post-Petition Obligations and any exit facility that the Agent and Lenders choose to offer.  Such Commitment Fee is fully prepaid and non-refundable in the event that the Agent chooses not to approve an exit credit facility.

12.   MISCELLANEOUS

12.1   Amendments and Waivers. Neither this Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

12.2   Further Assurances. Debtor shall, at its expense, at any time or times duly execute and deliver, or shall cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, pledge agreements, collateral assignments, Uniform Commercial Code financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Agent of all the rights and remedies hereunder, under any of the other Financing Agreements, any Financing Order or applicable law with respect to the Collateral, and do or cause to be done such further acts as may be necessary or proper in Agent's opinion to evidence, perfect, maintain and enforce the security interests of Agent, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement, any of the other Financing Agreements or the Financing Order. Upon the request of Agent, at any time and from time to time, Debtor shall, at its cost and expense, do, make, execute, deliver and record, register or file, financing statements, and other instruments, acts, pledges, assignments and transfers (or cause the same to be done) and will deliver to Agent such instruments evidencing items of Collateral as may be requested by Agent.

12.3   Headings. The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Agreement.

12.4   Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.

12.5   Additional Events of Default. The parties hereto acknowledge, confirm and agree that the failure of Debtor to comply beyond any applicable grace period with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by any Credit Party in connection herewith or with the terms and conditions of any Financing Order shall constitute an Event of Default under the Financing Agreements.

12.6   Costs and Expenses. Debtor shall pay to Agent on demand all costs and expenses that Agent pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Agreement and the other Financing Agreements and the Financing Order, including, without limitation: (a) reasonable attorneys' and paralegals' fees and disbursements of counsel to Agent; (b) costs and expenses (including

attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Agreement, the other Financing Agreements, the Financing Order and the transactions contemplated thereby; (c) costs and expenses of lien searches, recording and filing fees; (d) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Agent in the Collateral; (e) sums paid or incurred to pay any amount or take any action required of Debtor under the Financing Agreements or the Financing Order that Debtor fails to pay or take; (f) costs of appraisals, inspections and verifications of the Collateral and including travel, lodging, and meals for inspections of the Collateral and any Borrower's operations by Agent or its agent and to attend court hearings or otherwise in connection with the Chapter 11 Case; (g) costs and expenses of preserving and protecting the Collateral; and (h) costs and expenses (including attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the security interests and liens of Agent, sell or otherwise realize upon the Collateral, and otherwise enforce the provisions of this Agreement, the other Financing Agreements and the Financing Order, or to defend any claims made or threatened against Agent arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters). The foregoing shall not be construed to limit any other provisions of the Financing Agreements regarding costs and expenses to be paid by Debtor. All sums provided for in this Section 12.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Financing Agreements. Agent is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Agent with respect to Debtor.

12.7    <u>Effectiveness</u>. This Agreement shall become effective upon the execution hereof by Agent, each other Lender Party and each Credit Party and the entry of the Interim Financing Order.

[The remainder of this page is intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

WACHOVIA BANK, NATIONAL
ASSOCIATION, as Agent, LC Issuer and a Lender

By:_____
Name: _____
Title: _____

BISON BUILDING MATERIALS LLC,
as Debtor and Debtor-in-Possession

By:_____
Name: _____
Title: _____

BISON BUILDING GP, INC.,
a Texas corporation, as a Guarantor, a debtor and a
debtor-in-possession

By:_____
Name: _____
Title: _____

BISON BUILDING HOLDINGS INC.,
a Texas corporation, as a Guarantor, a debtor and a
debtor-in-possession

By:_____
Name: _____
Title: _____

MILLTECH INC.,
a Colorado corporation, as a Guarantor, a debtor and
a debtor-in-possession

By:_____
Name: _____
Title: _____


HLBM COMPANY,
a Texas corporation, as a Guarantor, a debtor and a
debtor-in-possession

By:_____
Name: _____
Title: _____


BISON BUILDING MATERIALS NEVADA, LLC,
a Nevada limited liability company, as a Guarantor,
a debtor and a debtor-in-possession

By:_____
Name: _____
Title: _____


BISON MULTI-FAMILY SALES, LLC,
a Texas limited liability company, as a Guarantor, a
debtor and a debtor-in-possession

By:_____
Name: _____
Title: _____

BISON CONSTRUCTION SERVICES, LLC,
a Texas limited liability company, as a Guarantor, a
debtor and a debtor-in-possession


By:_____

Name: _____

Title: _____

## **SCHEDULE I**

1.　　Article V – The representations and warranties under Sections 5.1, 5.7, 5.9, 5.17 and 5.18 are no longer accurate.

2.　　Section 6.1 – As set forth in this Schedule I, the Borrower has not observed, performed, complied with every term, covenant and condition in the Loan Documents.

3.　　Section 6.2 – The Borrower will not be able to deliver audited financials in accordance with Section 6.2 of the Credit Agreement.

4.　　Section 6.4 – The Borrower has not notified the Bank of all the Defaults and Events of Default, certain Lawsuits and Material Adverse Changes, defaults under indentures, mortgages, agreements, contracts and other instruments and has not been able to protect against and resolve all controversies.

5.　　Section 6.7 – The Borrower has not timely paid all Liabilities owed by it on ordinary trade terms, has not discharged all other Liabilities owed by it and has not reserved in its financial statements for all material liablities resulting from delinquencies on real estate and equipment leases and other obligations.

6.　　Section 6.11 – The Borrower has not complied with all provisions in leases, agreements and contracts to which it is a party.

7.　　Section 7.1 – The Borrower has incurred obligations that are more than 90 days past due (and therefore are Indebtedness). In addition, the Borrower has issued promissory notes to two vendors with respect to past due amounts attributable to purchases of inventory.

8.　　Section 7.2 – The Borrower has granted Liens on unencumbered real estate and on other collateral to secure the notes referred to in paragraph 7 above.

9.　　Section 7.4 – The Borrower has conducted bulk sales of inventory from certain terminated locations.  The Bank was aware of these transactions and received the proceeds of sale.

10.　　Section 7.10 – The Borrower was in breach of the Tangible Net Worth covenant as of May 31, 2009.

11.　　Sections 8.1(c), (d), (e), (f), (g), (h), (l), (n) and (o) – The Borrower may be in default under Sections  8.1(c), (d), (e), (f), (g), (h), (l), (n) and (o) as a result of the matters referred to in paragraphs (1) – (10) above.

12.　　Section 8.1(k) – The Borrower has filed for protection under Chapter 11 of the Bankruptcy Code.

## SCHEDULE II

## First Day Orders

**EXHIBIT "A"**

**Initial Budget**

## EXHIBIT "B"

### Guarantees

1.     Guaranty, dated May 7, 2002, executed by Bison Building GP, Inc., in favor of Wachovia Bank, National Association (as successor by merger with SouthTrust Bank and as successor in interest to Bank of Texas, N.A.), as agent, as amended by that certain First Amendment to Security Agreement and Guaranty effective as of June 26, 2002, that certain Second Amendment to Security Agreement and Guaranty effective as of January 15, 2003, that certain Third Amendment to Security Agreement and Guaranty effective as of May 12, 2003, that certain Fourth Amendment to Security Agreement and Guaranty effective as of September 30, 2003, that certain Fifth Amendment to Security Agreement and Guaranty effective as of March 11, 2004, that certain Sixth Amendment to Security Agreement and guaranty effective as of July 7, 2004, that certain Seventh Amendment to Security Agreement and Guaranty effective as of March 18, 2005, that certain Eighth Amendment to Security Agreement and Guaranty effective as of August 31, 2005, and that certain Ninth Amendment to Security Agreement and Guaranty effective as of November 17, 2005 (collectively, the "Bison GP Guaranty").

2.     Guaranty, dated May 7, 2002, executed by Bison Building Holdings Inc. (f/k/a Bison Building Materials, Inc.), in favor of Wachovia Bank, National Association (as successor by merger with SouthTrust Bank and as successor in interest to Bank of Texas, N.A.), as agent, as amended by that certain First Amendment to Security Agreement and Guaranty effective as of June 26, 2002, that certain Second Amendment to Security Agreement and Guaranty effective as of January 15, 2003, that certain Third Amendment to Security Agreement and Guaranty effective as of May 12, 2003, that certain Fourth Amendment to Security Agreement and Guaranty effective as of September 30, 2003, that certain Fifth Amendment to Security Agreement and Guaranty effective as of March 11, 2004, that certain Sixth Amendment to Security Agreement and guaranty effective as of July 7, 2004, that certain Seventh Amendment to Security Agreement and Guaranty effective as of March 18, 2005, that certain Eighth Amendment to Security Agreement and Guaranty effective as of August 31, 2005, and that certain Ninth Amendment to Security Agreement and Guaranty effective as of November 17, 2005 (collectively, the "Bison Holdings Guaranty").

3.     Guaranty, dated May 7, 2002, executed by Milltech Inc., in favor of Wachovia Bank, National Association (as successor by merger with SouthTrust Bank and as successor in interest to Bank of Texas, N.A.), as agent, as amended by that certain First Amendment to Security Agreement and Guaranty effective as of June 26, 2002, that certain Second Amendment to Security Agreement and Guaranty effective as of January 15, 2003, that certain Third Amendment to Security Agreement and Guaranty effective as of May 12, 2003, that certain Fourth Amendment to Security Agreement and Guaranty effective as of September 30, 2003, that certain Fifth Amendment to Security Agreement and Guaranty effective as of March 11, 2004, that certain Sixth Amendment to Security Agreement and guaranty effective as of July 7, 2004, that certain Seventh Amendment to Security Agreement and Guaranty effective as of March 18, 2005, that certain Eighth

Amendment to Security Agreement and Guaranty effective as of August 31, 2005, and that certain Ninth Amendment to Security Agreement and Guaranty effective as of November 17, 2005 (collectively, the "Milltech Guaranty").

4.    Guaranty, dated January 15, 2003, executed by HLBM Company, in favor of Wachovia Bank, National Association (as successor by merger with SouthTrust Bank and as successor in interest to Bank of Texas, N.A.), as agent, as amended by that certain First Amendment to Security Agreement and Guaranty effective as of May 12, 2003, that certain Second Amendment to Security Agreement and Guaranty effective as of September 30, 2003, that certain Third Amendment to Security Agreement and Guaranty effective as of March 11, 2004, that certain Fourth Amendment to Security Agreement and guaranty effective as of July 7, 2004, that certain Fifth Amendment to Security Agreement and Guaranty effective as of March 18, 2005, that certain Sixth Amendment to Security Agreement and Guaranty effective as of August 31, 2005, and that certain Seventh Amendment to Security Agreement and Guaranty effective as of November 17, 2005 (collectively, the "HLBM Guaranty").

5.    Guaranty, dated September 8, 2006, executed by Bison Building Materials Nevada, LLC in favor of Wachovia Bank, National Association (the "Bison Nevada Guaranty").

6.    Guaranty, dated July 29, 2008, executed by Bison Multi-Family Sales, LLC in favor of Wachovia Bank, National Association (the "Bison Multi-Family Guaranty").

7.    Guaranty, dated July 29, 2008, executed by Bison Construction Services, LLC in favor of Wachovia Bank, National Association (the "Bison Construction Services Guaranty").

**EXHIBIT "C"**

**Security Documents**

1.     Security Agreement dated June 29, 2007, executed by Bison Building Materials LLC in favor of Wachovia Bank, National Association.

2.     Security Agreement dated May 7, 2002, executed by Bison Building Materials LLC (as successor by merger with Bison Building Materials, Ltd.), in favor of Wachovia Bank, National Association (as successor by merger with SouthTrust Bank and as successor in interest to Bank of Texas, N.A.), as agent, as amended by that certain First Amendment to Security Agreement dated effective June 26, 2002, that certain Second Amendment to Security Agreement dated effective January 15, 2003, that certain Third Amendment to Security Agreement dated effective May 12, 2003, that certain Fourth Amendment to Security Agreement dated effective September 30, 2003, that certain Fifth Amendment to Security Agreement dated effective March 11, 2004, that certain Sixth Amendment to Security Agreement dated effective July 7, 2004, that certain Seventh Amendment to Security Agreement dated effective March 18, 2005, that certain Eighth Amendment to Security Agreement dated effective August 31, 2005, and that certain Ninth Amendment to Security Agreement dated effective November 17, 2005.

3.     Security Agreement dated May 7, 2002, executed by ALL Pan, Ltd. (as successor by merger with Bison Building Materials LLC), in favor of Wachovia Bank, National Association (as successor by merger with SouthTrust Bank and as successor in interest to Bank of Texas, N.A.), as agent, as amended by that certain First Amendment to Security Agreement dated effective June 26, 2002, that certain Second Amendment to Security Agreement dated effective January 15, 2003, that certain Third Amendment to Security Agreement dated effective May 12, 2003, that certain Fourth Amendment to Security Agreement dated effective September 30, 2003, that certain Fifth Amendment to Security Agreement dated effective March 11, 2004, that certain Sixth Amendment to Security Agreement dated effective July 7, 2004, that certain Seventh Amendment to Security Agreement dated effective March 18, 2005, that certain Eighth Amendment to Security Agreement dated effective August 31, 2005, and that certain Ninth Amendment to Security Agreement dated effective November 17, 2005.

4.     Security Agreement dated May 7, 2002, executed by Bison Building GP, Inc. in favor of Wachovia Bank, National Association (as successor by merger with SouthTrust Bank and as successor in interest to Bank of Texas, N.A.), as agent, as amended by that certain First Amendment to Security Agreement and Guaranty effective as of June 26, 2002, that certain Second Amendment to Security Agreement and Guaranty effective as of January 15, 2003, that certain Third Amendment to Security Agreement and Guaranty effective as of May 12, 2003, that certain Fourth Amendment to Security Agreement and Guaranty effective as of September 30, 2003, that certain Fifth Amendment to Security Agreement and Guaranty effective as of March 11, 2004, that certain Sixth Amendment to Security Agreement and guaranty effective as of July 7, 2004, that certain Seventh Amendment to Security Agreement and Guaranty effective as of March 18, 2005, that certain Eighth Amendment to Security Agreement and Guaranty

effective as of August 31, 2005, and that certain Ninth Amendment to Security Agreement and Guaranty effective as of November 17, 2005 (collectively, the "Bison GP Security Agreement").

5.    Security Agreement dated May 7, 2002, executed by Bison Building Holdings Inc. (f/k/a Bison Building Materials, Inc.), in favor of Wachovia Bank, National Association (as successor by merger with SouthTrust Bank and as successor in interest to Bank of Texas, N.A.), as agent, as amended by that certain First Amendment to Security Agreement and Guaranty effective as of June 26, 2002, that certain Second Amendment to Security Agreement and Guaranty effective as of January 15, 2003, that certain Third Amendment to Security Agreement and Guaranty effective as of May 12, 2003, that certain Fourth Amendment to Security Agreement and Guaranty effective as of September 30, 2003, that certain Fifth Amendment to Security Agreement and Guaranty effective as of March 11, 2004, that certain Sixth Amendment to Security Agreement and guaranty effective as of July 7, 2004, that certain Seventh Amendment to Security Agreement and Guaranty effective as of March 18, 2005, that certain Eighth Amendment to Security Agreement and Guaranty effective as of August 31, 2005, and that certain Ninth Amendment to Security Agreement and Guaranty effective as of November 17, 2005 (collectively, the "Bison Holdings Security Agreement").

6.    Security Agreement, dated May 7, 2002, executed by Milltech Inc. in favor of Wachovia Bank, National Association (as successor by merger with SouthTrust Bank and as successor in interest to Bank of Texas, N.A.), as agent, as amended by that certain First Amendment to Security Agreement and Guaranty effective as of June 26, 2002, that certain Second Amendment to Security Agreement and Guaranty effective as of January 15, 2003, that certain Third Amendment to Security Agreement and Guaranty effective as of May 12, 2003, that certain Fourth Amendment to Security Agreement and Guaranty effective as of September 30, 2003, that certain Fifth Amendment to Security Agreement and Guaranty effective as of March 11, 2004, that certain Sixth Amendment to Security Agreement and guaranty effective as of July 7, 2004, that certain Seventh Amendment to Security Agreement and Guaranty effective as of March 18, 2005, that certain Eighth Amendment to Security Agreement and Guaranty effective as of August 31, 2005, and that certain Ninth Amendment to Security Agreement and Guaranty effective as of November 17, 2005 (collectively, the "Milltech Security Agreement").

7.    Security Agreement dated January 15, 2003, executed by HLBM Company in favor of Wachovia Bank, National Association (as successor by merger with SouthTrust Bank and as successor in interest to Bank of Texas, N.A.), as agent, as amended by that certain First Amendment to Security Agreement and Guaranty effective as of May 12, 2003, that certain Second Amendment to Security Agreement and Guaranty effective as of September 30, 2003, that certain Third Amendment to Security Agreement and Guaranty effective as of March 11, 2004, that certain Fourth Amendment to Security Agreement and guaranty effective as of July 7, 2004, that certain Fifth Amendment to Security Agreement and Guaranty effective as of March 18, 2005, that certain Sixth Amendment to Security Agreement and Guaranty effective as of August 31, 2005, and that certain Seventh Amendment to Security Agreement and Guaranty effective as of November 17, 2005 (collectively, the "HLBM 2003 Security Agreement").

8.      Security Agreement dated May 7, 2002, executed by HLBM Company (as successor by merger with Gino Guido, Inc.) in favor of Wachovia Bank, National Association (as successor by merger with SouthTrust Bank and as successor in interest to Bank of Texas, N.A.), as agent, as amended by that certain First Amendment to Security Agreement and Guaranty effective as of May 12, 2003, that certain Second Amendment to Security Agreement and Guaranty effective as of September 30, 2003, that certain Third Amendment to Security Agreement and Guaranty effective as of March 11, 2004, that certain Fourth Amendment to Security Agreement and guaranty effective as of July 7, 2004, that certain Fifth Amendment to Security Agreement and Guaranty effective as of March 18, 2005, that certain Sixth Amendment to Security Agreement and Guaranty effective as of August 31, 2005, and that certain Seventh Amendment to Security Agreement and Guaranty effective as of November 17, 2005 (collectively, the "Gino Guido Security Agreement"; the HLBM 2003 Security Agreement and the Gino Guido Security Agreement are herein collectively called the "HLBM Security Agreement").

9.      Security Agreement dated September 8, 2006, executed by Bison Building Materials Nevada, LLC in favor of Wachovia Bank, National Association (the "Bison Nevada Security Agreement").

10.     Security Agreement, dated July 29, 2008, executed by Bison Multi-Family Sales, LLC in favor of Wachovia Bank, National Association (the "Bison Multi-Family Security Agreement").

11.     Security Agreement, dated July 29, 2008, executed by Bison Construction Services, LLC in favor of Wachovia Bank, National Association (the "Bison Construction Services Security Agreement").