

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS,
HOUSTON DIVISION**

**ENTERED
07/24/2009**

| | | |
|---|---|---|
| In re | § | |
| | § | |
| **BISON BUILDING MATERIALS, LLC,** | § | **Case No. 09-34452-H2-11** |
| **et al,** | § | **Chapter 11** |
| | § | **(Jointly Administered)** |
| Debtors. | § | |

**FINAL ORDER (I) AUTHORIZING SECURED POST-PETITION FINANCING; AND
(II) GRANTING LIENS AND SUPER-PRIORITY ADMINISTRATIVE CLAIMS
AND RELATED RELIEF**

On this 24th day of July, 2009, the Court considered the final portion of the Debtors' Motion for Interim and Final Orders (i) Authorizing the Use of Cash Collateral and Approving Post-Petition Secured Financing, (ii) Granting Adequate Protection, (iii) Granting Liens, and (iv) Scheduling a Final Hearing (the "Motion"), filed by Bison Building Holdings, Inc., Bison Building Materials, LLC, Bison Building GP, Inc., HLBM Company, Milltech, Inc., Bison Building Materials Nevada, LLC, Bison Multi-Family Sales, LLC and Bison Construction Services, LLC, the debtors and debtors-in-possession (each a "Debtor" and, collectively, the "Debtors"). The Motion seeks an order under 11 U.S.C. §§ 105, 361, 362, 364, 506, 507, 1107(a) and 1108 and Federal Rules of Bankruptcy Procedure 2002 and 4001:

1.  Authorizing, pursuant to Sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Debtors to obtain post-petition loans, advances and other financial accommodations on a final basis for a period through and including January 17, 2010 from Wachovia Bank, National Association, in its role as agent and lender (collectively, along with any and all other lenders under the DIP Facility (as hereinafter defined), "Lender"), inclusive of the amount of all pre-petition indebtedness owed by Debtors to Lender, in accordance with all of the lending formulas, sub-limits, terms and conditions set forth in the Existing Financing Agreements (as hereinafter defined), as amended and ratified by the Ratification and Amendment Agreement (as hereinafter defined) and any and all other related loan documents (with the Ratification and Amendment Agreement, and as defined therein, the "DIP Loan Documents"), the Budget (as hereinafter defined) and in accordance with this Order (the "DIP Facility"), secured by security interests in and liens upon all of the Collateral (as hereinafter defined) pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code;

2.  Authorizing the Debtors to enter into the Ratification and Amendment Agreement, by and between the Debtors and Lender (the "Ratification Agreement," in substantially the form attached hereto as Exhibit "A") which ratifies, restates, extends, adopts, reaffirms, confirms, and amends the Existing Financing Agreements and the other existing loan, financing and security agreements by and between Debtors and Lender (capitalized terms not otherwise defined in this

Order shall have the respective meanings ascribed thereto in the Existing Financing Agreements, as amended and ratified by the Ratification Agreement);

3.　　　Authorizing the Debtors to use the proceeds of the DIP Facility for the purposes set forth in the Ratification Agreement and the Budget including, without limitation, working capital and general corporate purposes, as well as the reimbursement and payment to Lender of unpaid fees and expenses, including reasonable attorneys fees, for which the Debtors are responsible pursuant to the DIP Loan Documents or otherwise;

4.　　　Authorizing the Debtors under 11 U.S.C. §§ 364(c)(1), (c)(2), (c)(3) and (d) to grant to Lender as security for the repayment of the borrowings and all other obligations arising under the Ratification Agreement and any other DIP Loan Documents (the "Post-Petition Obligations"), security interests in and liens upon all of the Debtors' existing and after-acquired property, wherever located (as more fully described in the DIP Loan Documents and below, the "Post-Petition Collateral") under the terms set forth in the Ratification Agreement; and

5.　　　Granting "super-priority" claim status to Lender with respect to the Post-Petition Obligations pursuant to 11 U.S.C. § 364(c)(1) and (d) as set forth herein.

The Court finds notice to have been given as required by the Complex Rules for the Southern District of Texas and as contemplated by Federal Rule of Bankruptcy Procedure 4001. The parties hereto have stipulated and agreed as follows, and based upon the pleadings, proffers of evidence, and representations of counsel, the Court hereby approves and adopts such stipulations, as evidenced by the signatures hereto of the Debtors' counsel and Lender's counsel, and agreements as findings of fact and conclusions of law, as appropriate, and grants the relief requested herein. Accordingly, based upon the record presented to the Court by the Debtors at the Hearing and upon the entire record thereof; and this Court having found good and sufficient cause appearing therefore,

**THE COURT HEREBY FINDS AND CONCLUDES** that:

A.　　　This Court has jurisdiction over this case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. This matter is a core proceeding as defined in 28 U.S.C. § 157(b)(2). Furthermore, venue is proper pursuant to 28 U.S.C. § 1409.

B.　　　The Debtors, in accordance with the terms of that certain Amended and Restated Credit Agreement, dated November 17, 2005, as amended and modified from time to time through certain Amendments to the Amended and Restated Credit Agreement, and as further modified pursuant to that certain Joinder to Amended and Restated Credit Agreement, dated June 29, 2007, along with any and all other related documents as further stated and/or defined in the Ratification Agreement (collectively, the "Existing Financing Agreements"), stipulate that they are indebted to Lender, without defense, counterclaim, recoupment or offset of any kind and, that as of the Petition Date, the Debtors are liable to Lender in the aggregate amount of not less than $15,313,504.64 (the "Pre-Petition Debt") (such amount, exclusive of contingent liabilities under outstanding Letters of Credit issued under the Existing Financing Agreements (the "Pre-Petition LC's")), along with interest as it continues to accrue, as well as those reasonable fees and expenses provided for in the

Existing Financing Agreements and otherwise allowable under 11 U.S.C. § 506(b), in respect to loans made by Lender pursuant to the Existing Financing Agreements.

C.      The Debtors stipulate and agree that the Pre-Petition Debt is secured by valid and enforceable first priority liens and security interests granted under the Existing Financing Agreements by the Debtors to Lender, upon and in all of the Debtors' right, title, and interest in and to each of the following:  accounts receivables, inventory, accounts, present and future contract rights, general intangibles (including tax and duty refunds, registered and unregistered patents, trademarks, service marks, copyrights, trade names, applications for the foregoing, trade secrets, good will, processes, drawings, blueprints, customer lists, licenses, whether as a licensor or licensee, choses in action and other claims) chattel paper, documents, instruments, securities and other investment property, letters of credit, bankers' acceptances and guaranties, all present and future monies, securities, credit balances, deposits, deposit accounts, records, and all products and proceeds of the foregoing, as stated and/or defined in the Existing Financing Agreements (the "Pre-Petition Collateral").

D.      The Debtors stipulate and agree that the Existing Financing Agreements are valid, binding and enforceable agreements and obligations of the Debtors, the security interests and liens granted to or for the benefit of Lender upon the Pre-Petition Collateral are valid, perfected, senior to all other security interests and liens upon the Pre-Petition Collateral (subject only to any liens permitted under the Existing Financing Agreements and/or pre-existing liens properly filed and perfected in accordance with applicable law) and are enforceable and non-avoidable, all of the Pre-Petition Debt constitutes allowable claims against the Debtors and is valid, enforceable and non-voidable in the amount of the Pre-Petition Debt, and the Debtors do not possess and will not assert any claim, counterclaim, recoupment, setoff or defense of any kind or nature, which would in any way affect the amount, validity, enforceability, priority and non-avoidability of any of the Pre-Petition Debt and Lender's security interests in and liens upon the Pre-Petition Collateral, or which would in any way reduce or affect the absolute and unconditional obligation of the Debtors to pay to Lender all of the Pre-Petition Debt.

E.      The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the financing provided by the DIP Facility.  The Debtors' ability to maintain business relationships and otherwise finance their operations is essential to the Debtors' continued viability.  Without immediate financing, the Debtors will be unable to preserve and maximize the value of their bankruptcy estates, and reorganize their businesses. Permitting the Debtors to obtain the loans set forth herein will enable the Debtors to preserve and maintain their assets, and preserve the possibility of a successful reorganization. Accordingly, good cause exists for approval of the Motion and entry of this Order, which is in the best interests of the Debtors, their creditors, and their bankruptcy estates.  In addition, the Debtors' need for financing is immediate and critical, and the preservation, maintenance and enhancement of the going concern value of the Debtors is of the utmost significance and importance to a successful reorganization of the Debtors.

F.      Given the Debtors' current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain additional financing on an unsecured basis. Financing on a post-petition basis is not otherwise available without the Debtors granting, pursuant to 11

U.S.C. § 364(c)(1), (1) "super-priority" administrative expense claims having priority over any and all administrative expenses, including, without limitation, the kind specified in 11 U.S.C. §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), and 726 (except as expressly provided herein), and/or (2) securing such financing, indebtedness and obligations with security interests in and liens upon the property described below as Post-Petition Collateral pursuant to 11 U.S.C. §§ 364(c) and (d).

       G.      Notice of the Hearing and the relief requested in the Motion has been given to the parties as required by the Complex Rules for the Southern District of Texas. Notice of the Hearing complies with the requirements of 11 U.S.C. §§ 364(c) and (d), and Federal Rules of Bankruptcy Procedure 2002 and 4001.

       H.      Based on the record presented at the Hearing, the DIP Loan Documents have been negotiated in good faith and at arm's length between the Debtors and Lender, and any credit extended and advances made to the Debtors pursuant to the DIP Loan Documents shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of, 11 U.S.C. § 364(e).

       I.      Based on the record presented at the Hearing, it appears that the terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with all fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

       J.      This Court concludes that entry of this Order is in the best interest of the Debtors' bankruptcy estates and their creditors as its implementation will, among other things, sustain the operation and value of the Debtors' bankruptcy estates, existing businesses and enhance the Debtors' prospects for a successful reorganization.

       K.      The Debtors stipulate and agree that they have obtained all corporate authorization necessary to enter into the DIP Loan Documents.

       L.      The Debtors stipulate and agree that in entering into the DIP Loan Documents, they have provided adequate notice to all required federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtors in connection with the execution, delivery, performance, validity, priority, amount, and enforceability of the DIP Loan Documents to which each Debtor is a party and, to the best of the Debtors' knowledge, none of the transactions contemplated by the Ratification Agreement (including, without limitation, the use of the proceeds of the Loans or other extensions of credit thereunder), will violate or result in a violation of Section 7 of the Securities Exchange Act of 1934, as amended, any regulations pursuant thereto, or Regulations T, U, or X of the Board of Governors of the Federal Reserve System.

       Based upon the foregoing stipulations, findings and conclusions, and upon the record made before this Court at the Hearing, and good and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

1.      The Ratification Agreement is approved on a final basis, subject to the terms of this Order.  Subject to the terms hereof, this Order is valid immediately and is fully effective upon its entry.

2.      The Debtors are expressly authorized and empowered, to the extent not already done, to enter into, execute and deliver the Ratification Agreement and any other DIP Loan Document to be entered into, executed and delivered in connection therewith, pursuant to which, *inter alia*, (a) the Debtors shall ratify, reaffirm, extend, assume, adopt and amend the Existing Financing Agreements; and (b) the Debtors shall ratify, assume and adopt the other agreements, documents and instruments by and among the Debtors, Lender and certain third parties, including without limitation any and all blocked account agreements, by and among Lender, the Debtors and any banking institutions.  The Debtors are authorized to enter into and comply with all of the terms and conditions of the DIP Loan Documents, including repayment of amounts borrowed there under, with interest, fees, costs and expenses, in accordance with and subject to the terms and conditions set forth in the DIP Loan Documents and this Order.  The Debtors are further authorized to pay all facility, commitment and other fees and expenses, including, without limitation, all reasonable fees and expenses of professionals engaged by Lender, in accordance with the terms of the DIP Loan Documents.  All loans and other extensions of credit made under the DIP Loan Documents (the "Post-Petition Loans") together with interest thereon and all fees, costs, expenses, indebtedness, obligations and liabilities of the Debtors to Lender at any time arising under the DIP Loan Documents and this Order constitute Post-Petition Obligations.

3.      In the absence of an Event of Default (as defined in the Ratification Agreement and as may be supplemented herein), the Debtors shall have continuing authority to borrow pursuant to the DIP Loan Documents and this Order and to use the cash proceeds thereof on the conditions set forth in this Order, the DIP Loan Documents, and the Budget; and to the extent and in the amounts provided for in the Budgets approved by Lender.  Unless extended by Lender in writing, the terms of this Order, and any authorizations granted hereunder, shall expire the earlier of (a) 5:00 p.m. CST on January 17, 2010; or (b) the occurrence of the Termination Date pursuant to the terms of this Order or the DIP Loan Documents.

4.      The Debtors are authorized to borrow those funds from Lender on an interim basis, on the terms and subject to the lending formula, availability reserves, the Budget attached hereto as Exhibit "B", and other terms and conditions set forth in the DIP Loan Documents and this Order.  The Debtors are authorized to use the proceeds of the Post-Petition Loans to operate the Debtors' businesses (and otherwise use the proceeds of the DIP Facility for the uses permitted in the Ratification Agreement), subject to the provisions of the DIP Loan Documents.  On or before the twentieth (20th) day before the expiration of the then current Budget, the Debtors shall submit a rolling thirteen week Budget to the Committee, Lender, and the US Trustee.  If no objection to the proposed Budget is filed within ten (10) days of the submission of the Budget, then the proposed Budget shall become the Budget in effect for the following thirteen week period.  If an objection is filed to the proposed Budget, then the proposed Budget shall become the Budget only for those items to which a party did not object.

5.      Upon the occurrence of an Event of Default, and prior to the exercise of the remedies set forth below, Lender shall give written notice to the Debtors, the U.S. Trustee, and any committee appointed in this case, if any, of the occurrence of such an Event of Default and may file an Emergency Motion seeking to terminate the automatic stay ("Stay Motion"), which shall be served on the parties required under the Order Granting Notice of Complex Case and the Local Rules. Lender shall be entitled to an emergency hearing on the Stay Motion upon five (5) days notice. If no objection to the notice of Event of Default is filed and served upon the Lender within five business days of such notice and/or immediately upon the entry of an order granting the Stay Motion, the Lender may (a) terminate the DIP Facility, (b) declare the principal of and accrued interest, fees and other liabilities constituting the Post-Petition Obligations due and payable, and (c) exercise any and all rights under the Ratification Agreement or any applicable statute and/or federal law. The Debtors shall only have the right to challenge whether or not an Event of Default has occurred, for which the Debtors shall have the burden of proof.

6.      In accordance with 11 U.S.C. §§ 363(c), 364(c)(1), and 364(d), the Post-Petition Obligations shall constitute claims (the "Super-Priority Claims") with priority in payment over any and all costs and administrative expenses including, without limitation, the kind specified in 11 U.S.C. §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726, but excluding the fees of the U.S. Trustee and the Carve-Out, all as more fully set forth herein below, senior to the rights of the Debtors, any successor trustee, successor entity, and/or any creditor, in this case or any subsequent proceeding under the Bankruptcy Code; provided, however, that neither the proceeds from the Chapter 5 causes of action nor the Chapter 5 causes of action themselves shall be used to satisfy the Super-Priority Claims unless otherwise ordered by the Court. Lender shall have the right to seek a modification of the aforementioned exclusion at a later date. Subject only to the Carve-Out and the fees of the U.S. Trustee, no cost or expense of administration under 11 U.S.C. §§ 105, 364(c)(1), 503(b), 506(c), 507(b), or otherwise, including those resulting from the conversion of this case pursuant to 11 U.S.C. § 1112, shall be senior to, or *pari passu* with, the Super-Priority Claims.

7.      As security for the Post-Petition Obligations, Lender shall have, and is hereby granted (effective upon the date of this Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or otherwise, and notwithstanding any provision of any instrument executed prior to the Petition Date purporting to restrict the grant of liens on any of the Pre or Post-Petition Collateral), valid and perfected security interests in and liens upon (the "DIP Liens"), all present and after-acquired property of the Debtors of any nature whatsoever including, without limitation, all property constituting Pre-Petition Collateral and/or the Post-Petition Collateral (as these terms are further defined in the Ratification Agreement), which includes, but is not necessarily limited to:

A.      all Accounts;

B.      all general intangibles, including, without limitation, all Intellectual Property but not including Chapter 5 causes of action as set forth below;

C.      all goods, including, without limitation, Inventory and Equipment;

D.      all Real Property and fixtures;

E.     all chattel paper, including, without limitation, all tangible and electronic chattel paper;

F.     all instruments, including, without limitation, all promissory notes;

G.     all documents;

H.     all deposit accounts;

I.     all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

J.     all supporting obligations and all present and future Liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (i) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (ii) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lien holder or secured party, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (iv) deposits by and property of account debtors or other persons securing the obligations of account debtors;

K.     all (i) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (ii) monies, credit balances, deposits and other property of the Debtors now or hereafter held or received by or in transit to Lender or at any other depository or other institution from or for the account of the Debtors, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

L.     all commercial tort claims;

M.     to the extent not otherwise described above, all Receivables;

N.     all Records; and

O.     all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral, as further stated and/or defined in the Ratification Agreement (collectively, the "Collateral"), with such DIP Liens having the following priorities:

(1)     Pursuant to 11 U.S.C. § 364(d), a first priority, perfected lien upon all of the Debtors' right, title, and interest in, to and under all the Collateral that was otherwise encumbered by Lender's liens under the Existing Financing Agreements and the DIP Loan Documents;

(2)     Pursuant to 11 U.S.C. § 364(c)(2), a first priority, perfected lien upon all of the Debtors' right, title and interest in, to and under all the Collateral that was not otherwise encumbered by a validly perfected security interest or lien on the Petition Date; and

(3)     Pursuant to 11 U.S.C. § 364(c)(3), a junior, perfected lien upon all of the Debtors' right, title and interest in, to and under all the Collateral that is encumbered by a validly perfected security interest or lien of any party in existence as of the Petition Date, or a valid lien perfected (but not granted) after the Petition Date to the extent such perfection in respect of a claim prior to the Petition Date that is expressly permitted under the Bankruptcy Code.

P.     Notwithstanding the foregoing list of the Collateral and lien rights thereon, no interest in or lien or lien right is granted in and to any cause of action under Chapter 5 of Title 11 of the United States Code, and/or the product and/or proceeds thereof.

8.     The Debtors shall promptly, if requested by Lender, execute and deliver to Lender all such documents as Lender may request to effectuate, evidence, confirm, validate, or perfect Lender's liens on and security interests in the Collateral as provided for herein or granted pursuant to any of the DIP Loan Documents, including, without limitation, UCC-1 financing statements, mortgages, continuation statements, amendments, and lock-box and blocked account agreements. The liens and priority granted to the Lender pursuant to the Order and the Ratification Agreement shall be perfected by operation of law upon entry of this Order by the Court.  Lender shall not be required to file any UCC-1 financing statements, mortgages or any other document, or take any other action (including possession of any of the Collateral) in order to validate or perfect the liens and security interests granted to Lender hereunder or under any of the DIP Loan Documents, as all such liens and security interests shall be deemed automatically perfected as of the date of the Order.  If Lender shall, in its discretion, choose to file such UCC-1 financing statements (or amendments to or continuations of any existing financing statements), mortgages and otherwise confirm perfection of such liens and security interests, all such financing statements, mortgage or similar instruments shall be deemed to have been filed or recorded at the time and on the date of entry of the Order.  Lender may, in its discretion, file a certified copy of this Order in any filing or recording office in any jurisdiction in which the Debtors have or maintain any of the Collateral or an office.

9.     Any provision of this Order or the Ratification Agreement to the contrary notwithstanding, the DIP Liens and Super-Priority Claims granted to Lender pursuant to the Ratification Agreement and this Order shall be subject and subordinate to a carve-out (the "Carve-Out") for: (a) the payment of allowed professional fees and disbursements incurred by bankruptcy counsel retained, pursuant to 11 U.S.C. §§ 327 or 1103(a), by the Debtors in an amount not to exceed $50,000 (the "Post-Default Carve-Out Amount") on account of such professional fees and disbursements incurred following the "Default Point" (as defined below), and the aggregate amount (the "Pre-Default Carve-Out Amount") of all accrued, invoiced or paid professional fees and disbursements for the time period from the Petition Date until the Default Point up to the amount set forth in the Budget during the time period from the Petition Date until the Default Point (provided nothing herein shall be construed to (i) provide for double payment of any fees or disbursements; (ii) alter the procedures for the approval of professional compensation

as set forth under the Bankruptcy Code and Rules and the rules of this Court; or (ii) alter the ability of any party to object to such fees and disbursements); and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; provided, however, the Carve-Out shall not include professional fees and disbursements above $25,000 incurred in connection with investigating and/or any professional fees and disbursements litigating any claims or causes of action against Lender and/or any defense to the Pre-Petition Debt or any lien of Lender.  Until the Default Point, the Debtors shall be permitted to pay compensation and reimbursement of expenses in accordance with the Budget, allowed and payable under 11 U.S.C. §§ 330 and 331 and/or all other orders of the Court, as the same may be payable, and the amounts so paid shall be free and clear of the DIP Liens and the Super-Priority Claims. As used herein, "Default Point" means that date when both (x) an Event of Default shall have occurred and (y) Lender has ceased making advances to the Debtors under the DIP Loan Documents.  The Lender shall be entitled to reserve for such amounts.

10.     As set forth in the Ratification Agreement, and as long as any portion of the Post-Petition Obligations remains unpaid, it shall constitute an Event of Default, in addition to other Events of Default in the Ratification Agreement, if: (a) there shall be entered any order dismissing or converting these bankruptcy cases; (b) there shall be entered an order appointing a trustee or an examiner with expanded powers; or (c) except as otherwise expressly permitted under the Ratification Agreement, there shall be entered in this case, or any subsequent Chapter 7 case, any order that authorizes under any section of the Bankruptcy Code, including 11 U.S.C. §§ 105, 363 or 364, (x) the granting of any senior or *pari passu* lien or security interest in any property of the Debtors that is encumbered by Lender; (y) the use of cash collateral attributable to the Post-Petition Collateral and/or Pre-Petition Collateral; and/or (z) the obtaining of credit or the incurring of indebtedness that is entitled to super-priority administrative status equal or superior to that granted to Lender pursuant to this Order; unless, in connection with any transaction cited in clause (x), (y) or (z) of this paragraph, such order requires that the Post-Petition Obligations shall first be indefeasibly paid in full to Lender.  Absent payment in full, the liens, security interests, priority claims, rights, and remedies granted to Lender pursuant to this Order and the DIP Loan Documents shall not be modified, altered, or impaired in any manner by any plan of reorganization or liquidation or order of confirmation for the Debtors' bankruptcy estates, or by any other financing of, extensions of credit to, or incurring of debt by the Debtors, whether pursuant to 11 U.S.C. § 364 or otherwise.

11.     Nothing herein shall be deemed to be a waiver by Lender of any right including the right to request additional or further protection of their interests in any property of the Debtors, to move for relief from the automatic stay, to seek the appointment of a trustee or examiner or the dismissal of this case, or to request any other relief.  Nor shall anything herein or in the Ratification Agreement constitute an admission by Lender of the quantity, quality, or value of any collateral securing the Pre-Petition Debt or Post-Petition Obligations or constitute a finding of adequate protection with respect to the interests of Lender in any such collateral.  Lender shall be deemed to have reserved all rights to assert entitlement to the protections and benefits of 11 U.S.C. § 507(b) in connection with any use, sale, or other disposition of any of the Collateral, to the extent that the protection afforded by this Order to Lender's interests in any Collateral proves to be inadequate.

12.     Except as otherwise provided herein, Lender's pre-petition claims, including the Pre-Petition Debt, liens, and security interests shall be deemed valid, perfected, and enforceable as to all creditors and parties-in-interest, and shall be subject to no further challenge, unless a creditor or party-in-interest, including, without limitation, any committee appointed in this case, (a) shall have commenced an adversary proceeding or contested matter against Lender (in its capacity as pre-petition lender and/or pre-petition agent) for the purpose of challenging the amount, validity, extent, priority, perfection, and enforceability of the Pre-Petition Debt or Lender's liens, claims, mortgages, and security interests in the Pre-Petition Collateral or otherwise asserting any claims or causes of action against Lender on behalf of the Debtors' bankruptcy estates, within sixty (60) days from entry of the Final Order; and (b) the Court rules in favor of the plaintiff or movant in any such timely-filed adversary proceeding or contested matter.  Any person or entity, including without limitation any committee appointed in this case, that fails to commence such an adversary proceeding or contested matter within such periods shall be barred from doing so.  The Debtors shall have no right to challenge the Lender's Pre-Petition Debt or the Pre-Petition Liens and are otherwise bound by the stipulations and agreements contained in this Order and the Existing Financing Agreements.

13.     Until all obligations under the Existing Financing Agreements have been paid, subject to any right to challenge to the Pre-Petition Liens and/or the Pre-Petition Debt, and in an effort to provide adequate protection, pursuant to 11 U.S.C. § 361, of the interest of Lender under the Existing Financing Agreements, Lender is hereby granted, to the extent of the diminution of the value of the Pre-Petition Collateral, a valid, perfected and enforceable security interest in and replacement liens upon all of the assets of the Debtors, exclusive of all causes of action under Chapter 5 of Title 11 of the United States Code, and all products and proceeds thereof, created after the Petition Date, including, without limitation, the Collateral, and all of the Debtors' accounts, contract rights, inventory, general intangibles and such other Collateral in which Lender has an interest prior to the Petition Date and all improvements thereof, all books and records with respect thereto and all products and proceeds of the foregoing, provided that any and all such replacement liens granted to Lender by operation of this paragraph shall be subordinate in all respects to the liens, claims and security interests granted to Lender under the terms of the DIP Loan Documents and this Order. The security interests and liens granted to Lender in this paragraph shall be effective immediately and without the necessity of the execution or filing by the Debtors of a security agreement, financing statements, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office or Copyright Office, mortgages, landlord lien waivers, licensee consents or otherwise.

14.     Subject to the provisions of the Ratification Agreement, the DIP Loan Documents, and this Order, until all obligations under the Existing Financing Agreements have been paid, subject to any right to challenge to the Pre-Petition Liens and/or the Pre-Petition Debt, and in an effort to provide adequate protection, pursuant to 11 U.S.C. § 361, of the interests of Lender under the Existing Financing Agreements, unless and until the occurrence of an Event of Default pursuant to and as defined in the Ratification Agreement, the Debtors are authorized and directed to pay to the Lender for application to the Pre-Petition Debt all collections on accounts and sales of inventory that constitute Pre-Petition Collateral, including interest pursuant to the terms of the Existing Financing Agreements on the Petition Date, on the Pre-Petition Debt as adequate protection payments to Lender. All such payments are adequate protection payments and are to be

afforded the full and complete protection given to such payments under the Bankruptcy Code. These payments are to be made to Lender because, among other things, the Debtors will continue to use the Pre-Petition Collateral that secures the claims and obligations owing under the Existing Financing Agreements. Such payments are being made for the purpose of, among other things, protecting Lender's claims and obligations, and Collateral interest from such use and the potential depreciation and deterioration of the Collateral as a result thereof. Upon satisfaction in full of the Pre-Petition Debt, collections from Pre-Petition Collateral shall be applied to the Post-Petition Obligations.

15.     As long as any portion of the Post-Petition Obligations remains unpaid, all proceeds of dispositions of any or all of the Post-Petition Collateral including, but not limited to, all proceeds from the sales of any or all of the Post-Petition Collateral in the ordinary course of business or outside the ordinary course of business, shall be paid promptly to Lender in reduction of the Post-Petition Obligations under the Ratification Agreement to the extent of Lender's interest and priority in all the Collateral. The Debtors and Lender are hereby authorized (a) to create and implement blocked accounts and/or lock-box accounts for such purposes as are set forth in the DIP Loan Documents; (b) to deposit or cause to be deposited, or to remit, in kind, immediately to Lender, all monies, checks, credit card sales drafts, credit card sales or charges slips or receipts, or any other form of receipts, drafts and any other payments or proceeds of Collateral received from account debtors and other parties, now or hereafter obligated to pay for inventory or other property of the Debtors' bankruptcy estates in any blocked accounts/lock-box accounts established for the benefit of Lender; (c) to instruct all parties now or hereafter in possession of monies, claims or other payments for the accounts of the Debtors or other properties of the Debtors' bankruptcy estates in which Lender have a security interest or lien to remit such payments to any blocked accounts/lock-box accounts; and (d) to enter into such agreements as may be necessary to effectuate the foregoing.

16.     The Debtors are authorized and directed to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements in addition to the Ratification Agreement and the DIP Loan Documents, as Lender may reasonably require, as evidence of and for the protection of the Post-Petition Obligations, or which otherwise may be deemed reasonably necessary by Lender to effectuate the terms and conditions of this Order and/or the DIP Loan Documents. The Debtors are further authorized, without further order of this Court, to pay Lender all reasonable fees incurred under the DIP Loan Documents, including but not limited to all filing and recording fees, audit fees, appraisal fees, closing fees, servicing fees, unused line fees, early termination fees, letter of credit fees, and any other fees as described or allowed in the DIP Loan Documents. Payment of any attorney and other professional fees shall be subject to further review and approval by the Court in accordance with the Bankruptcy Code and the orders of this Court.

17.     The Debtors and Lender are hereby authorized to implement, in accordance with the terms of the Ratification Agreement, any modifications of the Ratification Agreement without further order of the Court on the following conditions: (a) the modifications must not materially change the terms of the Ratification Agreement ("Material Terms," as used herein, means interest rate, maturity date, events of default and remedies); (b) copies of the modifications must be served

upon counsel for any statutory committees appointed; and (c) any material modifications must be approved by the Court.

18.    Having been found to be extending credit and making DIP Loans to the Debtors in good faith, Lender shall be entitled to the full protection of 11 U.S.C. §§ 363(m) and 364(e) with respect to the Post-Petition Obligations and the DIP Liens created or authorized by this Order in the event that this Order or any authorization contained herein is stayed, vacated, reversed or modified on appeal. Each of the DIP Loan Documents to which the Debtors are and will become a party shall constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with their respective terms. The DIP Loan Documents must be duly executed and delivered to Lender by the Debtors prior to any funding under the Ratification Agreement. Any stay, modification, reversal or vacation of this Order shall not affect the validity of any obligation of the Debtors to Lender incurred pursuant to this Order. Notwithstanding any such stay, modification, reversal or vacation, all Loans made pursuant to this Order and the Ratification Agreement, and all Post-Petition Obligations incurred by the Debtors pursuant hereto or under the DIP Loan Documents prior to the effective date of such stay, modification, reversal or vacation, shall be governed in all respects by 11 U.S.C § 364, the provisions of the DIP Loan Documents, and this Order, and Lender shall be entitled to all the rights, privileges and benefits as a good-faith lender under 11 U.S.C. § 364(e), including without limitation, the DIP Liens and Super-Priority Claims granted herein.

19.    The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order that may be entered (a) converting this case to a Chapter 7 case; (b) dismissing this case; or (c) appointing or confirming the election of a trustee or an examiner with expanded powers in this case, and the terms and provisions of this Order as well as the Super-Priority Claims and DIP Liens granted pursuant to this Order and/or the DIP Loan Documents shall continue in full force and effect notwithstanding the entry of such order, and such Super-Priority Claims and DIP Liens shall maintain their priority as provided by this Order until all of the Post-Petition Obligations are indefeasibly paid in full and discharged.

20.    It shall be an Event of Default for the Debtors to file or otherwise support the confirmation of any plan of reorganization that proposes to treat the Post-Petition Obligations in any manner other than payment-in-full on the date of confirmation, other than a plan of reorganization proposed or accepted in writing by Lender, after which Lender shall have the right to immediately terminate the DIP Facility and to decline to make any further advances there under.

21.    The fees to be paid to Lender pursuant to the Ratification Agreement and the other DIP Loan Documents are reasonable, fully-earned when due and non-refundable when paid, and the Debtors are authorized and directed to pay to Lender any fees which are currently due pursuant to all of the foregoing, but that have not yet been paid.

22.    The Debtors agree to waive and release their rights (i) to challenge or contest the extent, amount, priority, or validity of any liens or security interests securing the Pre-Petition Debt, Post-Petition Obligations, or any liens or security interests granted to Lender under this Order, the Ratification Agreement and Existing Financing Agreements, and/or (ii) to assert defenses, counterclaims, recoupment rights, or setoffs with respect to Lender's claims in these cases.

23.     All DIP Loans are made in reliance on this Order and the Ratification Agreement and, an Event of Default occurs (in addition to the Events of Default set forth herein and in the Ratification Agreement) if the Debtors, prior to the termination or non-renewal by Lender of the Ratification Agreement, sell, lease, or otherwise dispose of property of any of the Debtors' bankruptcy estates, out of the ordinary course of business, in which Lender has a lien, unless (i) permitted by the Ratification Agreement, (ii) Lender shall have given express prior written consent thereto (no such consent being implied from any other action, inaction, or acquiescence by Lender) or (iii) the Court orders otherwise.

24.     The Debtors shall not use any cash collateral, at any time after the termination or non-renewal by Lender of the Ratification Agreement, unless Lender shall have given express prior written consent thereto (no such consent being implied from any other action, inaction, or acquiescence by Lender) or the Court orders otherwise; or at any time after the termination or non-renewal by Lender of the Ratification Agreement seek any order which authorizes the obtaining of credit or the incurring of indebtedness under 11 U.S.C. § 364 secured by a lien or security interest which is equal or senior to a lien or security interest in property that Lender holds, or which is entitled to administrative priority claim status which is equal or superior to that granted to Lender herein, unless, in each instance (i) Lender shall have given express prior written consent thereto, no such consent being implied from any other action, inaction, or acquiescence by Lender, or (ii) such other order requires that the Post-Petition Obligations shall first be immediately and indefeasibly paid in full in cash, including all debts and obligations of the Debtors to Lender which arise or result from the Post-Petition Loans and DIP Liens in the Collateral authorized herein.  The liens and security interest granted to or for the benefit of Lender hereunder and the rights of Lender pursuant to this Order with respect to the Post-Petition Obligations and the Post-Petition Collateral are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of the Debtors and, in the event Lender shall expressly consent in writing that the Post-Petition Obligations shall not be repaid in full upon confirmation thereof, shall continue after confirmation and consummation of any such plan.

25.     Entry of this Order shall be without prejudice to any and all rights, remedies, claims and causes of action that Lender may have against the Debtors or third parties, and without prejudice to the right of Lender to seek relief from the automatic stay in effect pursuant to 11 U.S.C. § 362 or any other relief in this case.  The provisions of this Order shall be binding upon and inure to the benefit of Lender, the Debtors, and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors or the Debtors' bankruptcy estates.

26.     Except as provided hereinabove for the Post-Default Carve-Out Amount, no cost or expense chargeable or alleged to be chargeable against the Collateral under 11 U.S.C. § 506(c) shall be incurred in these proceedings without the express consent of Lender unless the party seeking to impose such cost or expense has first sought the express written consent of Lender upon reasonable notice and opportunity to respond.  Nothing contained in this Order shall be deemed to be a consent by Lender to any charge, lien, assessment or claim against the Collateral under 11 U.S.C. § 506(c) or otherwise.

27.     The terms of this Order shall be deemed to control over terms of the Ratification Agreement and other DIP Loan Documents that are inconsistent with the terms of this Order.

Dated this 24th day of July 2009.

THE HONORABLE WESLEY W. STEEN
UNITED STATES BANKRUPTCY JUDGE

**Agreed to in form and substance by:**

By: _____
David R. Jones
State Bar No. 00786001/S.D.Tex. No. 16082
Joshua W. Wolfshohl
State Bar No. 24038592
Porter & Hedges, L.L.P.
1000 Main Street, 36th Floor
Houston, Texas 77002
(713) 226-6000
(713) 226-6248 (Facsimile)
**Attorneys for the Debtors**

By: _/s/ Michael H. Traison with permission_
Michael H. Traison
Miller Canfield Paddock & Stone, PLC
225 West Washington, Suite 2600
Chicago, Il  60606
(312) 460-4230
**Attorneys for the Official**
**Committee of Unsecured Creditors**

By: _/s/ William L. Medford w/permission_
William L. Medford
Texas State Bar No. 00797060/S.D.Tex. No. 24231
Greenberg Traurig, LP
2200 Ross Ave., Suite 5200
Dallas, Texas 75201
(214) 665-3600 (phone)
(214) 665-5937 (facsimile)
**Attorneys for Wachovia Bank, N.A.**

**EXHIBIT A**

## RATIFICATION AND AMENDMENT AGREEMENT

THIS RATIFICATION AND AMENDMENT AGREEMENT (this "<u>Ratification Agreement</u>" or "<u>Agreement</u>"), dated as of [_____], 2009, is by and among WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association, individually ("<u>Wachovia</u>"), as letter of credit issuer (in such capacity, the "<u>LC Issuer</u>") and as agent (in such capacity, "<u>Agent</u>"), the lenders party to the Credit Agreement defined below (collectively, the "<u>Lenders</u>" and each a "<u>Lender</u>"; the Agent, the LC Issuer and the Lenders are collectively referred to herein as the "<u>Lender Parties</u>" and each a "<u>Lender Party</u>"), BISON BUILDING MATERIALS LLC, a Texas limited liability company, as debtor and debtor-in-possession ("<u>Debtor</u>" or "<u>Borrower</u>") and the persons party hereto as "<u>Guarantors</u>", as debtors and debtors-in-possession (collectively, the "<u>Guarantors</u>" and each a "<u>Guarantor</u>").

## W I T N E S S E T H:

WHEREAS, Debtor and Guarantors have commenced a joint case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division and Debtor and Guarantors have retained possession of their assets and are authorized under the Bankruptcy Code to continue the management and operation of their business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, before the commencement of the Chapter 11 Case (as hereinafter defined), Lenders made loans and advances to Debtor secured by the assets and properties of Debtor and Guarantors and guaranteed by the Guarantors as set forth in the Existing Financing Agreements (as hereinafter defined); and

WHEREAS, Debtor has applied to Agent and Lenders for a post-petition revolving credit facility; and

WHEREAS, the Bankruptcy Court (as hereinafter defined) has entered a Financing Order (as hereinafter defined) pursuant to which Lenders may make post-petition loans and advances to Debtor on the terms therein set forth; and

WHEREAS, the Financing Order provides that as a condition to the making of such post-petition loans and advances and extending such other financial accommodations Debtor and Guarantors shall execute and deliver this Ratification Agreement; and

WHEREAS, each of Debtor and each Guarantor desires to reaffirm its obligations pursuant to the Existing Financing Agreements, ratify the Existing Financing Agreements and acknowledge its continuing liabilities to Agent and Lenders thereunder as set forth herein in order to induce Lenders to make such post-petition loans and advances to Debtor; and

WHEREAS, Debtor has also requested that Agent and Lenders agree to amend the Credit Agreement (as hereinafter defined) as provided in this Ratification Agreement and Agent and Lenders are willing to do so, subject to the terms and conditions contained herein;

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, LC Issuer, Lenders, Debtor and Guarantors mutually covenant, warrant and agree as follows:

1.    DEFINITIONS

1.1    Additional Definitions. As used herein, the following terms shall have the respective meanings given to them below and the Credit Agreement shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    "Bank Product Provider" shall mean any Lender or any Affiliate of a Lender or other financial institution approved by Agent that provides any Bank Products to the Credit Parties.

(b)    "Bank Products" shall mean any one or more of the following types of services or facilities provided to a Credit Party or any Subsidiary thereof by a Bank Product Provider: (a) credit cards or stored value cards (including credit cards or stored value cards issued to employees of a Credit Party or Subsidiary thereof), (b) cash management or related services, including, without limitation (i) the automated clearinghouse transfer of funds for the account of a Credit Party or Subsidiary thereof pursuant to agreement or overdraft for any accounts of a Credit Party or Subsidiary thereof maintained at Agent or any other Bank Product Provider that are subject to the control of Agent (whether by operation of law or pursuant to a control agreement to which Agent is a party), as applicable and (ii) controlled disbursement services and (c) Hedge Agreements, if and to the extent permitted under the Financing Agreements.

(c)    "Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

(d)    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of Texas, Houston Division or the United States District Court for the Southern District of Texas or any other court having jurisdiction over the Chapter 11 Case from time to time.

(e)    "Budget" shall mean any set of projections approved by the Agent showing all projected cash receipts and all projected cash disbursements (with detail as to sources of cash receipts and identification of cash disbursements) for the Debtor and Guarantors delivered to Agent pursuant to Section 5.4 of this Agreement or Section 6.2(i) of the Credit Agreement. The initial Budget shall be substantially in the form of Exhibit "A" hereto and made a part hereof and all Budgets thereafter shall be in form and detail acceptable to Agent showing all facets of the Debtors and Guarantors' operations (with inclusion of the following line items: sales, expenses, collections, inventory purchases, loan balance and excess availability).

(f)    "Budget Variance" shall mean, for any rolling four week period, (i) with respect to any expense or disbursement line item set forth in the Budget or with respect to the aggregate amounts set forth for expenses or disbursements, a variance of more than or equal to one hundred

and fifteen percent (115%) of any such amount during such period and (ii) with respect to any revenue or collection line item set forth in the Budget or with respect to the aggregate amounts set forth for revenue or collection, a variance of less than or equal to eighty-five percent (85%) of any such amount during such period.

(g) "Carve-Out" shall have the meaning assigned to it in the Financing Order.

(h) "Carve-Out Amount" shall mean a carve-out for: (a) the payment of allowed professional fees and disbursements incurred by bankruptcy counsel retained, pursuant to 11 U.S.C. §§ 327 or 1103(a), by the Debtors in an amount not to exceed $50,000 (the "Post-Default Carve-Out Amount") on account of such professional fees and disbursements incurred following the "Default Point" (as defined below), and the aggregate amount (the "Pre-Default Carve-Out Amount") of all accrued, invoiced or paid professional fees and disbursements for the time period from the Petition Date until the Default Point up to the amount set forth in the Budget during the time period from the Petition Date until the Default Point (provided nothing herein shall be construed to (i) provide for double payment of any fees or disbursements; (ii) alter the procedures for the approval of professional compensation as set forth under the Bankruptcy Code and Rules and the rules of the Bankruptcy Court; or (ii) alter the ability of any party to object to such fees and disbursements); and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; provided, however, the Carve-Out Amount shall not include professional fees and disbursements above $25,000 incurred in connection with investigating and/or any professional fees and disbursements litigating any claims or causes of action against Lender and/or any defense to the Pre-Petition Debt or any lien of Lender. Until the Default Point, the Debtors shall be permitted to pay compensation and reimbursement of expenses in accordance with the Budget, allowed and payable under 11 U.S.C. §§ 330 and 331 and/or all other orders of the Bankruptcy Court, as the same may be payable, and the amounts so paid shall be free and clear of the DIP Liens and the Super-Priority Claims. As used herein, "Default Point" means that date when both (x) an Event of Default shall have occurred and (y) Lender has ceased making advances to the Debtors under the DIP Loan Documents. The Lender shall be entitled to reserve for such amounts.

(i) "Chapter 11 Case" shall mean the Chapter 11 Cases of Debtor and Guarantors, Chapter 11 Case No's. [_____] through [_____], which are being administered under the Bankruptcy Code, and are pending in the Bankruptcy Court.

(j) "Collateral" shall mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral. Collateral shall not in any event include claims and causes of action of any Credit Party arising under §§ 544, 545, 547, 548 or 549 of the Bankruptcy Code.

(k) "Collection Account" shall mean account #2000018530395 of Debtor maintained with and controlled by Agent.

(l) "Credit Agreement" shall mean the Amended and Restated Credit Agreement, dated November 17, 2005, between Agent, Lender and Bison Building Materials LLC (as successor by Merger with Bison Building Materials, Ltd.), as Borrower, as amended by First Amendment to Amended and Restated Credit Agreement dated as of January 18, 2006, Second Amendment to Amended and Restated Credit Agreement dated as of March 10, 2006, Third

RATIFICATION AND AMENDMENT AGREEMENT - Page 3
DAL 77,552,678.6

Amendment to Amended and Restated Credit Agreement dated as of September 8, 2006, Fourth Amendment to Amended and Restated Credit Agreement dated as of July 30, 2007, Fifth Amendment to Amended and Restated Credit Agreement dated as of February 26, 2008, Sixth Amendment to Amended and Restated Credit Agreement and Limited Waiver dated as of July 29, 2008, Seventh Amendment to Amended and Restated Credit Agreement dated as of January 6, 2009, and Eighth Amendment to Amended and Restated Credit Agreement dated as of March 31, 2009, as the same now exists (including after amendment hereby) or may hereafter be amended, modified, supplemented , extended, renewed, restated or replaced.

(m)   "Credit Parties" shall mean, collectively, Debtor and each Guarantor.

(n)   "Debtor" shall mean Bison Building Materials LLC, a Texas limited liability company, as a debtor and debtor-in-possession, and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(o)   "Default Point" means that date when both (x) an Event of Default shall have occurred and shall be continuing and (y) Lenders shall have notified Borrower that, as a result of such Event of Default, Lenders will no longer make advances to the Borrower under the Credit Agreement, as amended hereby.

(p)   "Existing Events of Default" shall mean the Events of Default existing as of the Petition Date under the Existing Financing Agreements, as amended hereby, as specifically set forth in Schedule I attached hereto.

(q)   "Existing Financing Agreements" shall mean the Financing Agreements as in effect immediately before the Petition Date.

(r)   "Final Financing Order" shall mean the order entered by the Bankruptcy Court in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2), pursuant to Section 364(c) and (d) of the Bankruptcy Code, as to which no stay pending appeal has been entered, and no motion to reconsider filed, and which has not been vacated, modified or reversed, (i) authorizing the Borrower to incur post-petition secured indebtedness and authorizing the Credit Parties to grant Liens in accordance with this Agreement and the other Financing Agreements, (ii) providing for the super-priority of the Obligations, including without limitation, a specific grant of a security interest to Agent, for the benefit of Lender Parties, in all Collateral, as well as the right to the proceeds from all Collateral in accordance with this Agreement and the other Financing Agreements, (iii) providing "adequate protection" pursuant to Section 364(d) of the Bankruptcy Code to such creditors whose Liens have been primed, if any, and (iv) authorizing the payment by the Borrower of all fees and expenses contemplated by this Agreement and the other Financing Agreements, including, but not limited to, those certain fees set forth in Section 10 herein, each as set forth in such order, and in all respects to be satisfactory to Agent.

(s)   "Financing Agreements" shall mean, collectively, the Credit Agreement, the Security Documents, the Guarantees and the other Existing Financing Agreements and this

Agreement, together with all supplements, agreements, notes, documents, security agreements, pledge agreements, instruments and guarantees at any time executed and/or delivered in connection therewith or related thereto, as all of the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(t)    "Financing Order" shall mean, collectively, the Interim Financing Order, the Final Financing Order and such other orders relating thereto or authorizing the granting of credit by Lender Parties to Debtor on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

(u)    "Guarantees" shall mean the guarantees listed on Exhibit "B" attached hereto and made a part hereof, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(v)    "Guarantors" shall mean, collectively, Bison Building GP, Inc., Bison Building Holdings Inc., Milltech Inc., HLBM Company, Bison Building Materials Nevada, LLC, Bison Multi-Family Sales, LLC, and Bison Construction Services, LLC, each as a debtor and debtor-in-possession, and their successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as such Person's legal representative or with respect to the property of the estate of such Person whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and their successors upon conclusion of the Chapter 11 Case).

(w)    "Hedge Agreements" shall mean (a) any agreement providing for options, swaps, floors, caps, collars, forward sales or forward purchases involving interest rates, commodities or commodity prices, equities, currencies, bonds, or indexes based on any of the foregoing, including, without limitation, Swap Agreements, (b) any option, futures or forward contract traded on an exchange, and (c) any other derivative agreement or other similar agreement or arrangement.

(x)    "Interim Financing Order" shall mean the order entered by the Bankruptcy Court in the Chapter 11 Case pursuant to Section 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), as to which no stay pending appeal, has been entered, and which Interim Order has not been vacated, modified or reversed, (i) authorizing the Borrower to incur post-petition secured indebtedness and authorizing the Credit Parties to grant Liens in accordance with this Agreement and the other Financing Agreements, (ii) providing for the super-priority of the Obligations, including without limitation, a specific grant of a security interest to Agent, for the benefit of Lender Parties, in all Collateral, as well as the right to the proceeds from all Collateral in accordance with this Agreement and the other Financing Agreements, (iii) providing "adequate protection" pursuant to Section 364(d) of the Bankruptcy Code to such creditors whose Liens have been primed, and (iv) authorizing the payment by the Borrower of all fees and expenses contemplated by this Agreement and the other Financing Agreements, including, but not limited to, those certain fees set forth in Section 11 hereof, each on an interim basis and as set forth in such order, and in all respects to be satisfactory to Agent.

(y)    "Lockbox" shall mean Debtor's lockbox #951315 maintained with Agent.

(z) "Petition Date" shall mean the date of the commencement of the Chapter 11 Case.

(aa) "Post-Petition Borrowing Base" means an amount equal to (1) 85% of the Credit Parties Eligible Receivables, less adjustments to the extent required by Agent for the effect of non-cash credits against Accounts of the Credit Parties in excess of 5% of the aggregate amount of all Accounts, plus (2) the lesser of (a) 50% of the Credit Parties' Eligible Inventory and (b) up to 85% of the NOLV of the Credit Parties' Eligible Inventory, minus (3) Reserves established by Agent.

(bb) "Post-Petition Closing Date" shall mean the date upon which all conditions precedent set forth in Section 9 of this Agreement have been satisfied.

(cc) "Post-Petition Collateral" shall mean, collectively, all now existing or hereafter acquired personal property of Credit Parties' estates, wheresoever located, of any kind or nature, including fixtures, upon which Agent, for the benefit of Lender Parties, is granted a security interest or lien pursuant to the Financing Agreements or the Financing Order or any other order entered or issued by the Bankruptcy Court. Post-Petition Collateral shall not in any event include claims and causes of action of any Credit Party arising under §§ 544, 545, 547, 548 or 549 of the Bankruptcy Code.

(dd) "Post-Petition LC Obligations" shall mean, at any time of determination, the sum of all Post-Petition Matured LC Obligations plus the maximum amounts which LC Issuer might then or thereafter be called upon to advance under all Post-Petition Letters of Credit then outstanding.

(ee) "Post-Petition Letter of Credit" means any post-petition letter of credit issued by LC Issuer pursuant to Section 7.5 of this Agreement at the application of Borrower.

(ff) "Post-Petition Loan Limit" shall mean $25,000,000.

(gg) "Post-Petition Matured LC Obligations" shall mean all amounts paid by LC issuer on drafts or demands for payment drawn or made under or purported to be under any Post-Petition Letter of Credit and all other amounts due and owing to LC Issuer under any LC Application for any Post-Petition Letter of Credit, to the extent the same have not been repaid to LC Issuer (with the proceeds of Post-Petition Revolving Loans or otherwise).

(hh) "Post-Petition Obligations" shall mean (a) all Post-Petition Revolving Loans, Post-Petition LC Obligations and all other advances, debts, obligations, liabilities, indebtedness, covenants and duties of Credit Parties to Lender Parties of every kind and description, however evidenced, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not due, primary or secondary, liquidated or unliquidated, and (b) all obligations, liabilities and indebtedness of every kind, nature and description arising under or pursuant to any Bank Products and, with respect to each of (a) and (b) of this definition, arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Case, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Case, and arising under or related to this Agreement, the other Financing Agreements, a Financing Order or by operation of law or otherwise and whether incurred by Credit Parties as principal, surety, endorser, guarantor or otherwise and including, without

limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, early termination fees, prepayment penalties, late payment fees, other fees, commissions, costs, expenses and attorneys, accountants and consultants fees and expenses incurred by Lender Parties in connection with any of the foregoing.

(ii)   "Post-Petition Revolving Loan Commitment" shall mean the lesser of (a) the Post-Petition Loan Limit and (b) the Post-Petition Borrowing Base.

(jj)   "Post-Petition Revolving Loan Default Interest Rate" shall mean the Post-Petition Revolving Loan Interest Rate plus two percent (2.0%) per annum.

(kk)   "Post-Petition Revolving Loan Interest Rate" shall mean the LIBOR Market Index Rate plus five percent (5.0%) per annum.

(ll)   "Post-Petition Revolving Loans" shall mean the loans made by Lenders to or for the benefit of Borrower on a revolving basis as set forth in Section 7 hereof.

(mm)   "Pre-Petition Collateral" shall mean all "Collateral" as such term is defined in the Credit Agreement and all other security for the Pre-Petition Obligations as provided in the Existing Financing Agreements immediately prior to the Petition Date.

(nn)   "Pre-Petition Obligations" shall mean all Loans, LC Obligations, and all other advances, debts, obligations, liabilities, indebtedness, covenants and duties of Credit Parties to Lender Parties of every kind and description, however evidenced, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not due, primary or secondary, liquidated or unliquidated, and all obligations, liabilities and indebtedness of every kind, nature and description owing by any or all of the Credit Parties to Agent or any Lender or any Affiliate of Agent or any Lender arising under or pursuant to any Swap Agreement, each arising before the Petition Date and arising under or related to the Existing Financing Agreements or by operation of law and whether incurred by Credit Parties as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, early termination fees, prepayment penalties, late payment fees, other fees, commissions, costs, expenses and attorneys, accountants and consultants fees and expenses incurred in connection with any of the foregoing.

(oo)   "Reserves" shall mean, on any date of determination, the sum of (a) a reserve or reserves in the full amount of the Carve-Out Amount on such date and (b) such other reserves against availability that Agent, in its reasonable credit judgment, establishes from time to time.

(pp)   "Security Documents" shall mean the documents and instruments listed on Exhibit "C" attached hereto and made a part hereof, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(qq)   "Termination Date" shall mean the earlier to occur of: (i) 180 days after the Petition Date; (ii) the date of termination of Lenders' obligation to make Post-Petition Revolving Loans and LC Issuer to issue Post-Petition Letters of Credit pursuant to Section 8.1 of the Credit Agreement; (iii) July 6, 2009, if the Interim Financing Order, in form and substance acceptable

to Agent, has not been entered by the Bankruptcy Court by such date; (iv) August 15, 2009, if the Final Financing Order, in form and substance acceptable to Agent, has not been entered by the Bankruptcy Court by such date; (v) the date on which the Interim Financing Order expires, unless the Final Financing Order shall have been entered and become effective by such date; (vi) the date of entry of an order of the Bankruptcy Court confirming a plan of reorganization in any Chapter 11 Case that has not been consented to by Agent and that fails to provide for the payment in full in cash of all Obligations (and termination of all related lending commitments) on the effective date of such plan; (vii) if a plan of reorganization that has been consented to by the Agent or that provides for payment in full in cash of all Obligations (and termination of all related lending commitments) has been confirmed by order of the Bankruptcy Court, the earlier of (1) the effective date of such plan of reorganization or (2) the thirtieth (30th) day after the date of entry of such confirmation order; (viii) conversion or dismissal of the Chapter 11 Case; or (ix) appointment of a trustee (or examiner with expanded powers equivalent to those of a trustee) in the Chapter 11 Case.

        1.2    <u>Amendments to Definitions in Financing Agreements.</u>

        (a)    All references to the term "Collateral" in the Credit Agreement or any other term referring to the security for the Pre-Petition Obligations therein shall be deemed and each such reference is hereby amended to include, without limitation, the Pre-Petition Collateral and the Post-Petition Collateral. All references to the term "Collateral" of any Person in any Security Document or any other term referring to the security for the Pre-Petition Obligations therein shall be deemed and each such reference is hereby amended to include, without limitation, the Pre-Petition Collateral of such Person and the Post-Petition Collateral of such Person.

        (b)    All references to the term "Borrower" in any of the Existing Financing Agreements, shall be deemed and each such reference is hereby amended to mean and include Bison Building Materials LLC, a Texas limited liability company, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

        (c)    All references to the term "Guarantor" in the Bison GP Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the Bison GP Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include Bison Building GP, Inc., a Texas corporation, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

        (d)    All references to the term "Guarantor" in the Bison Holdings Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the Bison Holdings Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include Bison Building Holdings Inc., a Texas corporation, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any

trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(e)     All references to the term "Guarantor" in the Milltech Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the Milltech Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include Milltech Inc., a Colorado corporation, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(f)     All references to the term "Guarantor" in the HLBM Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the HLBM Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include HLBM Company, a Texas corporation, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(g)     All references to the term "Guarantor" in the Bison Nevada Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the Bison Nevada Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include Bison Building Materials Nevada, LLC, a Nevada limited liability company, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(h)     All references to the term "Guarantor" in the Bison Multi-Family Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the Bison Multi-Family Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include Bison Multi-Family Sales, LLC, a Texas limited liability company, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(i)     All references to the term "Guarantor" in the Bison Construction Services Guaranty (as such term is defined in Exhibit "B") and to the term "Debtor" in the Bison Construction Services Security Agreement (as such term is defined in Exhibit "C") shall be deemed and each such reference is hereby amended to mean and include Bison Construction

Services, LLC, a Texas limited liability company, as debtor and debtor-in-possession and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(j)    All references to the term "Loan Document" in any of the Existing Financing Agreements, shall be deemed and each such reference is hereby amended to include, in addition and not in limitation, this Agreement, all of the Existing Financing Agreements as ratified, assumed and adopted by Credit Parties pursuant to the terms hereof, as amended and supplemented hereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(k)    All references to the term "Agreement" in the Credit Agreement and to the term "Credit Agreement" in any of the other Existing Financing Agreements and the Financing Agreements shall be deemed and each such reference is hereby amended to mean this Agreement, all of the Existing Financing Agreements as ratified, assumed and adopted by Debtor pursuant to the terms hereof, as amended and supplemented hereby and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(l)    All references to a "Guaranty" in the Existing Financing Agreements shall be deemed and each such reference is hereby amended to mean such Guaranty, as ratified, assumed and adopted by the applicable Guarantor pursuant to the terms hereof, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(m)    All references to a "Security Agreement" in the Existing Financing Agreements shall be deemed and each such reference is hereby amended to mean the Security Agreements, this Agreement, all of the Existing Financing Agreements as ratified, assumed and adopted by Credit Parties pursuant to the terms hereof, as amended and supplemented hereby and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(n)    All references to "Agreement" in any Security Document shall be deemed and each such reference is hereby amended to mean such Security Document and this Agreement, each as ratified, assumed and adopted by Credit Parties pursuant to the terms hereof, as amended and supplemented hereby and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(o)    All references to the term "Material Adverse Change", "material adverse effect" and "material adverse change" in this Agreement and in any of the Existing Financing Agreements shall be deemed and each reference in the Existing Financing Agreements is amended to add at the end of such term "; provided, that, the commencement of the Chapter 11 Case, and the events which lead to such filing, shall not constitute a material adverse effect or material adverse change."

(p)  All references to the term "LC Obligations" in this Agreement and in any of the Existing Financing Agreements shall be deemed and each such reference in the Existing Financing Agreements is hereby amended to include, without limitation, the Post-Petition LC Obligations.

(q)  All references to the term "Obligations" and "Secured Obligations" in this Agreement and in any of the Existing Financing Agreements shall be deemed and each such reference in the Existing Financing Agreements is hereby amended to include, without limitation, the Pre-Petition Obligations and the Post-Petition Obligations.

1.3  Interpretation.

(a)  For purposes of this Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used and/or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Credit Agreement.

(b)  All references to the terms "Agent", "LC Issuer", "Lender" or any other person pursuant to the definitions in the recitals hereto or otherwise shall include its or their respective successors and assigns.

(c)  All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular.

(d)  All terms not specifically defined herein which are defined in the UCC shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

2.  ACKNOWLEDGMENT

2.1  Pre-Petition Obligations.  Debtor hereby acknowledges, confirms and agrees that Debtor is indebted to Lender Parties for the Pre-Petition Obligations, as of the close of business on the Petition Date, in an amount of not less than $15,368,504.64 in the aggregate, all of which Pre-Petition Obligations are unconditionally owing by Debtor, jointly and severally, individually and collectively, to Lender Parties, together with interest accrued and accruing thereon, in each case together with costs, expenses, fees (including attorneys' fees and legal expenses) and all other charges now or hereafter owed by Debtor to Lender Parties, all of which are unconditionally owing by Debtor to Lender Parties, without offset, recoupment, defense or counterclaim of any kind, nature and description whatsoever.

2.2  Acknowledgment of Security Interests and Liens.  Each Credit Party hereby acknowledges, confirms and agrees that Agent, for the benefit of Lender Parties, has and shall continue to have valid, enforceable and perfected first priority, subject only to the Carve-Out Amount and validly perfected Permitted Liens, and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted by such Credit Party to Agent, for the benefit of Lender Parties, pursuant to the Existing Financing Agreements as in effect immediately prior to the Petition Date to secure all of the Obligations, as well as valid and enforceable first priority and senior security interests in and liens upon (subject and subordinate only to the Carve-Out Amount and validly perfected Permitted Liens) all Post-Petition Collateral granted to Agent, for

the benefit of Lender Parties, under the Financing Order or hereunder or under any of the other Financing Agreements or otherwise granted to or held by Agent, for the benefit of Lender Parties.

     2.3    <u>Binding Effect of Documents</u>.  Each Credit Party hereby acknowledges, confirms and agrees that: (a) each of the Existing Financing Agreements to which it is a party has been duly executed and delivered to Agent by such Credit Party and is in full force and effect as of the date hereof, (b) the agreements and obligations of such Credit Party contained in the Existing Financing Agreements constitute the legal, valid and binding obligations of such Credit Party enforceable against such Credit Party in accordance with their respective terms and no Credit Party has a valid defense, offset, recoupment claim or counterclaim to the enforcement of such obligations, and (c) Lender Parties are and shall be entitled to all of the rights, remedies and benefits provided for in the Financing Agreements and the Financing Order.

3.    <u>ADOPTION AND RATIFICATION</u>.  Each Credit Party hereby (a) ratifies, assumes, adopts and agrees to be bound by the Existing Financing Agreements, as modified by this Agreement, and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of the Existing Financing Agreements, as modified by this Agreement and the Financing Order. All of the Existing Financing Agreements are hereby incorporated herein by reference as amended herein, and hereby are and shall be deemed adopted and assumed in full by each Credit Party, as a debtor and debtor-in-possession, and considered as agreements between Credit Parties and Lender Parties.  Each Credit Party hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Existing Financing Agreements, as amended and supplemented pursuant hereto and the Financing Order, and each Credit Party agrees to be fully bound, as a debtor and debtor-in-possession, by the terms of the Financing Agreements as amended hereby to which such Credit Party is a party.

4.    <u>GRANT OF SECURITY INTEREST</u>

     4.1    <u>Grant of Security Interest</u>.  As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), each Credit Party, as debtor and debtor-in-possession, hereby grants, pledges and assigns to Agent, for the benefit of Lender Parties, and also confirms, reaffirms and restates the prior grant to Agent, for the benefit of Lender Parties, of, continuing security interests in and liens upon, and rights of setoff and recoupment against, all of such Credit Party's Collateral.  Each Credit Party hereby confirms, reaffirms and restates the prior grant to Agent, for the benefit of Lender Parties, of, continuing security interests in and liens upon, and rights of setoff and recoupment against, all of such Credit Party's Collateral.

     4.2    <u>Liens Under Financing Orders</u>.  The Liens and security interests granted to the Agent, for the benefit of Lender Parties, pursuant to the provisions of this Agreement and pursuant to any of the other Financing Agreements shall be all those Liens conferred upon Agent, for the benefit of Lender Parties, by the Bankruptcy Court pursuant to the terms of the Financing Orders. Anything contained in this Agreement or any other Financing Agreements to the contrary notwithstanding, except for the sale of Inventory to buyers in the ordinary course of business and except as specifically permitted herein, no Credit Party has any authority, express or implied, to dispose of any item or portion of the Collateral without the consent of the Agent.

### 4.3    Priority of Liens; Further Assistance.

(a)    The Liens granted pursuant to the terms of this Agreement and the other Financing Agreements, and the Liens conferred upon Agent, for the benefit of Lender Parties, pursuant of the Financing Orders, shall constitute (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, a "super-priority" administrative expense claim, subject and subordinate only to the Carve-Out Amount, (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, a first-priority Lien, subject and subordinate only to the Carve-Out Amount, upon or security interest in all of the Post-Petition Collateral that is not otherwise encumbered by a validly perfected security interest or Lien in existence on the Petition Date that has not been primed, if any; and (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, a second priority Lien upon or security interest in all of the Post-Petition Collateral subject to a validly perfected and unavoidable security interest or Lien that has not been primed and which has not been subordinated to the Liens in favor of Agent, for the benefit of Lender Parties in their capacity as pre-petition lenders.

(b)    Agent's Liens on and in the Collateral of the Credit Parties and Agent's and Lenders' respective administrative claims under Section 364(c)(1) and 364(d) of the Bankruptcy Code afforded the Obligations shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code, subject and subordinate only to the Carve-Out Amount. Except for the Carve-Out Amount, no expenses, costs or charges in connection with the Bankruptcy Case shall be charged against the Collateral or any Lender Party under Section 506(c) of the Bankruptcy Code and each Credit Party hereby waives any rights it has to seek such charges under Section 506(c) of the Bankruptcy Code.

5.    REPRESENTATIONS, WARRANTIES AND COVENANTS.    The Credit Parties hereby ratify and confirm the representations and warranties contained in Sections 5.2, 5.3 (subject to entry of the Financing Orders), and 5.5 (subject to entry of the Financing Orders) of the Credit Agreement (but not any other representation therein or in any other Existing Financing Agreements). In addition, the Credit Parties, jointly and severally, hereby represent, warrant and covenant with, to and in favor of Lender Parties the following:

5.1    Use of Proceeds. The Debtor shall use the proceeds of all Post-Petition Revolving Loans for the purpose of funding post-petition cash expenditures expressly set forth in the Budget. No portion of any administrative expense claim or other claim relating to the Chapter 11 Case shall be paid with the proceeds of such Post-Petition Revolving Loans provided by Lenders to Debtor, other than those administrative expense claims and other claims relating to the Chapter 11 Case (i) directly attributable to the operation of the business of Debtor and as specifically identified in the Budget, or (ii) as otherwise authorized by the Bankruptcy Court and expressly authorized by Agent in writing. No proceeds of any Post-Petition Revolving Loans or Post-Petition Letter of Credit may be utilized by the Debtor or any other Credit Party to finance in any way any professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against any Lender Party or its counsel or advisors (including advisors to their counsel) under this Agreement, the Credit Agreement, the Financing Agreements or the Existing Financing Agreements and/or challenging or raising any defenses to the obligations or Liens under this Agreement, the Credit Agreement, the Financing Agreements or the Existing Financing Agreements; provided, however, that proceeds of Post-

Petition Revolving Loans in an amount up to $25,000 may be used by counsel to the Official Creditors' Committee, if any, to investigate (but not prosecute) any such claims, causes of action or defenses.

     5.2     <u>Cash Management System; Collection of Receivables and other Collateral</u>.

     (a)     Each Credit Party shall, and shall cause its Subsidiaries to, maintain cash management arrangements consistent with those in effect immediately prior to the Petition Date. Without limiting the foregoing, all proceeds of Collateral shall be deposited into the Lockbox and/or Collection Account and immediately applied against the Obligations in accordance with this <u>Section 5.3</u>. Credit Parties hereby agree to enter into one or more lockbox and/or blocked account or deposit account control agreements with Agent in order to further evidence the Agent's control of amounts held in the Lockbox and the Collection Account, as may be required by Agent in its discretion. Additionally, Credit Parties shall not and shall not cause or permit their Subsidiaries to (i) deposit any Collateral or proceeds of Collateral into any bank account other than the Lockbox or the Collection Account or (ii) establish any new bank accounts without prior written notice to Agent and unless the bank at which the applicable account is to be held enters into a tri-party control agreement, in form and substance reasonably satisfactory to Agent, regarding such bank account pursuant to which such bank (1) acknowledges the security interest of Agent in such bank account, (2) agrees to comply with instructions originated by Agent directing disposition of the funds in the bank account without further consent from such Credit Party or Subsidiary and (3) agrees to subordinate and limit any security interest the bank may have in the bank account.

     (b)     All payments made to the Lockbox, funds received in the Collection Account or other funds received and collected by Agent, whether in respect of Eligible Receivables, as proceeds of Collateral or otherwise, shall be treated, unless otherwise specified by or prohibited by the Financing Orders, (i) to the extent such property is Pre-Petition Collateral or the proceeds of Pre-Petition Collateral, first as payments on the Pre-Petition Obligations, and then as payments to Agent, for the benefit of Lender Parties, in respect of the Obligations and therefore shall constitute the property of Lender Parties to the extent of the then outstanding Obligations, and (ii) to the extent such property is Post-Petition Collateral, first as payments to Agent, for the benefit of Lender Parties, in respect of the Post-Petition Obligations and therefore shall constitute the property of Lender Parties to the extent of the then outstanding Post-Petition Obligations.

     5.3     <u>Budget</u>.

     (a)     The Budget has been thoroughly reviewed by Credit Parties and their management and sets forth projected cash disbursements for the period covered thereby, of Credit Parties.

     (b)     Each Credit Party acknowledges that it shall constitute a material deviation from the Budget and an additional Event of Default under the Credit Agreement if a Budget Variance occurs, as calculated on the second business day of each week based on the rolling four week period ending on the Friday of the immediately preceding week.

(c)     By no later than 11:00 a.m., Prevailing Central Time, on the second business day of each week, the Borrower shall deliver to Agent a schedule of receipts and disbursements received and paid, respectively, during the previous week and other information with respect to compliance with the Budget as requested by the Agent and/or Majority Lenders.

5.4     Sales or other Disposition of Assets. Notwithstanding anything to the contrary contained in Section 7.4 of the Credit Agreement or any other provision in the Credit Agreement or any of the other Financing Agreements, no Credit Party shall sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of Agent and an order of the Bankruptcy Court (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent, or any other Lender Party), except for sales of Credit Parties' Inventory in the ordinary course of its business.

5.5     ERISA.  Credit Parties hereby represent and warrant with, to and in favor of Lender Parties that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of Credit Parties arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "PBGC") or the controlling sponsor of, or a member of the controlled group of, any pension benefit plan of a Credit Party and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of Debtor or any other Credit Party.

5.6     Environmental. Each Credit Party hereby represents and warrants with, to and in favor of Lender Parties that, to the best of its knowledge, (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of such Credit Party arising under any Environmental Law, whether held by the Texas Department of Environmental Protection or any other Person, and (b) no notice of lien has been filed by the Texas Department of Environmental Protection (or any other Person) pursuant to any Environmental Law against any assets or properties of any Credit Party.

5.7     Inventory. Each Credit Party hereby represents and warrants with, to and in favor of Lender Parties as to the accuracy, in all material respects, of post-petition written information, furnished to the Agent in connection with Inventory counts, if any.

5.8     Administrative Claims.  Credit Parties shall pay all Professional Fees and Administrative Claims (as such terms are defined in the Financing Order) and other Administrative Claims as provided in the Budget or as otherwise approved by Agent and the Bankruptcy Court within the respective due dates, to the extent it has funds available to do so.

5.9     Compliance with Laws. Each Credit Party hereby represents and warrants with, to and in favor of Lender Parties that it is in compliance with all applicable Laws except where failure to do so would not reasonably be expected to have a Material Adverse Effect.

5.10    Existing Events of Default. Credit Parties hereby represent and warrant with, to and in favor of Lender Parties that Schedule I sets forth a complete and accurate description of the Existing Events of Default and further provides that it is not in default in the payment of any amounts at any time due on any material indebtedness owed by Credit Parties or in the performance of any other material terms or covenants of any evidence of such indebtedness or of

RATIFICATION AND AMENDMENT AGREEMENT - Page 15
DAL 77,552,678.6

any mortgage, security agreement, indenture, pledge or other agreement relating thereto or securing such indebtedness except as set forth on Schedule I hereto.

6.      REAFFIRMATION OF GUARANTEES.  Each Guarantor hereby (i) consents to this Agreement, (ii) reaffirms all of its payment and performance obligations under, and all other terms and conditions of, its Guaranty and (iii) acknowledges and agrees that its Guaranty remains in full force and effect and is hereby reaffirmed, ratified and confirmed.  Each Guarantor hereby agrees that all references to the "Credit Agreement" and the "Loan Documents" in its Guaranty shall be a reference to the Credit Agreement and Loan Documents, as applicable, as modified by this Agreement, and as the same may from time to time hereafter be amended, modified or restated.  The terms of this Section 6 shall constitute part of each Guaranty and each Guaranty shall be deemed to be hereby amended and modified to include the terms hereof.  Each Guarantor hereby further agrees and acknowledges that (i) neither the execution and delivery of this Agreement by the undersigned, nor Lender Parties' request therefore, shall constitute a course of dealing between Lender Parties and such Guarantor requiring a reaffirmation of guaranty with respect to any other modifications to any Financing Agreement or this Agreement as a condition to the enforceability of its Guaranty, (ii) nothing herein or in this Agreement shall constitute a waiver by any Lender Party of any violation by such Guarantor (whether or not known to the Lender Parties) of such Guarantor's obligations under its Guaranty or any previous reaffirmation agreement with respect thereto, or any right or remedy of Lender Parties with respect thereto, all of which rights and remedies are hereby expressly reserved and (iii) no delay or inaction on the part of any Lender Party to enforce any of its rights or remedies under its Guaranty shall constitute a waiver of, or otherwise diminish or modify, such rights or remedies.

7.      WAIVER OF EXISTING EVENTS OF DEFAULT.  Agent and each other Lender Party each hereby waives the Existing Events of Default during the term of this Agreement, it being understood that upon the occurrence and continuation of any additional or other Event of Default or the expiration or termination of this Agreement, Agent and the other Lender Parties shall have the right to exercise any and all of their rights and remedies with respect to the Existing Events of Default.  No existing defaults or Events of Default and no rights or remedies of Agent or the other Lender Parties have been or are being waived hereby and no changes or modifications to the Financing Agreements have been or are being made or are intended hereby, except for the waivers and amendments expressly set forth herein.  In addition, without limiting the foregoing, the waivers by Agent and the other Lender Parties set forth herein do not constitute an agreement to grant, and Credit Parties acknowledge that Agent and the other Lender Parties may decline to grant, any other or further waivers with respect to the subject matter hereof or any other matters regardless of whether or not there occurs any change in facts or circumstances relating to any Credit Party.

8.      AMENDMENTS

        8.1     Post-Petition Revolving Loans

        (a)     Upon the request of Borrower to the Agent, made at any time and from time to time prior to the Termination Date, subject to the terms and conditions contained herein, in the Credit Agreement and in the other Financing Agreements, each Lender shall make Post-Petition Revolving Loans to Borrower in amounts in excess of the amounts otherwise available to

Borrower under Section 2.1 of the Credit Agreement (as calculated by Agent, and subject to the sublimits and Reserves provided for in this Agreement) so long as (i) such Post-Petition Revolving Loans are in accordance with the Budget, and (ii) the aggregate amount of outstanding Post-Petition Revolving Loans and existing Post-Petition LC Obligations (after giving effect to any such borrowing request) does not exceed the Post-Petition Revolving Loan Commitment. Borrower may borrow, repay and re-borrow Post-Petition Revolving Loans under this Section 8.1 subject to the conditions set forth herein. All Post-Petition Revolving Loans shall be considered "Revolving Loans" under the Credit Agreement and shall be made in accordance with the terms of Section 2.1 of the Credit Agreement.

(b)    Except in Agent's and Lenders' discretion, Borrower shall not have any right to request, and Lenders shall not make, any Post-Petition Revolving Loans in excess of the amounts contained in the Budget up to the Post-Petition Revolving Loan Commitment or at any time after the occurrence and during the continuation of an Event of Default or after the Termination Date. The Post-Petition Revolving Loans shall be secured by all Collateral.

(c)    The Credit Agreement or the other Financing Agreements, all outstanding and unpaid Obligations arising pursuant to the Post-Petition Revolving Loans (including, but not limited to, principal, interest, fees, costs, expenses and other charges in respect thereof payable by Borrower to Lender Parties) shall automatically, without notice or demand, be absolutely and unconditionally due and payable and Borrower shall pay to Agent, for the benefit of Lender Parties, in cash or other immediately available funds all such Obligations on the Termination Date. All amounts received by Agent and Lenders in respect of the Obligations shall be applied as set forth in Section 3.1 of the Credit Agreement, as amended hereby.

8.2    Interest Rate. Interest shall accrue on the outstanding principal balance of all Post-Petition Revolving Loans made pursuant to this Section 8 at a variable rate, adjusted on the first day of each month, equal to the Post-Petition Revolving Loan Interest Rate and shall be due and payable monthly on the first business day of each calendar month beginning with the calendar month immediately succeeding the Post-Petition Closing Date.

8.3    Priority of All Advances and Loans. All Post-Petition Revolving Loans made hereunder by Lenders to Borrower shall constitute and be deemed a cost and expense of administration in the Bankruptcy Case and shall be entitled to priority under Section 364(c)(1), Section 364(c)(2), Section 364(c)(3), and Section 364(d) of the Bankruptcy Code ahead of all other costs and expenses of administration of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code, except as subject and subordinate to the Carve-Out Amount and as may be otherwise provided in the Financing Orders.

8.4    Definitions. The following definitions in Section 1.1 of the Credit Agreement are hereby amended in their entirety to read as follows:

"'Material Adverse Change' means a material and adverse change, other than the filing of the Chapter 11 Case, on (a) the business, assets, operations or financial or other condition of any Restricted Person, (b) Borrower's ability to timely pay the Obligations; or (c) the enforceability of the material terms of any Loan Documents."

"'Eligible Inventory' means, as of any date, collectively, Eligible Lumber Inventory and Eligible Other Inventory as of such date, the aggregate value of all inventory (excluding work in progress and packaging materials, supplies and any advertising costs capitalized into inventory) then owned by and in the possession or under the control of the Borrower or any Guarantor and held for sale or disposition in the ordinary course of its business, in which Agent for the benefit of Lenders has a perfected, first priority lien (subject only to the Carve-Out Amount), valued at the lower of cost or market value and which Agent has determined to be eligible for credit extensions hereunder. Eligible Inventory shall not include (a) inventory that has been shipped or delivered to a customer on consignment, on a sale or return basis or the basis of any similar understanding, (b) inventory with respect to which a claim exists disputing Borrower's or any Guarantor's title to or right to possession of such inventory, (c) inventory that is not in good and saleable condition or does not comply with any applicable laws, rules or regulations or the standards imposed by any governmental authority with respect to its transportation, storage, labeling, use or sale, (d) inventory that constitutes inventory-in-transit; provided that the aggregate value of inventory excluded from Eligible Inventory as a result of this subparagraph (d) shall not exceed $500,000, and (e) inventory that Agent, in its sole discretion, has determined to be unmarketable. 'Eligible Lumber Inventory' means all inventory described above which is comprised of materials that are of a type that historically have been characterized by the Borrower and Guarantors as "lumber inventory", and 'Eligible Other Inventory' means all other inventory of Borrower and the Guarantors."

"'Eligible Receivables' means, at any time, an amount equal to the aggregate net invoice or ledger amount owing on all trade accounts receivable of Borrower and each Guarantor for goods sold or leased or (as approved by Agent) services rendered in the ordinary course of business, in which Agent for the benefit of Lenders has a perfected, first priority lien (subject only to the Carve-Out Amount), after deducting (without duplication): (i) each such Account that is unpaid ninety (90) days or more after the past due date thereof, (ii) the amount of all discounts, allowances, rebates, credits and adjustments to such Accounts, (iii) the amount of all contra accounts, setoffs, defenses or counterclaims asserted by or available to the account debtors, (iv) all Accounts with respect to which goods are placed on consignment or subject to a guaranteed sale, bill and hold sale, sale-or-return, sale-on-approval or other similar terms by reason of which payment by the account debtor may be conditional or which is subject to repurchase, return, rejection, repossession, loss or damage, (v) the amount billed for or representing retainage, if any, until all prerequisites to the immediate payment of retainage have been satisfied, (vi) all Accounts owing by account debtors that are not solvent or for which there has been instituted a proceeding in bankruptcy or reorganization under the United States Bankruptcy Code or other law, whether state or federal, now or hereafter existing for relief of debtors, (vii) all Accounts owing by any affiliates or employees of Borrower or any Guarantor, (viii) all Accounts in which the account debtor is the United States or any department, agency or instrumentality of the United States, except to the extent an acknowledgement of assignment to Agent of such Account in compliance with the Federal Assignment of Claims Act and other applicable laws has been executed by Borrower or such Guarantor, as the case may be, in favor of Agent for the benefit of Lenders, (ix) all Accounts due Borrower or any Guarantor by any account debtor whose principal place of business is located outside the United States of America and its territories or any account debtor that is a Sanctioned Person (as defined in the current Loan Agreement), (x) all Accounts subject to any provision prohibiting assignment or requiring notice of or consent to such assignment, (xi) if more than twenty percent (20%) of the then

balance owing by any single account debtor does not qualify as an Eligible Receivable under any other provisions of this definition, pursuant to clause (i) above, then the aggregate amount of all Accounts owing by such account debtor shall be excluded from Eligible Receivables, (xii) Accounts as to which the goods giving rise to the Account have not been delivered to and accepted by the account debtor or the service giving rise to the Account has not been completely performed or which do not represent a final sale, (xiii) Accounts evidenced by a note or other instrument or chattel paper or reduced to judgment, (xiv) Accounts for which the total of all Accounts from an account debtor (together with the affiliates of the account debtor) exceed fifteen percent (15%) of the total Accounts of Borrower and the Guarantors (to the extent of such excess), (xv) Accounts which, by contract, subrogation, mechanics' lien laws or otherwise, are subject to claims by Borrower's or any Guarantor's creditors or other third parties or which are owed by account debtors as to whom any creditor of Borrower or any Guarantor (including any bonding company) has filed an affidavit of lien or has exercised retainage rights or has otherwise exercised its collateral rights, (xvi) any and all other Accounts the validity, collectability, or amount of which is determined in good faith by Borrower, any Guarantor or Agent to be doubtful, (xvii) Accounts owed by an account debtor to Borrower or any Guarantor which is located in a jurisdiction where Borrower or such Guarantor, as the case may be, is required to qualify to transact business or to file reports, unless Borrower or such Guarantor, as the case may be, has so qualified or filed, (xviii) Accounts owed by an account debtor who disputes the liability therefore (to the extent of such dispute), and (xix) any other Account which Agent otherwise in its sole and absolute discretion deems to be ineligible."

"'LIBOR Market Index Rate' means the rate of interest (rounded upwards, if necessary, to the nearest 1/100th of 1%) for one month U.S. Dollar deposits as reported on Reuters Screen LIBOR01 (or any successor page) as of 11:00 a.m., London time, on such day, or if such day is not a London business day, then the immediately preceding London business day as determined by Agent (or if not so reported, then as determined by Agent from another recognized source of interbank quotation)."

"'Eligible Transferee' means a Person which either (a) is a Lender or an Affiliate of a Lender, or (b) is consented to as an Eligible Transferee by Agent and, so long as no Default or Event of Default is continuing, by Borrower, which consents in each case will not be unreasonably withheld; provided, however, that in no event will a Person that is a "vulture fund" or is regularly a purchaser of "distressed debt" be deemed an Eligible Transferee under clause (b) hereof.

8.5    Letter of Credit Accommodations.   Subject to the terms and conditions hereof, Borrower may from time to time prior to the Termination Date request LC Issuer to issue one or more Post-Petition Letters of Credit, provided that, after taking such Post-Petition Letter of Credit into account:

(a)    The aggregate amount of outstanding Post-Petition Revolving Loans and existing Post-Petition LC Obligations at such time does not exceed the Post-Petition Revolving Loan Commitment at such time;

(b)    the aggregate amount of Post-Petition LC Obligations at such time does not exceed $2,000,000.00;

(c)     the expiration date of such Post-Petition Letter of Credit is prior to the Termination Date;

(d)     such Post-Petition Letter of Credit is to be used for general corporate purposes of Borrower;

(e)     such Post-Petition Letter of Credit is not directly or indirectly used to assure payment of or otherwise support any Indebtedness of any Person other than Indebtedness of any Restricted Person;

(f)     the issuance of such Post-Petition Letter of Credit will be in compliance with all applicable governmental restrictions, policies, and guidelines and will not subject LC Issuer to any cost which is not reimbursable under Article III of the Credit Agreement;

(g)     the form and terms of such Post-Petition Letter of Credit are acceptable to LC Issuer in its sole and absolute discretion; and

(h)     all other conditions in the Credit Agreement to the issuance of Letters of Credit have been satisfied.

LC Issuer will honor any such request if the foregoing conditions (a) through (h) (for all purposes herein and in the Credit Agreement called the "LC Conditions") have been met as of the date of issuance of such Post-Petition Letter of Credit. LC Issuer may choose to honor any such request for any other Post-Petition Letter of Credit if the LC Conditions are not met but has no obligation to do so and may refuse to issue any other requested Post-Petition Letter of Credit for which the LC Conditions are not met. Borrower shall request Post-Petition Letters of Credit in accordance with the provisions of Section 2.11 of the Credit Agreement. All Post-Petition Letters of Credit shall be considered "Letters of Credit" under the Credit Agreement and shall be governed by the terms of Sections 2.11 through 2.15 of the Credit Agreement, as such sections are amended hereby.

8.6     Post-Petition Fees. Section 2.6 of the Credit Agreement shall be amended by adding the following new subsection (e) at the end thereof:

> "(f) Post-Petition Revolving Loans Facility Fee. The Borrower agrees to pay to Agent, for the account of each Lender, a facility fee equal to three-quarters of one percent (0.75%) per annum times the daily unused portion of such Lender's Post-Petition Revolving Loan Commitment from the Post-Petition Closing Date to and including the date on which all Post-Petition Revolving Loans and other Obligations are paid in full, payable on the first day of each calendar month, in arrears, and on the Termination Date."

8.7     Payments. Section 3.1 of the Credit Agreement is hereby amended as follows:

(a)     by deleting subsections (a) through (d) and replacing them with new subsections (a) through (e), to read as follows:

"(a)    first, to pay any fees, indemnities or expense reimbursements then due to Agent, LC Issuer or Lenders from any Restricted Person;

(b)    second, to pay interest due in respect of any Loans or LC Obligations;

(c)    third, to pay principal due in respect of the Loans and to pay Obligations then due arising under or pursuant to any Hedge Agreements of any Restricted Person with a Bank Product Provider, on a pro rata basis;

(d)    fourth, to pay or prepay any other Obligations whether or not then due, in such order and manner as Agent determines and at any time an Event of Default exists or has occurred and is continuing, to provide cash collateral for any LC Obligations or other contingent Obligations (but not including for this purpose any Obligations arising under or pursuant to any Bank Products); and

(e)    fifth, to pay or prepay any Obligations arising under or pursuant to any Bank Products (other than to the extent provided for above) on a pro rata basis."

; and

(b)    by adding the following sentence at the end of Section 3.1:

"Without limiting the generality of the foregoing, Lenders shall apply any such payments and proceeds received from Pre-Petition Collateral first to the Pre-Petition Obligations until such Pre-Petition Obligations are paid and satisfied in full."

8.8    Representations and Warranties.    Sections 5.1, 5.4 and 5.6 through 5.18 are hereby deleted in their entirety and replaced with the following:

"[Reserved]."

8.9    Reporting Requirements.

Section 6.2 of the Credit Agreement is hereby amended by:

(a)    inserting the following language at the end of Section 6.2(a):

"provided, however, that Borrower shall not be required to obtain an audit opinion for the Fiscal Year ending April 30, 2009"

(b)    amending Section 6.2(c) to read as follows:

"(c)    upon each request for an advance and, in addition thereto, daily delivery, on or before 11:00 a.m., Prevailing Central Time, on each business day, of the Borrowing Base report and

Compliance Certificate, together with a daily summary of aging of Eligible Receivables as of the end of the immediately preceding business day and a daily report of inventory of Borrower and Guarantors, by category and location, each in form and substance reasonably acceptable to Agent."

and

(c)     deleting the "." at the end of Section 6.2(f) and replacing it with ";" and adding the following subsections 6.2(g) through (n) immediately following Section 6.2(f) as follows:

"(g)  No later than 11:00 a.m., Prevailing Central Time, on the second business day of each week, (1) a detailed aging of Eligible Accounts as of the last day of the preceding calendar week and (2) a reconciliation to the previous calendar week's aging of Eligible Accounts and to Borrower's general ledger;

(h)  No later than 11:00 a.m., Prevailing Central Time on the second business day of each week, a certified comparison of the corresponding figures for the corresponding periods in the most recent Budget and a report as to the actual performance of the prior week ending Friday and of the cumulative rolling four (4) week period ending on the Friday of the prior week, in form and substance reasonably satisfactory to Agent;

(i)  No later than 11:00 a.m., Prevailing Central Time, on the second business day of each week, an updated, "rolling" 13-week Budget (or, for the first four weeks following the Petition Date, an updated "rolling" 5-week Budget) which sets forth by line item updated projected receipts and disbursements for the Borrower and the other Restricted Persons during the period commencing from the end of the previous week through and including thirteen weeks (or 5 weeks, if applicable) thereafter; provided that the Borrower and Restricted Persons shall still be subject to and governed by the terms of the immediately preceding Budget approved by Agent and then in effect and the Agent, LC Issuer and Lenders shall have no obligation to fund to such updated budget or permit the use of cash with respect thereto until such time as Agent notifies Borrower that such updated budget has been approved;

(j)  Promptly (and in any event within two business (2) days) after filing thereof, copies of any pleadings, motions, applications, financial information and other papers and documents filed by the Borrower and/or any other Restricted Person in the Chapter 11 Case, which papers and documents would not otherwise be served on the Agent or Lenders (including counsel to Agent and Lenders) pursuant to the Bankruptcy Court's appropriate procedures;

(k)   Promptly after sending thereof, copies of all written reports given by the Borrower or any other Restricted Person to any official or unofficial creditors' committee in the Chapter 11 Case; and

(l)   From time to time, with reasonable promptness, any and all receivables schedules, inventory reports, collection reports, deposit records, copies of invoices to account debtors, shipment documents and delivery receipts for goods sold, and such other material, reports, records or information as the Agent may request."

8.10   Field Examinations. Section 6.3 of the Credit Agreement is hereby amended in its entirety to read as follows:

"Section 6.3   Other   Information   and   Inspections. Borrower will furnish to each Lender Party any information which such Lender Party may from time to time request in writing concerning any covenant, provision or condition of the Loan Documents, any collateral or any matter in connection with the businesses and operations of each Restricted Person.   Each Restricted Person will permit representatives appointed by Agent (including independent accountants, auditors, agents, attorneys, appraisers, examiners and any other Persons) to, inspect and examine, at such times and in such manner as may be required by Agent during normal business hours, any of its property, including its books of account, other books and records, and any facilities or other business assets, and to make extra copies therefrom and photocopies and photographs thereof, and to write down and record any information such representatives obtain, and will permit Agent or its representatives to investigate and verify the accuracy of the information furnished to Agent and Lenders in connection with the Loan Documents and to discuss all such matters with its officers, employees and representatives.   In addition, twice per Fiscal Year, upon Agent's request, Borrower shall provide Agent with an inventory appraisal, performed by an appraisal firm satisfactory to Agent and in form and containing assumptions and appraisal methods satisfactory to Agent.   So long as no Event of Default has occurred and is continuing, the Borrower shall not be required to pay for more than a total of three (3) field audits and/or inventory appraisals prior to the Termination Date; provided, however, the Borrower shall be required to pay for all such field audits and inventory appraisals conducted during the continuance of an Event of Default.   The cost of field examinations shall not exceed $1,000 per examination per day plus out-of-pocket expenses."

8.11    Payment of Taxes. Section 6.7 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

> "Section 6.7. Payment of Taxes. Each Restricted Person will timely pay all taxes, assessments, and other governmental charges or levies imposed upon it or upon its income, profits or property and maintain appropriate accruals for any of the foregoing in accordance with GAAP; provided, however, no Restricted Person shall be required to pay any taxes, assessments or other charges or levies the nonpayment of which is permitted by, or stayed by, the Bankruptcy Code.  Borrower and any other Restricted Person may, however, delay paying or discharging any of the foregoing so long as it is in good faith contesting the validity thereof by appropriate proceedings and has set aside on its books adequate reserves therefor."

8.12    Financial Covenants. Section 7.10 of the Credit Agreement is hereby deleted in its entirety and replaced with:

> "Section 7.10 [Reserved]".

8.13    Events of Default. Section 8.1 of the Credit Agreement is hereby amended as follows:

(a)    Section 8.1(a) of the Loan Agreement is deleted in its entirety and replaced with the following:

> "(a) Any Restricted Person fails to pay when due any of the Obligations or fails to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Financing Agreements;"

(b)    Sections 8.1(b), 8.1(k)(ii) and 8.1(o) of the Credit Agreement are deleted in their entirety and replaced with the following:

> " [Reserved]."

(c)    the following language shall be added to the beginning of each of Sections 8.1(c), 8.1(g) and 8.1(h):

> "Except for defaults and Events of Default occasioned by the filing of the Chapter 11 Case and defaults and Events of Default resulting from obligations with respect to which the Bankruptcy Code prohibits any Restricted Person from complying or permits any Restricted Person not to comply,"

(d)     Sections 8.1(k)(i) and 8.1(k)(iii) of the Credit Agreement are hereby amended to add at the end of each of such Section the following: "provided, that, the foregoing shall not apply to Borrower and Guarantors in the Chapter 11 Case."

(e)     Section 8.1 of the Credit Agreement is hereby amended by adding new Sections 8.1(p) through 8.1(bb) immediately after 8.1(o) as follows:

"8.1(p) the occurrence of any condition or event that permits Agent or any other Lender Party to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default", as such term is defined in the Financing Order; or

(q) the termination or non-renewal of the Loan Documents or other Financing Agreements as provided for in the Financing Order as the result of the objection of any third party being sustained; or

(r) any Restricted Person suspends or discontinues or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business (other than cessation of the AllPan truss operations) or if a trustee, receiver or custodian is appointed for any Restricted Person or any of its properties; or

(s) any act, condition or event occurring after the date of the commencement of the Chapter 11 Case that has a material adverse effect upon the assets of any Restricted Person or the Collateral or the rights and remedies of Agent or any other Lender Party under this Agreement, any other Loan Documents or any other Financing Agreements; or

(t) entry by the Bankruptcy Court of an order converting the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code; or

(u) entry by the Bankruptcy Court of an order dismissing the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily; or

(v) except as specifically authorized by Agent and Majority Lenders in writing, the grant of a lien on or other interest in any Restricted Person's property (other than a lien or encumbrance permitted by Section 4 hereof or by the Financing Order or the proceeds of which are to be immediately applied upon closing to pay the Obligations in full in cash) or an administrative expense claim (other than any such administrative expense claim permitted by the Financing Order) that is superior to or ranks in

RATIFICATION AND AMENDMENT AGREEMENT - Page 25
*DAL 77,552,678.6*